G9JVROD1

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
    UNITED STATES OF AMERICA
3
            v.                      15 CR 756 (PAC)
4
    MICHAEL EARL RODRIGUEZ,
5
                Defendant.       JURY TRIAL
6  ------------------------------x
7                              New York, N.Y.
                              September 19 2016
8                              2:15 p.m.
9
10  Before:
11                      HON. PAUL A. CROTTY,
                                District Judge
12
                        APPEARANCES
13
    PREET BHARARA
14       United States Attorney for the
        Southern District of New York
15  AMANDA L. HOULE
    JORDAN L. ESTES
16  TIMOTHY T. HOWARD
       Assistant United States Attorneys
17
    GOLDSTEIN & HANDWERKER LLP
18      Attorney for Defendant Rodriguez
    MICHAEL HANDWERKER
19
    -Also Present-
20  RICHARD DEMURJIAN, Special Agent (DEA)
21  SYLVIA LEE, Paralegal (SDNY USAO)
    YOLANDA BUSTILLO, Paralegal (SDNY USAO)
22
23
24
25

G9JVROD1

1                    A F T E R N O O N   S E S S I O N

2                              2:15 P.M.

3              (A jury of 12 and 2 alternates was impanelled and

4       sworn)

5              THE COURT:  The jury is here, so we'll call in the

6       jury and start with the openings.

7              Marlon.

8              (Jury present)

9              THE COURT:  As I told you before the luncheon break,

10      I'm now going to give you initial instructions about this case

11      and how it's going to be conducted and about your duties as

12      jurors.  After all the evidence is in and the lawyers have

13      summed up, I will give you final instructions; then you can

14      begin your deliberations.  I may also give you instructions

15      during the trial; but unless I specifically tell you otherwise,

16      all such instructions, those I give you now and those I give

17      you later, are equally binding on you and must be followed.

18             Your duty is to find from the evidence what the facts

19      are.  You, and you alone, are the judges of those facts.  And

20      then you apply the law as I give it to you to the facts as you

21      find them in reaching your verdict.  You have to follow the

22      law, whether or not you agree with it.

23             Please remember that nothing I may say or do during

24      the course of the trial is intended to indicate to you or

25      should be taken by you to be indicating what your verdict

G9JVROD1

should be.  Your verdict will be strictly up to you.

I've already told you about the charges alleged in this case.  The defendant, Michael Rodriguez, is charged with the commission of two federal crimes under the indictment, and was appropriately indicted on each charge by a grand jury sitting in this district.

Here's what the indictment charges:

Count One.  In or about August of 2015, Mr. Rodriguez conspired with others to distribute marijuana and possess marijuana with the intent to distribute it.

Count Two charges that on or about August 21st of 2015, Mr. Rodriguez carried or possessed a firearm during and in relation to the crime charged in Count One.

Mr. Rodriguez denies these allegations.  The government must prove these charges in the indictment beyond a reasonable doubt.

The evidence from which you are going to find the facts will consist of the testimony of witnesses who are going to be sitting right there in the witness chair, documents, and other things that will be received in evidence, and occasionally facts that the parties may stipulate to, we call them stipulations.

Certain things are not in evidence and you should not consider them.  I'm going to list them for you.

First of all, the attorneys' arguments are not

G9JVROD1

evidence.  The attorneys are not sworn as witnesses and they do
not testify under oath.  The attorneys' statements and
questions are not evidence either.  Let me emphasize this
again.  It is not the questions that the lawyers ask; what is
important is the witness's answer to the question.

Secondly, objections to questions are not evidence.
It is the duty of the attorney for each side of a case to
object when the other side offers testimony or other evidence
that the attorney believes is not properly admissible.  Don't
be influenced by the objection or by my ruling on it.  If the
objection is sustained, you'll hear me say "sustained."  Then
you should ignore the question.  If I overrule the objection,
then you should treat the answer just like any other answer.
My job is to rule on what evidence comes in at trial, but I
have no view on what your verdict should be, because that is
strictly up to you, the jury, to decide.

If I instruct you that some items of evidence are
being received for limited purposes only, you must follow that
instruction, as you must follow all of my instructions.  You
don't have to worry about this right now.  There may not be
limiting instructions in this case; but if there is, I will
explain it to you at the time and give you instructions as
clearly as I possibly can on what the limitations are.  I might
tell you that I'm excluding testimony or tell you to disregard
testimony.  When I do that, it means you have to follow my

G9JVROD1

1    instructions, and ignore the testimony, as it is not in

2    evidence.

3           In addition, anything you may have seen or heard

4    outside this courtroom is not evidence and should be

5    disregarded.  You are to decide this case solely on the

6    admissible evidence that is presented here in the courtroom.

7           Now, there are two kinds of evidence that I want to

8    review with you:  Direct evidence and circumstantial evidence.

9           Direct evidence is direct proof of a fact.  An example

10   of that would be the testimony of an eyewitness, somebody who

11   actually saw the events as they occurred.

12          Circumstantial evidence is proof of a fact or facts

13   from which you may infer or conclude that some other fact or

14   facts exist.

15          Obviously I'm going to give you further instructions

16   on this in more detail, but just keep in mind that you can

17   consider both kinds of evidence, direct and circumstantial.

18          Probably the most important task for every jury is to

19   determine the credibility of the witnesses.  You decide which

20   witnesses to believe, which witnesses not to believe, how much

21   of any witness's testimony to accept or reject.  Again, in my

22   instructions to you at the end of the trial I will give you

23   some guidelines which I hope will be helpful to you in

24   determining witness credibility.

25          Remember what we discussed earlier:  Law enforcement

G9JVROD1

1    witnesses' testimony gets no greater or lesser weight because

2    they are law enforcement status.  Everybody is treated the

3    same; nobody has a preference in terms of credibility.

4            This is a criminal case.  You have to remember that

5    there are three basic rules about the criminal law which you

6    have to keep in mind:  First, the defendant is presumed,

7    innocent; second, the government has the burden of proof; and

8    third, the government must prove its case beyond a reasonable

9    doubt.

10           Let me go through each of these now.

11           First, as I mentioned earlier, the defendant is

12   presumed innocent until proven guilty.  The indictment against

13   the defendant brought by the government is only an accusation

14   and nothing more.  It is not proof of guilt or anything else.

15   The defendant therefore starts out with an absolutely clean

16   slate.

17           Second, the burden of proof is on the government.  The

18   defendant has no burden to prove their innocence, and -- excuse

19   me, to prove his innocence, and to present any evidence, to

20   testify.  Since he has the right to remain silent, the law

21   prohibits you from arriving at your verdict by considering that

22   the defendant may not have testified.

23           Third, the government must prove the defendant's guilt

24   beyond a reasonable doubt.  Again, I will give you further

25   detailed instructions on this point later; but bear in mind

G9JVROD1

that in this respect a criminal case is different from a civil

case.  The criminal standard is proof beyond a reasonable

doubt.

          Now, just a few final words about your own conduct as

jurors.

          First of all, do not discuss the case with anyone or

permit anyone to discuss it with you.  Most of us today use

computers.  My instructions to not discuss the case includes

discussing the case in person, in writing, by phone or

electronic means via text messaging, email, Facebook, Twitter,

blogging, or any other form of social media.  This even

includes discussing the case with your fellow jurors in the

jury room while the trial is going on.  You can not deliberate

on your verdict until after you are charged by me, and that

takes place at the end of the trial.  Until then, you simply

cannot talk about this case.

          You can talk to each other about almost anything that

you'd like, but don't talk about the case.  This probably seems

strange to you.  Here's the reason:  The evidence can only be

presented one witness at a time and one exhibit at a time.  We

don't want to start talking to each other and reaching

conclusions before you have an opportunity to see and hear all

the evidence in the case and hear the instructions on the law.

So that is why we direct you to begin your deliberations at the

end and, until that time, not to have any discussions about

G9JVROD1

this case.

        Think of the case like a painting, where you cannot tell from one stroke or one color what the painting will look like.  You have to wait until it's finished to make a judgment, and that's what we ask you to do.

        If at any time during the course of the trial any person attempts to talk to you or communicate with you about the case, either inside or outside the courtroom, courthouse, you should immediately report such attempt to me.  Don't bring it to the attention of other jurors; just send me a note directly.

        Also, the lawyers and other participants at counsel table have been instructed not to have any communication with you as jurors.  That's the rule.  Don't say hello or even wave. That goes for you, the lawyers, and the witnesses.  In this courthouse, because it's kind of close and confining, you may see people in the elevators.  So if you run into one another, don't acknowledge them or expect them to acknowledge you.  They are under instructions not to have any communication with you and they are going to observe the rule.

        Don't read or listen to anything touching upon the case; don't try to do any research on your own or conduct your own investigation.  This means, for example, you should not consult a dictionary, search the Internet, website, or blogs, or use any electronic tools to obtain information.  Don't visit

G9JVROD1

any of the sites mentioned in the testimony.  If you see

something about this case in the newspaper, don't read the

article.  Avoid watching television discussions about this case

or issues involved in the case.  Your sworn duty is to decide

this case solely and wholly upon the evidence presented in this

courtroom.

Now, if you wish to take notes, you are permitted to

do so.  So for some of us that helps us focus on the testimony

being given.  But you should not try to summarize the

testimony.  We have excellent court reporters here who take

down everything that's said throughout the trial.  Your job is

to listen to the testimony and assess the credibility of

witnesses.  If you do take notes, do not let it distract you

from the task.

Moreover, your notes are for your private use only as

a way to help you recall the testimony when you begin your

deliberations.  Your notes are not entitled to any greater

weight than any recollection of the juror who did not take

notes.  Finally, you may not take your notes away from the

court.  Leave them in the jury room at the end of each day and

at the end of the trial.

Let me tell you again how important your service is

and how much we appreciate it.  During the trial, all of us

have to be here before any work can be done.  That includes the

attorneys, the witnesses, the court reporter, me, and you, the

G9JVROD1

1    jury.  If one person is missing, nothing can start.  That's why

2    this makes it a little bit different than work.  This is not a

3    situation where you can simply call in sick.  There are, of

4    course, extraordinary circumstances that may excuse you from

5    serving, but in all other circumstances, we need you to be here

6    every day and on time.  I understand that this may impose a

7    burden, but, as I have said, this is an important service and

8    one that is greatly appreciated.

9         As I've told you, the trial will last less than a

10   week.  I start my trial days at 9:30.  Before that, we open the

11   jury room at 9 a.m. and provide you with a light breakfast.  We

12   also provide you with an afternoon snack when we take our

13   afternoon break.  We cannot provide you with lunch for the

14   trial.  Each day, the morning session will go from 9:30 in the

15   morning until 12:45.  We'll then take a one-hour-and-15-minute

16   break.  We resume at 2 o'clock; we go until 4:30.  We'll break,

17   have a morning break and an afternoon break, 15 minutes.  We

18   may start a little bit earlier on Friday, if we go that long,

19   and end earlier as well.

20        Here's how we're going to proceed:  The government

21   will make its opening statement, which is an outline of that

22   which they hope to prove and to help you understand the

23   evidence as it comes in.

24        Mr. Handwerker has decided to make an opening.  He

25   doesn't have to do so, but he wants to, so he's allowed to do

G9JVROD1

1   it.  Please remember as you listen to the opening statements by
2   the lawyers that the statements are not evidence.
3          Then the government will start presenting its
4   witnesses, and the defense may cross-examine those witnesses.
5          Following the government's case, the defendant may, if
6   he wishes, present witnesses, but he does not have to do so.
7          After all the evidence is in, each side will have an
8   opportunity again to get up and present their closing arguments
9   to you.  These arguments they will summarize and interpret the
10  evidence for you.  And then, of course, I will instruct you on
11  the law.  After that is completed, you retire to begin your
12  verdict.
13         Now for some housekeeping matters.
14         The court reporters are Martha Martin, sitting here.
15  She's helped and assisted by Alena Lynch.  You may see the
16  court reporters walking back and forth as they relieve one
17  another.
18         You've already met Mr. Ovalles, my courtroom deputy,
19  who takes care of making arrangements for you.
20         I am assisted by my two law clerks, Michael Schwartz,
21  who's sittings here and, Laena Keyashian, who is sitting -- I
22  can't see from behind the screen, but against the wall.
23         So that's the outline.
24         Who's going to open for the government, Ms. Houle?
25         MS. HOULE:  Yes, your Honor.

G9JVROD1                          Opening – Ms. Houle

1          THE COURT:  All right.  You may proceed.

2          MS. HOULE:  Thank you.

3          Ladies and gentlemen, this is a case about a man who

4    ran an illegal business, growing and selling marijuana, and who

5    had a gun with his drugs.  The man who ran that business and

6    who had that gun is this man, the defendant, Michael Rodriguez.

7          You're going to hear about the defendant's drug

8    business and about his gun through the defendant's own words.

9    You'll hear that the defendant told the government that he was

10   a drug dealer who sold high-end marijuana to select clients,

11   and he described a friend who he sold marijuana with.  The

12   defendant said that that friend who he sold marijuana with sold

13   the defendant a gun.  And the defendant kept that gun in an

14   apartment where he also kept marijuana.  The defendant

15   described the day where he carried the gun and the marijuana

16   together in a bag and was caught by law enforcement.  You'll

17   hear the defendant say the same thing in phone calls and you'll

18   see that he wrote the same thing in email.

19         What the defendant admitted to the government and what

20   he said to others in those calls and that email is just what

21   he's charged with in this case:  Agreeing with others to

22   possess and distribute marijuana and possessing a gun in

23   connection with his drug trafficking crime.

24         This is a straightforward case.  But the government is

25   not going to rely only on the defendant's statements in

presenting our case to you.  By the end of this trial, you will
have seen photos and documents and you will have heard
testimony showing the defendant's marijuana operation, the
operation he worked with others to maintain, and the one that
he needed that gun to protect.

First, you'll hear about where the defendant's
high-end marijuana was grown, an apartment in a residential
building in Manhattan; you'll hear testimony from law
enforcement who executed a search warrant at that apartment;
you'll hear that they found a full-scale marijuana grow
operation.  That apartment was set up exclusively for growing
marijuana.  You will see the pictures to prove that.

Where there should have been furniture in that
apartment, there were platforms for marijuana plants; where
there should have been a stove in that apartment, there was a
gas line linked by rubber tubes to carbon dioxide generators;
where there should have been windows, they were boarded up with
plywood nailed to the wall; where there should have been food
in a kitchen cabinet, there were chemicals and supplies for
packaging drugs; and where there should have been lights, there
were LED grow lamps, all of this in a Manhattan residential
building where families and unsuspecting residents live.

You'll see all of the ways that the trail from that
grow-house apartment leads directly to the defendant.  You'll
see documents from a management company for the apartment

G9JVROD1                    Opening – Ms. Houle

1    building where that grow-house was found.  You'll see in those

2    records that at one point in time, the defendant's own name was

3    on that apartment.  You'll hear testimony and you'll see

4    documents that show that even when the defendant's name was

5    taken off of that apartment, he continued to pay its rent.

6    You'll see location data from the defendant's cell phone that

7    shows that he was regularly in the area of that grow-house

8    apartment.  You'll hear that two of the defendant's close

9    associates were found at that apartment, one inside, and one

10   approaching as law enforcement was there.  Finally, you'll hear

11   from a witness who works in that apartment building who we

12   expect will tell you just what the cell phone data shows:  That

13   the defendant was regularly in the area of that grow-house

14   apartment.

15         Further connecting the defendant to that apartment and

16   to this marijuana business is a storage unit in the Bronx.

17   Whose name is on that storage unit?  Michael Rodriguez, the

18   defendant.  What did law enforcement find when they executed a

19   search warrant at that storage unit?  Supplies for a marijuana

20   grow-house.  You'll see pictures of this and you'll hear

21   testimony about what was found.  You'll see pictures of carbon

22   dioxide generators, grow lamps, other grow-house supplies, just

23   like the supplies found in the defendant's marijuana

24   grow-house, they were found in the defendant's storage unit.

25         Not surprisingly, you'll hear that those two

G9JVROD1                         Opening – Ms. Houle

1   associates who were found at the defendant's marijuana

2   grow-house were also connected to his storage unit.  You'll see

3   a photo of one of them showing up after the defendant was

4   arrested in this case to pay for the storage unit.  You'll see

5   documents and you'll hear testimony that the other associate

6   tried to empty out the storage unit after the defendant was

7   arrested in this case; not surprising, given what law

8   enforcement found there.

9           Again, ladies and gentlemen, this is a straightforward

10  case.  You have a marijuana grow-house where the defendant was

11  frequently, for which he paid rent and where his two close

12  associates were found; you have a storage unit in the

13  defendant's name where supplies for a marijuana grow-house were

14  found; and you have the defendant's own statements again and

15  again that he was a drug dealer who sold high-end marijuana and

16  that he possessed a gun after buying it from another drug

17  dealer.

18          Now, at the end of this trial, after all the evidence

19  has come in, the government will have another opportunity to

20  speak to you and to tell you how all of that evidence fits

21  together to show that the defendant is guilty of agreeing with

22  others to possess and distribute marijuana and possessing a gun

23  in connection with his drug trafficking crime.  Until then, we

24  ask that you do three things:

25          First, pay close attention to the evidence as it comes

G9JVROD1                    Opening – Mr. Handwerker

1   in.  Second, follow Judge Crotty's instructions on the law.

2   And third, use your common sense, the same common sense that

3   you use every day in your lives as New Yorkers.  If you do

4   these three things, the defendant will have a fair trial, the

5   government will have a fair trial, and you will reach the only

6   verdict consistent with the evidence in this case:  That the

7   defendant, Michael Rodriguez, is guilty as charged.

8            THE COURT:  Thank you, Ms. Houle.

9            Mr. Handwerker.

10           MR. HANDWERKER:  Thank you, Judge.

11           Good morning, ladies and gentlemen -- good afternoon.

12   Thank you for your patience this morning.  I'm not going to be

13   very long, my opening statement.

14           I represent Michael Rodriguez.  Michael Rodriguez

15   comes here and says, I am not guilty.  Bring forth your

16   evidence.  And bring forth your evidence by way of reliable,

17   competent, credible, and trustworthy evidence.

18           What Ms. Houle just did is give a preview of what she

19   hopes to prove.  She gave you the government's theory of the

20   case.  They have to connect the evidence -- or lack of

21   evidence -- to the man who's charged, Mr. Rodriguez; the man

22   who is saying to you, through me, I am not guilty what they are

23   charging me with.

24           There's a gun allegation in this case; there's an

25   allegation he possessed a gun.  I say to you now, I submit to

G9JVROD1                         Opening - Mr. Handwerker

1   you, there is not a scintilla of evidence in this case, in all

2   of this testimony, these carts, nine lawyers, the whole ball of

3   wax, that can connect the weapon in this case that is found to

4   any drug trafficking crime.  Wait till the evidence comes, wait

5   till his Honor gives you the law.  You are the judges of the

6   facts.  You'll have an opportunity to send questions to the

7   judge if there's evidence you don't understand, if there's

8   testimony that's not clear.

9            Ladies and gentlemen, I just would like to read to you

10  for a second from the indictment in this case, which, by the

11  way, the judge has told you is evidence of absolutely nothing;

12  it's an allegation.  But just listen to these words for a

13  second:

14           First of all, on or about August 21st, 2015, ladies

15  and gentlemen, they are going to be limited to a time frame in

16  this case.  If something happened years ago, it's not evidence

17  of wrongdoing in this case.  Pay attention to the time period

18  that's alleged in this case.  The accused, Michael Rodriguez,

19  during and in relation to a drug trafficking crime for which he

20  may be prosecuted in a court of law, namely, the district

21  court, which is where we are, that he possessed with intent to

22  distribute marijuana, and knowingly used and carry a firearm in

23  furtherance of such crime, and did possess a firearm and did

24  aid and abet the use of carrying a firearm.

25           Ladies and gentlemen, wait till you hear the law from

G9JVROD1                    Opening - Mr. Handwerker

1   the Court.  It's not enough for them to hear Michael

2   Rodriguez's words; you need evidence.  You need to make an

3   important decision in this case.  You have to base your

4   decision on evidence or lack of evidence, proof or failure to

5   prove.  I submit to you that the government will not do that.

6         We don't have any burden of proof.  I don't have to

7   open, I don't have to close, I don't have to call witnesses, I

8   don't have to cross-examine witnesses.  I'm opening.  I will be

9   closing.  I will cross witnesses, cross-examine witnesses, if I

10  think it's pertinent, competent, relevant.  If a witness takes

11  the stand and shows you and takes pictures, if my client is not

12  there, they have to connect him to it.  Either they connect or

13  fail to connect.

14        The judge has told you you have to keep an open mind.

15  Right now if you had to render a verdict, if you were asked to

16  render a verdict, it must be what?  Not guilty, because you've

17  heard no evidence from the witness stand.

18        She's a competent lawyer; I'd like to think I'm a

19  competent lawyer; and we are arguing to you what we hope to

20  prove or what they can or cannot prove.  I want you to keep an

21  open mind; I want you to use common sense.  No one is avoiding

22  anything in this case.  It may be simple, we may not be here

23  very long, but I'd ask you to keep an open mind and give

24  Mr. Rodriguez and the government a fair trial.

25        Pay careful attention to the phone conversations

G9JVROD1                          Walters – direct

1    you'll be hearing, the text messages that are exchanged, the

2    statements they allege Mr. Rodriguez makes, the seizure of

3    evidence, and the surveillance in this case.

4            Ladies and gentlemen, when you reach a verdict in this

5    case, based upon their case, their evidence, there's only one

6    verdict you'll reach, and that's not guilty.

7            Thank you very much.

8            THE COURT:  Thank you, Mr. Handwerker.

9            The government will call its first witness.

10           MS. ESTES:  Yes, your Honor.

11           The government calls Special Agent Moises Walters.

12    MOISES WALTERS,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15           THE COURT:  Please sit down make yourself comfortable.

16           Go ahead.

17    DIRECT EXAMINATION

18    BY MS. ESTES:

19    Q.  Good afternoon.

20    A.  Good afternoon.

21    Q.  Who are you employed by?

22    A.  The Drug Enforcement Administration.

23    Q.  Is that the DEA?

24    A.  Yes, it is.

25    Q.  What is your title?

G9JVROD1                              Walters – direct

1    A.  I'm a special agent.

2    Q.  How long have you been a special agent with the DEA?

3    A.  Approximately four years.

4    Q.  What are your duties and responsibilities as a special

5    agent with the DEA?

6    A.  We enforce the drug control laws in the United States and

7    abroad.

8    Q.  Are you assigned to a particular group?

9    A.  Yes.

10   Q.  What group?

11   A.  D22.

12   Q.  Does your group specialize in anything?

13   A.  Yes.

14   Q.  What do you specialize in?

15   A.  The clandestine laboratory part of our group.

16   Q.  Could you explain.

17   A.  Yes.

18          We are trained to identify and eradicate marijuana,

19   heroin, cocaine, or any kind of cultivation facilities as part

20   of our investigation.

21   Q.  Do you have experience in investigating grow-houses?

22   A.  Yes.

23   Q.  Approximately how many searches of grow-houses have you

24   conducted?

25   A.  Approximately three.

G9JVROD1                         Walters - direct

1  Q.  Agent Walters, let me direct your attention to August 21st,

2  2015.

3          Did you and other DEA agents execute a search warrant

4  on 420 East 111th Street, Apartment 909, that day?

5  A.  Yes.

6  Q.  Approximately what time did you execute the search warrant?

7  A.  It was in the evening.

8  Q.  Approximately how many agents executed the search warrant?

9  A.  Approximately five.

10 Q.  Very generally, when you entered the apartment, what was

11 inside?

12 A.  Marijuana, marijuana trees, heat lamps, and other marijuana

13 cultivation equipment.

14 Q.  What did the apartment smell like?

15 A.  Marijuana.

16 Q.  What was the temperature like?

17 A.  It was hot.

18 Q.  How large was the apartment?

19 A.  Relatively small.

20 Q.  Could you describe generally its layout.

21 A.  Sure.

22          It had a kitchen, two bedrooms, a bathroom, and maybe

23 one or two closets.

24 Q.  Did it appear that anyone lived there?

25 A.  No.

G9JVROD1                          Walters – direct

1   Q.  Were there any beds?

2   A.  No.

3   Q.  Any couches?

4   A.  No.

5   Q.  Any furniture?

6   A.  I believe there was one small foldout chair.

7   Q.  When you entered the apartment, was anyone there?

8   A.  Yes.

9   Q.  Who was there?

10  A.  Nanette Rodriguez.

11  Q.  Where was she?

12  A.  She was in the main bedroom.

13  Q.  What was she wearing?

14  A.  She had a hair net on, some sort of eye protection, gloves,

15  and like a dark-colored hoodie with jeans.

16  Q.  Did she have any relationship to the defendant?

17  A.  Yes.

18  Q.  What is that relationship?

19  A.  She's his sister.

20  Q.  Did you recognize Nanette Rodriguez when you saw her?

21  A.  Initially, no.

22  Q.  Did you later recognize her?

23  A.  Yes.

24  Q.  How?

25  A.  Because I saw her earlier that day.

G9JVROD1                        Walters - direct

1   Q.   Where had you previously seen her that day?

2   A.   In the vicinity of 195th Street and Amsterdam Avenue.

3   Q.   Agent Walters, in front of you is an exhibit binder that

4   I've placed there of exhibits that have been premarked for

5   identification purposes.  Could you turn in the exhibit binder

6   to Government Exhibit 133.

7   A.   Sure.

8   Q.   Do you recognize Government Exhibit 133?

9   A.   Yes.

10  Q.   Who is depicted in Government Exhibit 133?

11  A.   Nanette Rodriguez.

12  Q.   Does that fairly and accurately depict her as she looked at

13  the time of the search of the grow-house apartment?

14  A.   Yes.

15          MS. ESTES:  Your Honor, the government offers

16  Government Exhibit 133.

17          MR. HANDWERKER:  Judge, can I have a second to take a

18  look at the photographs?  Can I take a look at the photograph

19  for a second?

20          THE COURT:  Yes.  You should have gotten this over the

21  weekend.  Did you get it over the weekend?

22          MR. HANDWERKER:  It was left for me at the front desk.

23          THE COURT:  Okay.  133.

24          MR. HANDWERKER:  Okay, Judge.  Thank you.

25          THE COURT:  133 is in evidence.

1              (Government's Exhibit 133 received in evidence)

2              MS. ESTES:  Your Honor, may I publish --

3              THE COURT:  Yes, you may.

4              MS. ESTES:  -- Government Exhibit 133 for the jury?

5              THE COURT:  Yes.

6    Q.  Special Agent Walters, when you encountered Ms. Rodriguez

7    in the apartment, what was she doing?

8    A.  She was on her knees and she was doing something while she

9    was like bent over.  She had something -- she was messing

10   around with something on the floor.

11   Q.  Which room of the apartment was she in?

12   A.  The main bedroom.

13   Q.  What, if anything, did you find when you searched the

14   apartment?

15   A.  We found marijuana trees, we found pots of soil, we found

16   marijuana root balls, heat lamps.  There were AC units there.

17   There were mechanical -- like electrical equipment there.

18   There were huge tanks, some of them were filled with water.

19   There were buckets, a lot of tubing, a lot of cable wire.

20   Q.  Were you involved in searching each room of the apartment?

21   A.  Yes.

22   Q.  Did DEA agents take custody of any items in the apartment?

23   A.  Yes.

24             MS. ESTES:  Your Honor, may I approach the witness?

25             THE COURT:  Yes, you may.

G9JVROD1                          Walters - direct

1    Q.  Special Agent Walters, I've handed you what has been

2    previously identified for identification purposes as Government

3    Exhibit 100.  I've also handed you a pair of scissors.

4            Do you recognize this object?

5    A.  Yes.

6    Q.  How do you recognize it?

7    A.  Because I saw it a few days ago and it contains the

8    marijuana that was seized, some of the marijuana that was

9    seized from the residence.

10   Q.  Is there any marking on the object you recognize in

11   particular?

12   A.  Yes.

13   Q.  What is that?

14   A.  There's a DEA evidence sticker on it.

15   Q.  Agent Walters, could I ask you to open the box.

16   A.  Sure.

17   Q.  Could you take the object out of the box.

18           Do you recognize what's inside the box?

19   A.  Yes, I do.

20   Q.  How do you recognize it?

21   A.  Because it was seized from the residence.

22   Q.  What is it?

23   A.  Marijuana.

24           MS. ESTES:  Your Honor, the government offers

25   Government Exhibit 100.

G9JVROD1                          Walters - direct

1              MR. HANDWERKER:  Subject to connection, Judge, no

2      objection.

3              THE COURT:  Okay.  100 is in evidence.

4              (Government's Exhibit 100 received in evidence)

5              MS. ESTES:  Your Honor, may I display it to the jury?

6              THE COURT:  Yes, you may.

7              Agent, why don't you put the box down.  Thank you.

8              THE WITNESS:  No problem.

9      BY MS. ESTES:

10     Q.  Agent Walters, is that the way the marijuana appeared in

11     the apartment?

12     A.  I'm sorry?

13     Q.  Is that the way the marijuana appeared in the apartment?

14     A.  Yes.

15     Q.  Was it in a bag like that in the apartment?

16     A.  No.

17     Q.  What did it look like in the apartment?

18     A.  I'm sorry.  It was -- there were trees and there were some

19     portions of the marijuana that were hanging at the rear of the

20     main room, hanging upside down.  But I believe that these were

21     some of the clippings that were from the trees.

22     Q.  And who clipped those from the trees?

23     A.  I don't remember.

24     Q.  Was it a DEA agent though?

25     A.  Yes.

G9JVROD1                        Walters - direct

1    Q.  Does Government Exhibit 100 contain all of the marijuana

2    that was found in the apartment?

3    A.  No.

4    Q.  What other marijuana was found in the apartment?

5    A.  There were additional boxes that contained marijuana that

6    we had from the -- that we seized from the apartment.

7    Q.  And what did you do with that additional marijuana?

8    A.  They were destroyed.

9             MS. ESTES:  Your Honor, may I approach the witness?

10            THE COURT:  Yes, you may.

11   Q.  Agent Walters, I've handed you what has been previously

12   marked for identification purposes as Government Exhibit 101.

13            Do you recognize this box?

14   A.  Yes, I do.

15   Q.  How do you recognize it?

16   A.  It contains the roots that were seized from the apartment.

17   Q.  Does this box contain any markings?

18   A.  Yes, it does.

19   Q.  Where?

20   A.  Right in the center, on the top of it.  It's a DEA evidence

21   sticker.

22   Q.  Agent Walters, could I ask you to open this box.

23   A.  Sure.

24   Q.  Could you take the item out of the box.

25            Do you recognize the contents of the box?

G9JVROD1                         Walters - direct

1   A.  Yes.

2   Q.  How do you recognize it?

3   A.  These are the roots that were taken from the apartment.

4          MS. ESTES:  Your Honor, the government offers

5   Government Exhibit 101.

6          MR. HANDWERKER:  Same objection, Judge, subject to

7   connection.

8          THE COURT:  101 is in evidence.

9          (Government's Exhibit 101 received in evidence)

10          MS. ESTES:  Your Honor, may I display this for the

11   jury?

12          THE COURT:  Yes, you may.

13   Q.  Agent Walters, what are root balls?

14   A.  Root balls are the portion of the tree that's submerged in

15   the soil, the pot of soil.  It's like the very stem; it's the

16   bottom part of the marijuana tree.

17   Q.  Where were these found in the apartment?

18   A.  Inside plants -- inside the pots of soil inside the main

19   bedroom.

20          MS. ESTES:  Your Honor, may I approach the witness?

21          THE COURT:  Yes, you may.

22   Q.  Agent Walters, I've handed you what has been previously

23   marked for identification purposes as Government Exhibit 102.

24          Do you recognize this?

25   A.  Yes.

G9JVROD1                          Walters - direct

1    Q.  How do you recognize it?

2    A.  It was taken from the residence.

3    Q.  What is it?

4    A.  It's a marijuana heat lamp.

5           MS. ESTES:  Your Honor, the government offers

6    Government Exhibit 102.

7           MR. HANDWERKER:  Same objection, Judge.

8           THE COURT:  102 is received in evidence.

9           (Government's Exhibit 102 received in evidence)

10          MS. ESTES:  Your Honor, may I display this for the

11   jury?

12          THE COURT:  Yes.

13   Q.  Agent Walters, where was the heat lamp found in the

14   apartment?

15   A.  I believe it was the main room.

16          MS. ESTES:  Your Honor, the next item we have is a

17   heavy one.  May I ask AUSA Timothy Howard to bring the item to

18   Special Agent Walters?

19          THE COURT:  Yes.

20          How much does that weigh?

21          MR. HOWARD:  Very bad at estimating, your Honor.

22   Q.  Agent Walters, AUSA Howard has handed you what has been

23   previously marked for identification purposes as Government

24   Exhibit 103.

25          Do you recognize this?

G9JVROD1                      Walters - direct

1    A.  Yes.

2    Q.  How do you recognize it?

3    A.  It was seized from inside the residence.

4    Q.  What is it?

5    A.  It's an LED grow light.

6              MS. ESTES:  Your Honor, the government offers

7    Government Exhibit 103.

8              MR. HANDWERKER:  Same objection, Judge.

9              THE COURT:  LED grow light.  103 is received in

10   evidence.

11             (Government's Exhibit 103 received in evidence)

12   Q.  Agent Walters, let me direct your attention to the sticker,

13   to the side of the light near the exhibit sticker.

14             What does that say?

15   A.  It says "LED grow light CE."

16   Q.  Where was this grow light found in the apartment?

17   A.  It was in the second bedroom.

18             MS. ESTES:  Your Honor, may I ask AUSA Howard to

19   display Government Exhibit 103 for the jury?

20             THE COURT:  Yes.

21             Thank you.

22             MS. ESTES:  Your Honor, may I approach the witness?

23             THE COURT:  Yes, you may.

24   Q.  Agent Walters, I've handed you what has been previously

25   marked for identification purposes as Government Exhibit 104.

G9JVROD1                          Walters – direct

1          Do you recognize this?

2    A.   Yes.

3    Q.   How do you recognize it?

4    A.   It's a scale that was taken from the residence.

5          MS. ESTES:  Your Honor, the government offers

6    Government Exhibit 104.

7          MR. HANDWERKER:  Same objection, Judge.

8          THE COURT:  104 is in evidence.

9          (Government's Exhibit 104 received in evidence)

10          MS. ESTES:  Your Honor, may I display this for the

11    jury?

12          THE COURT:  Yes.

13          I think they all know what a scale is, but...

14    BY MS. ESTES:

15    Q.   Special Agent Walters, where was the scale found in the

16    apartment?

17    A.   In the kitchen.

18          (Continued on next page)

19

20

21

22

23

24

25

G9JQROD2                        Walters - Direct

1          MS. ESTES:  Your Honor, may I approach the witness?

2          THE COURT:  Yes, you may.

3   Q.  Agent Walters, I've handed you what has been previously

4   marked for identification purposes as Government Exhibit 105.

5   Do you recognize it?

6   A.  Yes.

7   Q.  How do you recognize it?

8   A.  They were taken from the residence.

9   Q.  What are they?

10  A.  Packaging material, Ziploc bags, latex gloves for

11  protection and twine.

12         MS. ESTES:  Your Honor, the government offers

13  Government Exhibit 105.

14         MR. HANDWERKER:  No objection, Judge.

15         THE COURT:  105 is in evidence.

16         (Government's Exhibit 105 received in evidence)

17  Q.  Agent Walters, was there any string in use in the grow

18  house?

19  A.  Yes.

20  Q.  Can you describe?

21  A.  In the main grow room, there were strings that were

22  attached from -- horizontally and vertically across the room.

23  Q.  What were they attached to?

24  A.  They were attached to wooden kind of like planks that were

25  screwed into the walls.

G9JQROD2                          Walters - Direct

1   Q.  Based on your observations of the grow room, what was their

2   purpose?

3   A.  To support the trees as they grow.

4   Q.  Did you observe any plastic bags in use in the grow house?

5   A.  Yes.

6   Q.  How were they being used?

7   A.  To package the trimmings of the marijuana plants.

8           MS. ESTES:  Your Honor, may I approach the witness?

9           THE COURT:  Yes, you may.

10  Q.  Agent Walters, I have handed you what has been previously

11  marked for identification purposes as Government Exhibit 106.

12  Do you recognize this?

13  A.  Yes, I do.

14  Q.  How do you recognize it?

15  A.  It was seized from the residence.

16  Q.  What is it?

17  A.  It's a cellular telephone.

18          MS. ESTES:  Your Honor, the government offers

19  Government Exhibit 106.

20          MR. HANDWERKER:  Subject to connection, Judge.

21          THE COURT:  It's received in evidence as 106.

22          (Government's Exhibit 106 received in evidence)

23  Q.  Agent Walters, is there a label on that cell phone?

24  A.  Yes.

25  Q.  Excuse me, on the bag containing that cell phone?

G9JQROD2                         Walters - Direct

1   A.  Yes.

2   Q.  What is that label?

3   A.  It says phone recovered from grow house.

4          MR. HANDWERKER:  Objection.

5          THE COURT:  It's in evidence.

6          MR. HANDWERKER:  Withdraw my objection.

7          THE COURT:  Go ahead.

8   A.  Phone recovered from grow house.

9   Q.  Did you create that label?

10  A.  Yes, I did.

11  Q.  Agent Walters, I'd like you to turn in the exhibit binder

12  to the tab that is premarked for identification as Government

13  Exhibit 110 through Government Exhibit 130.  If you could

14  review those tabs and let me know when you're done.

15         (Pause)

16         THE COURT:  Have you reviewed 110 through 130 yet?

17         THE WITNESS:  Last one.

18  A.  Yes, I'm done.

19  Q.  Do you recognize these documents?

20  A.  Yes.

21  Q.  How do you recognize them?

22  A.  They were photos taken from the residence.

23  Q.  Do they fairly and accurately depict the way the residence

24  looked on the day you searched it?

25  A.  Yes.

G9JQROD2                         Walters - Direct

1            MS. ESTES:  Your Honor, the government offers

2      Government Exhibits 110 through 130.

3            MR. HANDWERKER:  No objection, Judge.

4            THE COURT:  110 through 130 are received in evidence.

5            (Government's Exhibits 110 through 130 received in

6      evidence)

7            MS. ESTES:  Your Honor, may I publish Government

8      Exhibit 110.

9            THE COURT:  Yes, you may.

10     Q.  Agent Walters, directing your attention to this exhibit,

11     what does it show?

12     A.  It's the front door of the residence.

13     Q.  Could you read the number on the door?

14     A.  909.

15     Q.  What floor was the residence on?

16     A.  The ninth floor.

17     Q.  Agent Walters, could you turn in the Exhibit binder to what

18     has been premarked for identification purposes as Government

19     Exhibit 131 and Government Exhibit 132.  Do you recognize these

20     documents?

21     A.  Yes.

22     Q.  How do you recognize them?

23     A.  131 is a photo of the building, of the structure where we

24     actually executed our search warrant.

25     Q.  What is 132?

G9JQROD2                          Walters - Direct

1   A.   132 is another photo of the front door of the residence

2   where we executed our search warrant, but this is, I guess, the

3   hallway.

4   Q.   Did those photos fairly and accurately depict the building

5   and the front door of the residence?

6   A.   Yes.

7          MS. ESTES:   Your Honor, the government offers

8   Government Exhibits 131 and 132.

9          MR. HANDWERKER:   No objection.

10          THE COURT:   131 and 132 are received in evidence.

11          (Government's Exhibits 131 and 132 received in

12   evidence)

13          MS. ESTES:   Your Honor, may I publish Government

14   Exhibit 131.

15          THE COURT:   Yes, you may.

16   Q.   Agent Walters, directing your attention to this exhibit,

17   could you describe the apartment building?

18   A.   Yes.   It's approximately 25 or more stories tall.   On each

19   floor, there's about ten -- approximately ten apartments on

20   each floor.

21   Q.   What kind of apartment building is it?

22   A.   It's a residential apartment building.

23   Q.   Could you describe in relation to this picture where

24   apartment 909 is located?

25   A.   Yes.

1              THE COURT:  Do you want this up?  Is that what you

2     want.

3              MR. HANDWERKER:  Which Exhibit is she referring to?

4              THE COURT:  131.

5              MS. ESTES:  131.

6              THE COURT:  Go ahead.  What's your question?

7     Q.  Agent Walters, could you describe in relation to this

8     Exhibit the photo of the apartment building where apartment 909

9     is located?

10    A.  Yes.  It's going to be on the left-hand side midway up the

11    photograph nine floors from the ground level.

12             MS. ESTES:  Your Honor, we would now like to show a

13    series of photos of the interior of the grow house that have

14    previously been admitted in evidence.  May we publish them in

15    turn as they come up?

16             THE COURT:  Yes.  110 through 130?

17             MS. ESTES:  Yes, your Honor.

18                                  Ms. Lee, could you please publish

19    Government Exhibit 111.

20    Q.  Agent Walters, what does this show?

21    A.  This is a photo of the main grow room within the residence.

22    Q.  Could you describe the items in the picture?

23    A.  Sure.  To the far left are marijuana plants.  Above at the

24    top of the marijuana plants, you could see the string that's

25    connected horizontally and vertically across the room.  To the

G9JQROD2                         Walters - Direct

1    lower right-hand corner, is a trash bag.  Just to the right of
2    that, you could see pots -- one pot of it looks like it
3    contains trimmings of marijuana plants.  These marijuana plants
4    and pots are on top of a platform that's raised inside that
5    room.  In the very far center portion of the photo, you could
6    see marijuana trimmings that are hanging upside down that's
7    suspended by one long piece of twine connecting -- from the
8    right-hand side of the room to the left.  On the top right
9    corner next to the government exhibit label, you could see a
10   white fan that's installed on the top there that was actually
11   active when we entered the grow room.
12   Q.  Could you explain the lighting of this picture?
13   A.  Yes.  There are dark horizontal lines on the photograph
14   because there was -- the heat lamps were active when we entered
15   the residence and the grow room.  I guess it was just
16   interference with our camera lens and the heat lamps being
17   active that made the dark horizontal lines on the photograph.
18   Q.  Were there windows in the apartment?
19   A.  There were windows, but they were all boarded up by
20   plywood.
21   Q.  So was there any natural light?
22   A.  No.
23          MS. ESTES:  Ms. Lee, would you publish Government
24   Exhibit 113.
25   Q.  Agent Walters, what does this show?

G9JQROD2                     Walters - Direct

A.  It's a different angle within that same main grow room.  As
you can see, the top left portion of the photo are the
marijuana trimmings that are hanging upside down suspended by a
piece of twine.  To the right in the center of the photograph,
you could see more marijuana plants that were inside the pots.
The center lower portion of the photograph, you could see more,
I guess it's a pot that contains some kind of device there
that's connected to an aluminum tube.  To the right, far right,
upper right portion of the photograph, you see a ladder.  And
to the extreme left portion of the photograph, you could see
two pots that contains soil.

          MS. ESTES:  Ms. Lee, could you please publish
Government Exhibit 114.

Q.  Agent Walters, what does this show?

A.  Different angle of the same room.  Now you could actually
see two of the grow lights that are active on the top of the
photograph.  These two lights were -- and all of the lights in
this room were installed and suspended on a track that could
easily roll the heat lamps from the beginning of the grow room
to the far end of the grow room, and these are connected by
electrical cables that are suspended up against that wall that
you see there to the center of the photograph.  And again you
see the marijuana plants just under the heat lamps with the
twine that crossed the room again.  To the lower left, extreme
left portion of the photograph, you could see a, it looks like

G9JQROD2                      Walters - Direct

1    a gallon -- not a gallon, but a tank that contained water.  And

2    this tank had tubes coming out of them.  What else we have here

3    pots of soil that are stacked up against each other, some to

4    the left of the plants and some in front of the plants, and a

5    large black trash bag to the right-hand corner of the

6    photograph.

7    Q.  Agent Walters, turning to the track you reference, where is

8    that located on this picture?

9    A.  On the top, top portion of the photograph.

10           MS. ESTES:  Ms. Lee, would you publish Government

11   Exhibit 117.

12   Q.  Agent Walters, what does this photo show?

13   A.  These are two buckets that were used for soil, but in this

14   instance it was used to hold marijuana -- the trimmings of the

15   marijuana plants.

16   Q.  Did these buckets look like this when you executed the

17   search warrant?

18   A.  Yes.

19           MS. ESTES:  Ms. Lee, would you publish Government

20   Exhibit 118.

21   Q.  Agent Walters, what does this show?

22   A.  To the upper right portion of the photograph, it's a sealed

23   tube generator that had a $CO_2$ connection to it.  This black

24   tube that's coming from the $CO_2$ generator actually exited the

25   grow room and went directly into the kitchen where it was

G9JQROD2                          Walters - Direct

1   connected to stove connections inside the kitchen.  There is
2   also a rack here that was used just to store tools.
3   Q.  Approximately how long was that black tube?
4   A.  Approximately 20, 30 feet.
5   Q.  Agent Walters, what is CO2?
6   A.  CO2 is carbon dioxide.
7   Q.  Based on your observation of this operation, what was being
8   transmitted through that black tube?
9   A.  Gas.
10   Q.  Have you seen a carbon dioxide generator like this before?
11   A.  Yes.
12   Q.  Where?
13   A.  In previous grow houses.
14          MS. ESTES:  Ms. Lee, would you publish Government
15   Exhibit 120.
16   Q.  Agent Walters, what does this show?
17   A.  This shows -- this is the kitchen, a photo of the kitchen
18   where a stove should be, but instead there are some cables that
19   are attached.  The cable that I previously mentioned that was
20   attached to the carbon dioxide generator in the main grow room,
21   you could see it being attached and connected to the stove
22   connector here.
23          THE COURT:  This is the gas connection?
24          THE WITNESS:  Yes, it is.
25          MS. ESTES:  Ms. Lee, would you publish Government

G9JQROD2                          Walters - Direct

1    Exhibit 121.

2    Q.  Agent Walters, what does this show?

3    A.  This is the kitchen sink.  This tube ran directly from the

4    kitchen into one of the tanks that was in the main grow room.

5    When we entered, this tube was actually being drained into the

6    sink.

7    Q.  Based on your observations of this operation, what was the

8    purpose of the tube?

9    A.  To irrigate or to drain the plants.

10          MS. ESTES:  Ms. Lee, would you publish Government

11   Exhibit 122.

12   Q.  What does this show?

13   A.  Some of the contents of the kitchen cabinet.

14   Q.  Was there any food in the kitchen?

15   A.  No.

16          MS. ESTES:  Ms. Lee, would you publish Government

17   Exhibit 127.

18   Q.  Agent Walters, what does this show?

19   A.  This is a photograph of the bathroom within the residence.

20   Q.  Let me direct your attention to the right side of the

21   photograph.  What is hanging from the shower rod?

22   A.  A black tube.

23   Q.  Based on your observations of the operation, what was that

24   black tube being used for?

25   A.  I'm not -- I don't remember.

1          MR. HANDWERKER:  He hasn't been qualified as an

2    expert.  I don't think he is the proper witness.

3          THE COURT:  The objection is overruled.  He was there.

4    He can observe.

5          MR. HANDWERKER:  As a fact witness as to what he

6    found, that's fine, but he's making assumptions and he's trying

7    to concoct stories.

8          THE COURT:  The objection is overruled.

9    A.  This black tube was connected -- it exited the bathroom and

10   it went into the grow house, to the main grow room.  I'm not

11   sure what it was used for though.

12         MS. ESTES:  Ms. Lee, would you publish Government

13   Exhibit 128.

14   Q.  Agent Walters, what does this show?

15   A.  This is the second bedroom within the residence on the --

16   again, you could see on the top of the photograph there is

17   another track that suspended a grow light that was inactive

18   when we entered the room.  Just to the left of the grow light,

19   you could see another $CO_2$ generator that has a connection to

20   it.  This connector also went directly into the kitchen.  Just

21   below the heat lamp you could see one of the agents there.  And

22   just to the right of that agent, you could see another agent

23   who is actually tearing down some of the plywood that was used

24   to cover up the windows in this room.

25         MS. ESTES:  Ms. Lee, would you publish Government

G9JQROD2                              Walters - Direct

1   Exhibit 129.

2   Q.  Agent Walters, what does this show?

3   A.  This is Nanette Rodriguez.

4   Q.  Does this show how Nanette Rodriguez actually looked that

5   day?

6   A.  Yes.

7   Q.  Agent Walters, were you also involved in processing an

8   arrest on August 21, 2015?

9   A.  Yes.

10  Q.  Who was arrested that day?

11  A.  Michael Rodriguez.

12  Q.  Do you see Michael Rodriguez in the courtroom today?

13  A.  Yes, I do.

14  Q.  Could you describe him by something he's wearing?

15  A.  Sure.  Gray suit, gold tie, white shirt.

16       MS. ESTES:  Your Honor, I would respectfully request

17  the record reflect that Agent Walters has identified the

18  defendant.

19       MR. HANDWERKER:  We would stipulate to that.

20       THE COURT:  OK.  The agent recognizes Mr. Rodriguez.

21  Q.  Agent Walters, would you turn in your exhibit binder to

22  what has been premarked for identification as Government

23  Exhibit 134.  Do you recognize this document?

24  A.  Yes.

25  Q.  How do you recognize it?

G9JQROD2                       Walters - Cross

1    A.  It's a picture of Michael Rodriguez.

2    Q.  Does this fairly and accurately depict the defendant at the

3    time the photograph was taken?

4    A.  Yes.

5            MS. ESTES:  Your Honor, the government offers

6    Government Exhibit 134.

7            MR. HANDWERKER:  No objection, Judge.

8            THE COURT:  134 is in evidence.

9            (Government's Exhibit 134 received in evidence)

10           MS. ESTES:  Ms. Lee, would you publish Government

11   Exhibit 134.

12           Your Honor, may I have a moment?

13           THE COURT:  Yes, you may.

14           MS. ESTES:  We have no further questions.

15           THE COURT:  Mr. Handwerker.

16           MR. HANDWERKER:  Just a few, your Honor.

17   CROSS-EXAMINATION

18   BY MR. HANDWERKER:

19   Q.  Agent Walters, good afternoon, sir.

20   A.  Good afternoon.

21   Q.  I just want to ask you a couple of questions, OK?  When did

22   you first become involved in this investigation?

23   A.  I believe it was about two days before -- before the

24   arrest.

25   Q.  And what did you do two days before the arrest?  Were you

G9JQROD2                          Walters - Cross

1   involved in a conversation back in the DA headquarters

2   regarding this investigation?

3            MS. ESTES:  Your Honor, objection.  Hearsay.

4            THE COURT:  Overruled.  You may answer.

5   A.  Usually before arrest operations, we conduct a briefing as

6   to what is going -- supposed to transpire on the following day,

7   and yes, I was present for that.

8   Q.  And did you participate in any surveillance that day or

9   prior to?

10  A.  That day.  Not prior to.

11  Q.  And on that day, the surveillance pertaned to who?

12  A.  Michael Rodriguez.

13  Q.  You surveilled Michael Rodriguez the morning of his arrest?

14  A.  Yes.

15  Q.  About 6:00 a.m.?

16  A.  Correct.

17  Q.  At a gym located on Amsterdam Avenue?

18           MS. ESTES:  Your Honor, objection.  Outside the scope.

19           THE COURT:  No.  Overruled.

20  A.  I didn't physically see him, but, yes, it was put out over

21  the radio that he was there.

22  Q.  On Amsterdam Avenue, correct?

23  A.  Correct.

24  Q.  In the Nineties?

25  A.  190s.

G9JQROD2                         Walters - Cross

1    Q.  Between 93rd and 94th Street he was arrested on Amsterdam

2    Avenue?

3    A.  I don't remember if that was the exact street or the range.

4    Q.  Let me ask you this:  Did you ever see him at the location

5    420 East 111th Street?

6    A.  No.

7    Q.  Let me just ask you another question.  The items that were

8    placed into evidence, item 110 through 130, Government

9    Exhibits, were any fingerprints taken off those exhibits?

10           THE COURT:  What was the question, Mr. Handwerker?

11   Q.  Were any fingerprints lifted from those exhibits?

12   A.  I don't remember.

13   Q.  Well, who would know but you?

14   A.  The case agent.

15   Q.  I see.  Do you know if he lifted any prints out of any of

16   the items that were seized from that room?

17   A.  I do not know.

18   Q.  On August 21, a search warrant was presented to a judge,

19   correct?

20   A.  Correct.

21   Q.  And your studies -- withdrawn.  Your movements on that day

22   was to go to a location and execute the search warrant,

23   correct?

24   A.  Correct.

25   Q.  And that's what you did?

G9JQROD2                        Walters - Cross

1    A.  Correct.

2    Q.  Prior to going to that location, did you know what

3    apartment you were looking for?

4    A.  I don't recall.

5    Q.  You'd been in the investigation for two days, correct?

6    A.  Correct.

7    Q.  And your role was to execute a search warrant at 420 East

8    111th Street.  Is that right?

9    A.  Before -- before the operation, we did not know that we

10   were going to be executing a search warrant.

11   Q.  But you do admit that on that day you learned -- you knew

12   your role was to execute the search warrant, right?

13   A.  Correct.

14   Q.  When did you learn what apartment you were going to be

15   going to?

16   A.  Later on that day.  I don't remember exactly what time.

17   Q.  But when you went to the location, you searched for the

18   apartment, correct, without knowing what you were looking for?

19   A.  I'm sorry, can you ask the question again?

20   Q.  Sure.  Let me ask you this.  Let me withdraw my last

21   question.  The elevators in that building do not run -- their

22   elevators run through even floors and odd floors.  Is that

23   correct?

24   A.  I believe so.

25   Q.  You were there, right?

G9JQROD2                           Walters – Cross

1   A.  Yes.

2   Q.  Did you not go to an even floor and wait to see what the

3   traffic was like in that building?

4   A.  I don't remember doing that.

5   Q.  Did there come a time you saw someone near the apartment in

6   question, 909?

7   A.  I saw a couple of people.  The neighbors were walking back

8   and forth.

9   Q.  But you didn't know what apartment you were looking for,

10  correct?

11  A.  When I first got there, no.

12  Q.  And you didn't see Michael Rodriguez on that day, right?

13  A.  I'm sorry?

14  Q.  You did not see Michael Rodriguez on that day at that

15  location, right?

16  A.  That is correct.

17          MR. HANDWERKER:  No further questions, your Honor.

18          MS. ESTES:  Your Honor, we don't have any redirect.

19          THE COURT:  OK, agent, you're excused.  Thank you very

20  much.

21          (Witness excused)

22          THE COURT:  Ladies and gentlemen, why don't we take a

23  short break for your afternoon break.  We will resume and go

24  until 4:30.

25                      (Recess)

G9JQROD2                          Walters - Cross

1                       (Jury present)

2            THE COURT:  Ms. Houle.

3            MS. HOULE:  Your Honor, the government seeks to read

4    into evidence Government Exhibit 1200, which is a stipulation

5    signed by the parties.

6            THE COURT:  All right, go ahead.

7            MS. HOULE:  Your Honor, may we admit this into

8    evidence and publish it for the jury so they will follow along?

9            THE COURT:  Yes, you may.

10           MS. HOULE:  Thank you.

11           Ms. Lee, if you could please bring up Government

12   Exhibit 1200.

13           THE COURT:  1200 is in evidence.

14           (Government's Exhibit 1200 received in evidence)

15           MS. HOULE:  It is hereby stipulated and agreed, by and

16   among the United States of America, by Preet Bharara, United

17   States Attorney for the Southern District of New York, Jordan

18   Estes, Amanda Houle and Timothy Howard, Assistant United States

19   Attorneys of counsel, Michael Earl Rodriguez, the defendant, by

20   and with the consent of his attorney, Michael Handwerker

21   Esquire, that:  If called to testify, a representative of 1199

22   Housing Corporation located in New York, New York would testify

23   that for the period 2007 through 2012, the head of household of

24   apartment 909 at 420 East 111th Street, New York, New York

25   (which is hereinafter referred to as apartment 909) was

G9JQROD2                        Walters - Cross

1    required to submit an annual income affidavit to 1199 Housing

2    Corporation listing each resident of the apartment and their

3    income.  Such affidavits were not required after 2012.

4            Government Exhibit 1100 is a true and correct copy of

5    the income affidavit received for apartment 909 on June 12,

6    2007.

7            Government Exhibit 1101 is a true and correct copy of

8    the income affidavit received for apartment 909 on April 30,

9    2008.

10           Government Exhibit 1102 is a true and correct copy of

11   the income affidavit received for apartment 909 on July 2,

12   2009.

13           Government Exhibit 1103 is a true and correct copy of

14   the income affidavit received for apartment 909 on April 29,

15   2010.

16           Government Exhibit 1104 is a true and correct copy of

17   the income affidavit submitted for apartment 909 on May 5,

18   2011.

19           Government Exhibit 1105 is a true and correct copy of

20   the income affidavit submitted for apartment 909 on May 22,

21   2012.

22           1199 Housing Corporation's policies require that

23   whenever any head of household wishes to add an individual as a

24   resident to their apartment, the proposed new resident must

25   submit the following materials to 1199 Housing Corporation for

G9JQROD2                        Walters - Cross

1   copying and processing in their files:

2           1.  A birth certificate.

3           2.  Identification document.

4           3.  Social security card.

5           4.  Tax return for the prior calendar year.

6           Proposed residents must also agree to a criminal

7   history and credit check and provide payment by check or money

8   order in the amount of approximately $125 for the criminal

9   history and credit check.

10          Government Exhibit 1106 is a true and correct copy of

11  a letter from 1199 Housing Corporation to apartment 909's head

12  of household dated May 27, 2010.

13          Government Exhibit 1107 is a true and correct copy of

14  an application by Michael Rodriguez to be added as a resident

15  to apartment 909.  The application includes:

16          First, a race and ethnicity reporting form.

17          Second, a family summary sheet.

18          Third, a criminal, drug and sex offender information

19  form.

20          Fourth, a declaration of citizenship.

21          Fifth, a credit and criminal background check

22  application form.

23          Sixth, a 2009 resident income tax return.

24          Seventh, a social security card copy.

25          Eighth, a driver's license.

G9JQROD2                          Walters - Cross

1              Ninth, a birth certificate.

2              Tenth, a postal money order in the amount of $127.50

3    all in the name Michael Rodriguez.

4              It is further stipulated and agreed that this

5    stipulation and Government Exhibits 1100 through 1107 may be

6    received in evidence as Government Exhibits at trial.  And it

7    is signed by the parties

8              THE COURT:  OK.

9              MS. HOULE:  Your Honor, we'd seek to admit into

10   evidence Government Exhibits 1100 through 1107 as agreed to in

11   the stipulation.

12             THE COURT:  1100 through 1107 are received in

13   evidence.

14             (Government's Exhibits 1100 through 1107 received in

15   evidence)

16             MS. HOULE:  May I publish them as I review each with

17   the jury, your Honor?

18             THE COURT:  Yes, you may.

19             MS. HOULE:  Thank you.

20             Ms. Lee, could you please bring up Government Exhibit

21   1100.  I will ask that you zoom into the top half of the form.

22             At the top left is written 1199 Housing Corporation

23   management office.  In the center the document is listed

24   tenant/shareholder annual household income affidavit, calendar

25   year 2006.

G9JQROD2                    Walters - Cross

1          Underneath the housing company box, there is a

2     document -- there is a box that asks for last name, head of

3     household and first name.  And is written in there Cartegena

4     Ramon.  Underneath that, under the name, address is written 420

5     East 111th Street.  Next to that is written apartment 909.

6          In the box titled household composition, the name

7     Ramon Cartegena is written head of household.  Below that, the

8     name Ramon Cartegena is written.  Next to that the relationship

9     is son.

10         Ms. Lee, if you could zoom in on the bottom half of

11    the page where the signature blocks are.  There's a line that

12    says signature with a signature next to it.  And there is a

13    notarized date to the right of June 12, 2007.

14         Ms. Lee, if you could please publish Government

15    Exhibit 1101.  If you could again zoom in on the top half.

16         This document is titled tenant/shareholder annual

17    household income affidavit, calendar year 2007.  In the box

18    titled last name head of household is written Cartegena.  First

19    name is written Ramon.  For address it is written 420 East

20    111th Street, and for the apartment number it is written 909.

21         In the household composition box, the name Ramon

22    Cartegena is listed.  Next to the relationship, self is

23    written.  And below that the name Ramon Cartegena V is listed,

24    with the relationship next to that listed as son.

25         Ms. Lee, if you could zoom in on the bottom half of

G9JQROD2                        Walters – Cross

1    the page with the signature block.  There's a signature line

2    with a signature listed, and there's a notarized date of

3    April 30, 2008.

4              Ms. Lee, if you could please publish Government

5    Exhibit 1102 and again zoom in on the top half.  This document

6    is titled tenant/shareholder annual household income affidavit,

7    calendar year 2008.  Where the last name is requested, the name

8    Cartegena is listed.  First name is written Ramon.  Address

9    listed is 420 East 111th Street.  The apartment number, it says

10   909D.

11             Under household composition, the name Ramon Cartegena

12   is listed.  Next to it for the relationship, it says self.

13   Below it, the name Ramon Cartegena V is listed.  Next to that

14   where it requests relationship is listed son.

15             Ms. Lee, if you could zoom in on

16   the bottom of the page with the signature block, please.  Here

17   there is a signature line with a signature there is a notarized

18   date of June 2, 2009.

19             Ms. Lee, if you could please publish Government

20   Exhibit 1103.  Please zoom in on the top half.  This document

21   is titled tenant/shareholder annual household income affidavit,

22   calendar year 2009.  Where the last name is listed as

23   Cartegena.  First name Ramon.  Address listed is 420 East 111th

24   Street.  The apartment is listed as 909.

25             Under household composition, the name Ramon Cartegena

1   is listed.  The relationship box, the word self appears.

2   Beneath that, the name Michael Rodriguez is listed.  Next to

3   that in the relationship box the word is listed cousin.

4          Ms. Lee, if you could please zoom in on the bottom

5   half of the page with the signature blocks.  There are

6   signature lines with two signatures and a notarized date of

7   April 29, 2010.

8          Ms. Lee, if you could please publish Government

9   Exhibit 1104 and again zoom in on the top half of the page.

10  This document is titled tenant/shareholder annual household

11  income affidavit for calendar year 2010.  In the last name box

12  is written Cartegena.  Under first name, Ramon.  Under address

13  420 East 111th Street.  The apartment number listed is 909D.

14         Under household composition, the first line lists R.

15  Cartegena.  Next to that is written self.  The second line

16  lists Michael Rodriguez, and next to that is written friend.

17  The third line lists Ray Cartegena.  Next to that is written

18  son.

19         Ms. Lee, if you could please zoom in on the bottom

20  half of the page the signature blocks, there is signature

21  lines.  There appear to be two signatures on the page.  The

22  notarized date is May 5, 2011.

23         Ms. Lee, if you could please publish Government

24  Exhibit 1105 and zoom in on the top half.  This document is

25  titled tenant/shareholder annual household income affidavit

G9JQROD2                         Walters - Cross

calendar year 2011.  In the last name box is written Cartegena

with a Roman numeral next to it.  The first name is listed as

Ramon.  The apartment number listed is D909.

          Under household composition, the name Ramon Cartegena

is listed with the Roman Numeral IV.  Next to that is written

self.

          Ms. Lee, if you could zoom in on the bottom of the

page with the signature box.  There is a signature line and a

signature, and there's a notarized date of May 22, 2012.

          Ms. Lee, if you could please publish Government

Exhibit 1106.  This is a letter dated May 27, 2010, and as

described in the stipulation, it is to apartment 909 head of

household.

          Ms. Lee, if you could please zoom in on the bottom

half of that page where it starts "an additional."  It is

listed here an additional individual or individuals appear on

your 2009 income affidavit.  They did not appear on the

previous 2008 income affidavit.  Please provide

status/information for Michael Rodriguez.  In order to add

Michael Rodriguez to the family composition, please arrange an

appointment with the recertification specialist and provide the

following:  A money order for $127.50 for a credit, criminal

and sex offender background check for all adults.

          Please have birth certificate, social security card

and valid driver's license or photo identification.

G9JQROD2                          Walters - Cross

1            A notarized letter from the head of household giving

2      permission to add Michael Rodriguez.

3            Ms. Lee, if you would please publish Government

4      Exhibit 1107.  As noted in the stipulation, this is a document

5      that is an application by Michael Rodriguez to be added as a

6      resident to apartment 909 at 420 East 111th Street.  This

7      document is titled criminal, drug and sex offender information.

8            Ms. Lee, if you could please zoom in on the signature

9      at the bottom of the page.  Next to applicant's signature a

10     signature is listed and dated 7/20/2010.  Below that where

11     applicant's name is listed please print, Michael Rodriguez is

12     printed.

13           If you could turn to the next page, Ms. Lee.  This is

14     a race and ethnic data reporting form.  If you could zoom in on

15     the top half.  There is a name of head of household listed on

16     the left Ray Cartegena.  To the right above name, household

17     member is written Michael Rodriguez.

18           Ms. Lee, if you could please zoom in at the signatures

19     on the bottom of the page.  There is a signature and it is

20     dated 7/20/2010.

21                      Ms. Lee, if you could please turn

22     to the page ending 56 and zoom in on the image there.  This is

23     a postal money order dated 7/21/2010 in the amount of $127.50.

24     In the pay to line is listed 1199 Housing Corporation.  In the

25     from line is listed Michael Rodriguez, 420 East 111th Street

G9JQROD2                        Walters - Cross

1  number 909, New York, New York, 10029.

2            Ms. Lee, if you could please turn to the next page

3  which is a family summary sheet.  On the first line where it

4  says first name of member is listed Ramon.  Last name Cartegena

5  IV.  To the right of that is listed as self for relationship to

6  head of household.  Below that is written Michael Rodriguez and

7  the relationship is listed as friend.

8            Ms. Lee, if you could zoom in on the signature on the

9  bottom of the page in the center.  Under other household

10 member, phone number, the name Michael Rodriguez is printed.

11 Below it 420 East 111th Street number 909, and a phone number

12 is listed below that.

13           Ms. Lee, if you could turn to the next page, please,

14 which is a declaration of citizenship.  If you could zoom in on

15 the top where the last name is listed it is written Rodriguez;

16 first name Michael.

17           Ms. Lee, if you could turn to the declaration at the

18 bottom half of the page which reads:  I, Michael Rodriguez,

19 hereby declare under penalty of perjury that I am and it checks

20 a citizen or national of the United States.  There is a

21 signature listed and it's dated 7/20/10.

22           Ms. Lee, if you could please turn to the page ending

23 in 061.  This document is titled credit criminal background

24 check application.  If you could zoom in on the first half of

25 the page, Ms. Lee.  Under first name of applicant is listed

G9JQROD2                          Walters - Cross

1   Michael.  Last name of applicant, Rodriguez.  For the

2   applicant, present address is listed 420, there is something

3   crossed out, and above it is listed East 111th Street.  The

4   apartment is listed as 909.

5           Ms. Lee, if you could zoom in at the bottom of the

6   page, please.  There is a signature line, and it's dated

7   7/20/2010.

8           Ms. Lee, if you could please turn to the next page.

9   This is a resident income tax return.  The name listed is

10  Michael Rodriguez.  If you could zoom in at the top, please.

11  Thank you, Ms. Lee.  The mailing address that's listed, 733

12  Amsterdam Avenue, apartment 27A, New York, New York, 10025 in

13  Manhattan.

14          Ms. Lee, if you could now please turn to the page

15  ending in 089 which follows this tax return.  If you could

16  please zoom in on the images there.  There is a New York State

17  driver's license with the driver's license number 240 835 742.

18  The name that's listed below that, Rodriguez Michael.  Above

19  that is a social security card with a social security number

20  written and the name Michael E. Rodriguez.

21          Ms. Lee, if you could please turn to the next page,

22  which is a birth certificate in the name Michael Earl

23  Rodriguez.

24          Thank you, Ms. Lee.

25                          Your Honor, the government now

1    calls Jermel Teague.

2              THE COURT:  OK.  Swear him in, Marlon.

3     JERMEL TEAGUE,

4         called as a witness by the Government,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. HOULE:

8              THE COURT:  OK.  Go ahead, Ms. Houle.

9    Q.  Mr. Teague, where are you employed?

10   A.  1199 East River Landing.

11   Q.  How long have you been employed there?

12   A.  Four years.

13   Q.  What is your title there?

14   A.  Lieutenant security.

15   Q.  How long have you had that position?

16   A.  Two years.

17   Q.  What did you do before that?

18   A.  A regular security officer, sergeant.

19   Q.  Are you involved in overseeing security for residential

20   buildings?

21   A.  Yes.

22   Q.  What generally are your responsibilities as lieutenant of

23   security?

24   A.  I have of crew of 65 staff members.  I handle personal

25   relations with shareholders that live there.  You know, I walk

G9JQROD2                          Teague - Direct

1    around frequently around each building.

2    Q.  For how many buildings do you oversee security?

3    A.  Four.

4    Q.  Are the buildings that you oversee grouped in the same

5    general geographic area?

6    A.  Yes.

7    Q.  Is one of those buildings 420 East 111th Street in

8    Manhattan?

9    A.  Yes.

10   Q.  Mr. Teague, what shift do you work?

11   A.  8:00 to 4:00.

12   Q.  On what days of the week do you work?

13   A.  I work from Sunday to Thursday.

14   Q.  For approximately how long have you been working that

15   shift?

16   A.  Two years.

17   Q.  And before that, when you were working in security at the

18   buildings, what shift did you work?

19   A.  4:00 to 12:00.

20   Q.  As part of your regular duties and responsibilities, do you

21   patrol lobbies and outdoor areas of buildings that you oversee?

22   A.  Yes.

23          MS. HOULE:  Your Honor, may I publish Government

24   Exhibit 134 which is already in evidence?

25          THE COURT:  Yes.

G9JQROD2                        Teague – Direct

1    Q.  Mr. Teague, is there a photo appearing on your screen?

2    A.  Yes.

3    Q.  Do you recognize that person?

4    A.  Yes.

5    Q.  How do you recognize him?

6    A.  By him just being in the neighborhood 420, 425 building.

7    Q.  The 420 and the 425 buildings, are they connected to each

8    other?

9    A.  Yes.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9JVROD3                         Teague - direct

1   BY MS. HOULE:

2   Q.  The person that you recognize from this photo, do you see

3   him in the courtroom today?

4   A.  Yes.

5   Q.  Could you identify him based on a piece of clothing that

6   he's wearing?

7   A.  Gray suit, green tie, white shirt.

8            MR. HANDWERKER:  I'll stipulate.

9            THE COURT:  Okay.  Mr. Teague recognizes the

10   defendant, Mr. Rodriguez.

11   Q.  You indicated that you saw the defendant in the areas of

12   420 and 425, which are buildings that are connected to each

13   other, right?

14   A.  Yes.

15   Q.  Approximately how frequently would you see him around those

16   buildings?

17   A.  Maybe once or twice a week.

18   Q.  Do you recall seeing him approximately one or two times per

19   week for the duration of the time that you worked in security

20   in those buildings?

21   A.  Yes.

22            MS. HOULE:  May I have a moment, your Honor?

23            THE COURT:  Yes, you may.

24            MS. HOULE:  No further questions.

25            THE COURT:  Mr. Handwerker.

G9JVROD3                         Teague - cross

1        MR. HANDWERKER:  Just a question or two, Judge.

2   CROSS-EXAMINATION

3   BY MR. HANDWERKER:

4   Q.   Good afternoon, Mr. Teague.

5   A.   How are you doing?

6   Q.   Okay.  How are you?

7   A.   All right.

8   Q.   I'm just going to ask you a couple questions.

9   A.   Yes, sir.

10  Q.   Those buildings are nice buildings, aren't they?

11  A.   Beautiful.

12  Q.   Nice views of the East River?

13  A.   Yes.

14  Q.   In fact, those buildings, do they share a common pool?

15  A.   Meaning?

16  Q.   Is there a pool there?

17  A.   A pool?  There's a pool and there's a community room.

18  Q.   In the community room?

19  A.   Yes.

20  Q.   In each building?

21  A.   There's only one, yes.

22  Q.   What about tennis courts?

23  A.   It's in the same building.

24  Q.   You're a lieutenant now; you were a sergeant.  Correct?

25  A.   Yes.

G9JVROD3                         Teague - cross

1    Q.  In your capacity now, do you know that there are

2    inspections required every six months by the landlord to

3    oversee what's going on in those apartments?

4    A.  I'm not sure of that.

5    Q.  You're not sure of that?

6    A.  No.

7    Q.  Is it possible?

8    A.  Could be --

9             THE COURT:  Anything is possible.

10            MS. HOULE:  Objection, your Honor.

11            THE COURT:  Objection sustained.

12            MR. HANDWERKER:  Judge, he's a lieutenant.  I'm not

13   going to ask any further questions.

14            Thank you very much, sir.

15            THE COURT:  Any redirect?

16            MS. HOULE:  I'm sorry, your Honor.  May I have one

17   moment?

18            (Pause)

19            MS. HOULE:  No redirect.  Thank you, your Honor.

20            THE COURT:  Mr. Teague, thank you very much.

21            (Witness excused)

22            THE COURT:  Next witness.

23            MS. ESTES:  Your Honor, the government calls George

24   Parker.

25            THE COURT:  Mr. Parker.

G9JVROD3                        Parker - direct

1    GEORGE PARKER,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Okay.  Go ahead.

5    DIRECT EXAMINATION

6    BY MS. ESTES:

7    Q.  Good afternoon.

8              Where do you work?

9    A.  I work at U-Haul of Bruckner Boulevard.

10   Q.  What are the cross streets of Bruckner Boulevard and that

11   U-Haul?

12   A.  It's Willow Avenue and Bruckner -- I'm sorry.  Willow

13   Avenue and 138th Street.  The address is 780 East 138th Street.

14   Q.  What borough is that located in?

15   A.  That is in the Bronx.

16   Q.  How long have you worked there?

17   A.  Going on two years now.

18   Q.  What is your position?

19   A.  The general manager.

20   Q.  How long have you been in that position?

21   A.  I've been in that position for almost a year and-a-half.

22   Q.  What are your duties and responsibilities as the general

23   manager?

24   A.  To make sure the center is running smoothly; to make sure

25   contracts are done in a proper and timely fashion; to mediate

G9JVROD3                        Parker - direct

1    disputes between the customer and U-Haul.

2    Q.  Are you familiar with the documents and other business

3    records maintained by that U-Haul as part of its regular

4    business?

5    A.  Yes, ma'am.

6    Q.  Mr. Parker, what kind of services does that U-Haul offer?

7    A.  We offer storage and truck rentals.

8    Q.  Could you explain the process for obtaining storage at that

9    U-Haul facility.

10   A.  When you want to get storage, it's a month-to-month lease.

11   You bring your ID, you fill out some forms, we enter it into

12   the computer, and you sign the contract.

13   Q.  Before signing the contract, does the customer provide any

14   information to U-Haul?

15   A.  Yes.

16   Q.  What sort of information?

17   A.  Their name, address, contact information.  We need to have

18   their ID number on file.

19   Q.  If a customer obtains a unit, how do they access that unit?

20   A.  They have to -- they are given an access card.  They buy

21   their own lock.  The access card is used to get into the

22   building, and they have to swipe to go up in the elevator, and

23   then they have their own key for their own unit.

24   Q.  Now, when you're working at U-Haul within the facility,

25   where are you located?

G9JVROD3                           Parker - direct

1   A.  We're in what's called a showroom, which is basically the

2   storefront.

3   Q.  Does the customer have to visit the storefront to access

4   the storage unit?

5   A.  No.

6   Q.  How do they access the storage unit?

7   A.  There is a side door on the Willow Avenue side, and also we

8   have the loading bays in the back where the unit could be

9   accessed or the elevator could be accessed.

10  Q.  Are those units in the back accessible by vehicle?

11  A.  Yes, ma'am.

12  Q.  Now, when you're in the front, in the showroom, can you see

13  the entrances?

14  A.  You can't see the entrances to the store or the loading

15  bay.

16  Q.  What hours can a customer access the storage, to your

17  knowledge?

18  A.  We do offer 24-hour access for $10 extra.  But if you

19  didn't have it, you would be limited to the hours the center is

20  actually opened.

21  Q.  And what are those hours generally?

22  A.  It's 7 to 7.  On Friday we close at 8; and then on Sunday

23  it's 9 to 5.

24  Q.  Mr. Parker, could you please turn in the exhibit binder in

25  front of you to what has been premarked for identification

G9JVROD3                        Parker - direct

1   purposes as Government Exhibit 500.

2          Do you recognize this document?

3   A.  Yes, ma'am.

4   Q.  How do you recognize it?

5   A.  This is a U-Haul storage contract.

6   Q.  Was this document made and kept in the course of

7   regularly-conducted business at the U-Haul storage facility?

8   A.  Yes, ma'am.

9   Q.  Was it U-Haul's practice to make and keep documents of this

10  kind?

11  A.  Yes, it is.

12         MS. ESTES:  Your Honor, the government offers

13  Government Exhibit 500.

14         THE COURT:  Any objection?

15         MR. HANDWERKER:  Does he have that in front of him,

16  Judge?

17         THE COURT:  Pardon me?

18         MR. HANDWERKER:  Does he have the exhibit in front of

19  him?

20         THE COURT:  Yes, he does.

21         MR. HANDWERKER:  Could I take a look at it for a

22  second?

23         THE COURT:  No.  You've got the exhibit right there.

24         MR. HANDWERKER:  I'm trying to locate it.

25         THE COURT:  Well, it's under the tab that says "500."

G9JVROD3                              Parker - direct

1          MR. HANDWERKER:  Okay.

2          Okay, Judge.  Thank you.

3          THE COURT:  500 is received in evidence.

4          Go ahead.

5          (Government's Exhibit 500 received in evidence)

6          MS. ESTES:  Your Honor, may I publish Government

7     Exhibit 500?

8          THE COURT:  Yes, you may.

9          MS. ESTES:  Ms. Lee, could you zoom into the top

10    portion of the document.

11    BY MS. ESTES:

12    Q.  Mr. Parker, let me direct your attention to the line on

13    this document entitled "Customer Name."

14          What is the name listed on that line?

15    A.  The name is Michael E. Rodriguez.

16    Q.  What is the phone number listed on that line?

17    A.  There's two phone numbers.  There's 917917-407-8320.  The

18    other one is 212-316-2878.

19    Q.  What's the driver's license number listed?

20    A.  It's 240835742.

21          MS. ESTES:  Ms. Lee, could you move Government Exhibit

22    500 to the top portion of the screen; and could you also pull

23    up Government Exhibit 1107, which has been previously entered

24    into evidence.

25    Q.  Mr. Parker, directing your attention to Government Exhibit

G9JVROD3                          Parker - direct

1    1107, which is at the bottom of the screen, could you read the

2    number on that driver's license?

3    A.   It is 240835742.

4    Q.   Does that match the number in Government Exhibit 500, the

5    rental agreement?

6    A.   Yes, ma'am.

7    Q.   Generally, turning back to that rental agreement, what are

8    its terms?

9    A.   I don't understand.  You mean in general?

10   Q.   Yes, in general.

11   A.   Okay.  It's a month-to-month lease.  It's basically telling

12   you that you have to pay -- the day you move in is your due

13   date for the unit, and you have to pay on that date every

14   month.  If you want to move out, you move out before the due

15   date comes due.  It's just telling you that -- about late fees

16   and it also tells you like your agreement terms as in like

17   insurance and if you're responsible for anything that happens

18   to the unit.

19   Q.   When did the lease begin?

20   A.   It says here it was signed on May 14, 2013.

21   Q.   Does the document reflect the rent for the unit?

22   A.   Yes, it does.

23   Q.   How much is the rent?

24   A.   It's 129.95.

25        MS. ESTES:  Ms. Lee, could you display the last page

1    of the document.  Could you zoom into the bottom part of the

2    page.

3    Q.  Mr. Parker, does this document bear a signature?

4    A.  Yes, ma'am.

5    Q.  What name is the signature next to?

6    A.  Michael E. Rodriguez.

7    Q.  What is the room number listed?

8    A.  2324.

9    Q.  What does that refer to?

10   A.  That's the unit number; second floor and the number of the

11   unit.

12   Q.  Mr. Parker, could you please turn in your exhibit binder to

13   what has been premarked for identification purposes as

14   Government Exhibit 501.

15          Do you recognize this document?

16   A.  Yes, ma'am.

17   Q.  How do you recognize it?

18   A.  This is the payment history for the unit.

19   Q.  Do you recognize it from your experience as the manager at

20   U-Haul?

21   A.  Yes.

22   Q.  Was this document made and kept in the course of

23   regularly-conducted business at that U-Haul storage facility?

24   A.  Yes, ma'am.

25   Q.  Was it U-Haul's practice to make and keep documents of this

G9JVROD3                          Parker – direct

1    kind?

2    A.  Yes.

3            MS. ESTES:  Your Honor, the government offers

4    Government Exhibit 501.

5            MR. HANDWERKER:  No objection, your Honor.

6            THE COURT:  501 is in evidence.

7            (Government's Exhibit 501 received in evidence)

8            MS. ESTES:  Your Honor, may I publish Government

9    Exhibit 501?

10           THE COURT:  Yes, you may.

11           MS. ESTES:  Ms. Lee, could you zoom into the top part

12   of the document.

13   Q.  Mr. Parker, let me direct your attention to the column on

14   Government Exhibit 501 entitled "Description."

15           What does that column refer to?

16   A.  That refers to the description of the charge and/or

17   payment.

18   Q.  So does it refer to how the person pays for the unit?

19   A.  Yes.

20           MS. ESTES:  Ms. Lee, could you scroll down the

21   document.

22   Q.  Mr. Parker, does this record show how the unit was

23   generally paid for?

24   A.  Yes, ma'am.

25   Q.  How was it generally paid for?

G9JVROD3                        Parker - direct

1    A.  It looks to be paid in cash, with one exception of a charge

2    card.

3    Q.  Mr. Parker, could you turn in your exhibit binder to what

4    has been premarked for identification purposes as Government

5    Exhibit 502.

6             Do you recognize this document?

7    A.  Yes, ma'am.

8    Q.  How do you recognize it?

9    A.  This is the late notice sent to customers.

10   Q.  Was this document made and kept in the regular course of

11   business at the U-Haul storage facility?

12   A.  Yes, ma'am.

13   Q.  Was it U-Haul's practice to make and keep documents of this

14   kind?

15   A.  Yes, it is.

16            MS. ESTES:  Your Honor, the government offers

17   Government Exhibit 502.

18            THE COURT:  Objections?

19            MR. HANDWERKER:  Just one second, your Honor.

20            No.

21            THE COURT:  502 is received in evidence.

22            (Government's Exhibit 502 received in evidence)

23            MS. ESTES:  Your Honor, can I --

24            THE COURT:  You can publish it.

25            MS. ESTES:  Ms. Lee, could you zoom into the top part

G9JVROD3                    Parker - direct

1    of this document entitled "Late Notice."

2    Q.  Mr. Parker, what is the date of this late notice?

3    A.  It's August 17, 2015.

4    Q.  Who was it addressed to?

5    A.  It's addressed to Michael E. Rodriguez.

6    Q.  Mr. Parker, did you ever personally deal with Michael

7    Rodriguez?

8    A.  No, I did not.

9    Q.  Let me direct your attention to September 2015.

10            Around that time, did you receive a call related to

11   Storage Unit 2324?

12   A.  I don't remember really.

13   Q.  Is there anything that would refresh your recollection?

14   A.  Yes.  We keep contract notes for the unit.

15   Q.  And when were those notes made?

16   A.  Excuse me?

17   Q.  When are the notes made?

18   A.  They are made whenever -- when an employee deals with a

19   customer, supposed to enter the notes the same day at the

20   moment it happens -- well, after it happens.

21            MS. ESTES:  Your Honor, may I approach the witness?

22            THE COURT:  Yes, you may.

23   A.  What was the date again?

24   Q.  Mr. Parker, before you begin --

25            THE COURT:  Wait for the question.

1          THE WITNESS:  Sorry.

2    Q.  I'm showing you what has been premarked for identification

3    purposes as Government Exhibit 3505-13 and 3505-14.

4          If you could take a moment to review those pages and

5    let me know when you completed the review.

6    A.  Okay.  I've finished.

7    Q.  Mr. Parker, did that document refresh your recollection as

8    to whether you received a phone call in September 2015 related

9    to that unit?

10   A.  Yes, it did.

11   Q.  And what do you remember?

12   A.  The customer's sister called and she did, in fact, ask

13   about the unit.  She said her brother was in prison and she

14   wanted to clear up the balance and move everything out.

15   Q.  And did she, in fact, clear out the unit?

16   A.  No, she did not.

17   Q.  Why not?

18   A.  I do not really remember.  I didn't put it in the notes,

19   but I think it may have been an issue with paying the balance.

20   Q.  Was the person who called, was she listed as somebody who

21   could access the unit?

22   A.  No, she was not.

23   Q.  So did you give her access to the unit?

24   A.  No.

25   Q.  Let me direct your attention to November 10, 2015.

G9JVROD3                          Parker - direct

1              Around that time, did agents from the Drug Enforcement

2      Administration come to your facility?

3      A.   Yes, they did.

4      Q.   Why did they come to your facility?

5      A.   They said they needed to check the unit; they've had a

6      warrant.

7      Q.   And when you say "the unit," which unit are you referring

8      to?

9      A.   Unit 2324.

10     Q.   Did you review any surveillance footage with those agents?

11     A.   I don't really recall.

12     Q.   Is there anything that would refresh your recollection?

13     A.   Yes.  It would be the contract notes, but I see I didn't --

14     I may have forgot to put it in.

15              MS. ESTES:  One moment, your Honor.

16     Q.   Mr. Parker, was a search warrant carried out on that unit?

17     A.   Yes, it was.

18     Q.   After the search warrant, did you have a conversation with

19     the sister who had called previously?

20              MR. HANDWERKER:  Objection.  Hearsay.

21              THE COURT:  Overruled.

22              Did you have a conversation?

23              THE WITNESS:  Sometime after, not that same day.

24              THE COURT:  Okay.

25     Q.   When you had the conversation, what did you discuss?

G9JVROD3

1           MR. HANDWERKER:  Objection.

2           THE COURT:  Overruled.

3   A.   I can't remember what she really called for.  I think maybe

4   it was probably payment.  But I did tell her that a warrant had

5   been carried out that the police tipped on.

6   Q.   How did she react when you told her that?

7   A.   That her -- she -- her facial expression changed and she

8   said she's going to have to think about it at that point and

9   then she left.

10          MS. ESTES:  Your Honor, may I have one moment?

11          THE COURT:  Yes.

12          MS. ESTES:  Your Honor, no further questions.

13          THE COURT:  Mr. Handwerker?

14          MR. HANDWERKER:  I don't have any questions for this

15   witness, Judge.

16          THE COURT:  No questions?

17          MR. HANDWERKER:  No.

18          THE COURT:  Mr. Parker, you are excused.

19          Thank you very much.  Thanks for coming in.

20          (Witness excused)

21          THE COURT:  Do you have another witness?

22          MS. HOULE:  We do, your Honor.  We expect that he will

23   take 15 to 20 minutes.

24          THE COURT:  Okay.  Well, I think we'll break then,

25   because it's close -- normally we go right to 4:30, but the

G9JVROD3

1    witness would have to come back.

2            I think, in light of the fact that many people are

3    from Westchester and Rockland, and have to travel a long

4    distance, we'll break at 4:30, we count on that.  We won't go

5    over that time.

6            So remember what my instructions were:  Don't do any

7    research; don't talk about the case; keep open mind.  We'll

8    resume at 9:30 tomorrow morning.  Get here a little bit early.

9    We'll have coffee and doughnuts for you.

10           See you tomorrow morning.  Thank you.

11           (Jury excused)

12           THE COURT:  I was hoping for four witnesses today, but

13   we got three.

14           Where are we in your schedule?

15           MS. ESTES:  Your Honor, we have six more witnesses,

16   but we do expect most of them will be relatively short.

17           THE COURT:  Do you think you could finish tomorrow?

18           MS. ESTES:  Yes, your Honor.

19           THE COURT:  Okay.

20           Mr. Handwerker?

21           MR. HANDWERKER:  We don't have a case planned right

22   now.

23           THE COURT:  All right.

24           So when will we do the jury charge?

25           MS. ESTES:  Your Honor, we'd like to do it at

G9JVROD3

1    lunchtime, if that works for the Court.

2              THE COURT:  Okay.  We have your submissions in PDF.

3    Can we get them in Word?

4              MS. ESTES:  Yes, of course, your Honor.

5              THE COURT:  That will make it simpler for us.  We work

6    in Word.

7              MS. ESTES:  Yes, your Honor.

8              THE COURT:  All right.

9              Anything else to cover today?

10             MS. ESTES:  Nothing from the government.

11             THE COURT:  Mr. Handwerker?

12             MR. HANDWERKER:  Nothing from the defense.

13             THE COURT:  Michael?

14             THE LAW CLERK:  Nothing.

15             THE COURT:  Thank you very much.

16             See you tomorrow morning.

17             (Adjourned to September 20, 2016 at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    MOISES WALTERS

 4    Direct By Ms. Estes  . . . . . . . . . . . . .19

 5    Cross By Mr. Handwerker  . . . . . . . . . . .45

 6    JERMEL TEAGUE

 7    Direct By Ms. Houle  . . . . . . . . . . . . .61

 8    Cross By Mr. Handwerker  . . . . . . . . . . .65

 9    GEORGE PARKER

10    Direct By Ms. Estes  . . . . . . . . . . . . .67

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        GOVERNMENT EXHIBITS

2     Exhibit No.                              Received

3     133    . . . . . . . . . . . . . . . . .24

4     100    . . . . . . . . . . . . . . . . .26

5     101    . . . . . . . . . . . . . . . . .28

6     102    . . . . . . . . . . . . . . . . .29

7     103    . . . . . . . . . . . . . . . . .30

8     104    . . . . . . . . . . . . . . . . .31

9     105    . . . . . . . . . . . . . . . . .32

10    106    . . . . . . . . . . . . . . . . .33

11    110 through 130   . . . . . . . . . . . .35

12    131 and 132   . . . . . . . . . . . . . .36

13    134    . . . . . . . . . . . . . . . . .45

14    1200   . . . . . . . . . . . . . . . . .50

15    1100 through 1107   . . . . . . . . . . .53

16    500    . . . . . . . . . . . . . . . . .71

17    501    . . . . . . . . . . . . . . . . .74

18    502    . . . . . . . . . . . . . . . . .75

19

20

21

22

23

24

25
```