G9KQROD1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3
                v.                          15 CR 756 (PAC)
4                                           Trial
     MICHAEL EARL RODRIGUEZ
5
                    Defendant
6    ------------------------------x

7                                           New York, N.Y.
                                            September 20, 2016
8                                           9:45 a.m.

9

     Before:
10
                        HON. PAUL A. CROTTY
11                                          District Judge

12                                          and a Jury

13                        APPEARANCES

14
     PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16   AMANDA L. HOULE
     JORDAN L. ESTES
17   TIMOTHY T. HOWARD
         Assistant United States Attorney
18
     GOLDSTEIN & HANDWERKER LLP
19       Attorney for Defendant Rodriguez
     MICHAEL HANDWERKER
20
     -Also Present-
21   RICHARD DEMURJIAN, Special Agent (DEA)

22   SYLVIA LEE, Paralegal (SDNY USAO)
     YOLANDA BUSTILLO, Paralegal (SDNY USAO)
23

24

25

G9KQROD1

1          (Trial resumed; jury not present)

2          THE COURT:  Marlon has advised me one of the jurors

3     are stuck in traffic on Canal Street, one of the alternates.

4     We'll begin as soon as she arrives.

5          Ms. Houle, you wanted to put something on the record?

6          MS. HOULE:  Yes, your Honor.  Yesterday during

7     Mr. Handwerker's opening, he made a point that the government

8     wanted to make clear we believe is inconsistent with the jury

9     charge and with the law, and we are hoping that this doesn't

10    happen again in closing.

11         It's page 18, the first and second lines.

12    Mr. Handwerker said, "It's not enough for them to hear Michael

13    Rodriguez's words.  You need evidence."  Making the suggestion

14    that the defendant's statements are not themselves evidence.

15         THE COURT:  Mr. Handwerker, do you want to be heard?

16         MR. HANDWERKER:  I don't see anything wrong with this,

17    Judge.

18         THE COURT:  Well, Mr. Rodriguez's words are in fact

19    evidence, aren't they?

20         MR. HANDWERKER:  And you're going to instruct them on

21    that.  Right?  So, I mean, what I say is not evidence of

22    anything.  I'm making an opening statement.

23         THE COURT:  But you shouldn't be making incorrect

24    statements of the law, right?

25         MR. HANDWERKER:  That's true.

G9KQROD1

1          THE COURT:  So, "It's not enough for them to hear

2     Michael Rodriguez's words.  You need evidence" is somewhat

3     incorrect in that the fact that Michael Rodriguez's words can

4     be considered by the jury as evidence of -- here I guess it's

5     got to be used as evidence of his use of a gun.

6          MR. HANDWERKER:  Possession of a gun.

7          THE COURT:  Use or possession.

8          Ms. Houle, what I would do is take a look at the

9     instructions, if you want to modify the instructions in any way

10    to make this clear what Mr. Handwerker's or how Mr. Rodriguez's

11    statements can be used, his statements from jail and the U.S.

12    Attorney's Office, I'll consider it.

13         MS. HOULE:  Thank you, your Honor.  We've reviewed the

14    instruction last night.  We feel comfortable as it is now.  We

15    wanted to raise it to ensure it doesn't happen again.

16         THE COURT:  What instruction?

17         MS. HOULE:  It's request number 29, statements of the

18    defendant.

19         THE COURT:  All right.  If you're satisfied with the

20    instruction, I guess from my standpoint I'm not going to raise

21    this now with the jury.

22         MS. HOULE:  Thank you, your Honor.  We're not

23    requesting that.  We just want to be sure that the parties and

24    your Honor are in agreement on this point.

25         THE COURT:  Thank you.

G9KQROD1

1          Marlon, do you want to check with the jury?

2          (Pause)

3          THE COURT:  I'm taking a plea at 12:30, 12:45.  We

4    will take a little shorter break today this morning because of

5    the delayed start.  The plea will take about 15 minutes, and we

6    could do the jury charge after that.  It all depends how

7    quickly the witnesses go.  Is it the government's intention to

8    finish today?

9          MS. HOULE:  Yes, your Honor.

10         (Pause)

11         THE COURT:  We received a copy of the verdict sheet

12   last night in PDF form.  Do you think you could put that in

13   Word?

14         MS. HOULE:  I'm sorry, your Honor?  The verdict form?

15         THE COURT:  Could you put it in Word?

16         MS. HOULE:  Yes.

17         THE COURT:  Mr. Handwerker, did you see the verdict

18   sheet?

19         MR. HANDWERKER:  I did.  I was just going to approach

20   the government and discuss something about it.

21         THE COURT:  Fine.

22         (Pause)

23         (Jury present)

24         THE COURT:  Ms. Houle, do you want to call your next

25   witness?

1           MS. HOULE:  Thank you, your Honor.  The government

2     calls Michael Slavkovsky.

3      MICHAEL SLAVKOVSKY,

4           called as a witness by the Government,

5           having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MS. HOULE:

8           THE COURT:  Please sit down.  Make yourself

9     comfortable.

10          OK, Ms. Houle.

11    Q.  Where are you employed?

12    A.  I'm a U.S. postal inspector with the U.S. Postal Inspection

13    Service.  I'm a federal law enforcement officer, law

14    enforcement arm of the U.S. Postal Service.

15          THE COURT:  Mr. Slavkovsky, would you pull yourself

16    closer to the microphone?  Thank you very much.

17    BY MS. HOULE:

18    Q.  How long have you been an inspector with the U.S. Postal

19    Service?

20    A.  I've been an inspector for over three years.

21    Q.  What generally are your duties and responsibilities as an

22    inspector?

23    A.  We're responsible for ensuring public trust in the mail,

24    protecting our employees, protecting infrastructure and our

25    customers.  My primary function is to support and investigate

G9KQROD1                              Slavkovsky – direct

1    money laundering activities through the postal service.

2              MS. HOULE:  Apologies, your Honor.  I couldn't see

3    that the binder was in front of the witness.

4    Q.   Inspector, could you please turn to tabs Government

5    Exhibits 200, 201 and 202 in your binder.  Those have been

6    marked for identification purposes.  Please let me know once

7    you've reviewed the documents.

8    A.   All set.

9    Q.   Do you recognize these documents?

10   A.   Yes.

11   Q.   What are they?

12   A.   These are U.S. postal money orders.

13   Q.   Are they executed money orders?

14   A.   Yes, they are fully executed and negotiated money orders.

15   Q.   Are you familiar with the process through which money

16   orders are created and archived?

17   A.   Yes.

18   Q.   Generally speaking, how does someone buy a money order?

19   A.   A customer walks into a post office or a mail facility.

20   They conduct a transaction with one of our sales and service

21   associates where they request a specified amount of money to be

22   placed on a money order where then there's a tender transaction

23   where they're making some method of payment to pay for that.

24   Q.   If someone buys a money order, can they then use it to pay

25   someone to whom they owe money?

G9KQROD1                          Slavkovsky - direct

1   A.  Yes.

2   Q.  How does that person who receives the money order as

3   payment turn it into cash?

4   A.  They can turn it into cash by any financial institution or

5   general bank that accepts a money order or anybody who's

6   willing to take that as payment.

7   Q.  Does the U.S. Postal Service in coordination with the

8   Federal Reserve Bank keep records of executed money orders in

9   the regular course of business?

10  A.  Yes.  The way these checks are -- money orders are cleared

11  is through the Federal Reserve Bank and an image is kept there.

12  Q.  Are those images kept in a central database?

13  A.  Yes.

14  Q.  Did you pull these money orders from that database?

15  A.  That is correct.

16          MS. HOULE:  Your Honor, the government offers Exhibits

17  200, 201 and 202 into evidence.

18          THE COURT:  Any objection, Mr. Handwerker?

19          MR. HANDWERKER:  No, I will wait to hear the

20  testimony.

21          THE COURT:  200, 201 and 202 are received in evidence.

22          (Government's Exhibits 200, 201 and 202 received in

23  evidence)

24          MS. HOULE:  Your Honor, may I publish Government

25  Exhibit 200 to the jury?

1              THE COURT:  Yes, you may.

2              MS. HOULE:  Ms. Lee, could you please zoom in on the

3    image?

4    Q.   Inspector, I'd like to walk through with you the features

5    of the money order that's on the screen.  In the top left

6    there's a number listed as a serial number.  What does that

7    represent?

8    A.   The serial number is a unique identifying number for that

9    appropriate money order.

10   Q.   Does every money order issued have its own serial number?

11   A.   Yes, they all have a unique serial number.  They're issued

12   in blocks of a hundred.

13   Q.   Moving to the right of the serial number, there's a date

14   listed.  What does that reflect?

15   A.   That is printed at the point of sale between the customer

16   and our sales and service associate so that reflects when that

17   money order was created at the postal service and handed over

18   to the customer.

19   Q.   On this money order, what date is listed?

20   A.   June 4, 2015.

21   Q.   Moving further to the right on the money order, there's a

22   number listed below the words "post office."  What does that

23   reflect?

24   A.   Post office is the issuing post office down to the specific

25   site where that money order was created.

1    Q.  So each post office has a unique identifying number?

2    A.  Each post office down to a specific facility, if there are

3    multiple facilities in a post office.

4    Q.  Here 104551 is listed.  What post office is that?

5    A.  That's the post office located at 633 St. Ann's Avenue in

6    Bronx, New York.

7    Q.  Moving further to the right, there's an amount of money

8    listed.  What does that reflect?

9    A.  The face value of the money order that was issued from the

10   postal service that's requested by the customer, and the sales

11   and service associate from postal will complete that as

12   desired.

13   Q.  By that do you mean that that is what the money order is

14   worth?

15   A.  That's correct.

16   Q.  Here what amount is listed?

17   A.  $65.11.

18   Q.  Moving back to the side where the serial number is, below

19   that, there's a "pay to" field.  What does that reflect?

20   A.  "Pay to" will be who will be cashing this money order or

21   placing it into the financial institution.

22   Q.  Who is the "pay to" listed here?

23   A.  Parkwell LLC.

24   Q.  Does the post office worker who sells the money order write

25   in that "pay to" field?

1    A.  No.  They do not write in that field.

2    Q.  Are they permitted to write in that field?

3    A.  They are not.

4    Q.  To the right of the "pay to" field is a field listed as

5    "from."  What does that reflect?

6    A.  That would be who is paying that money order.

7    Q.  Who is listed in the "from" field here?

8    A.  Michael Rodriguez.

9    Q.  What address is listed?

10   A.  175 West 95th Street.

11          MS. HOULE:  Ms. Lee, could you please turn to the

12   fourth page of this exhibit.  If you could please zoom in again

13   on the image.

14   Q.  Inspector, is this also a postal money order?

15   A.  Yes.

16   Q.  Does it bear the same fields that you just described in

17   relation to the order that we just reviewed?

18   A.  Yes.

19   Q.  What is the date this order was issued?

20   A.  June 4, 2015.

21   Q.  What is the post office?

22   A.  633 St. Ann's Avenue in Bronx, New York.

23   Q.  And the amount?

24   A.  $1,000.

25   Q.  And the pay to?

1    A.  1199 Housing Corp.

2    Q.  And the "from"?

3    A.  Ramon Cartegena.

4    Q.  What address is listed there?

5    A.  420 East 111th Street.

6    Q.  Is there an apartment number listed?

7    A.  Yes.

8    Q.  Is that 909?

9    A.  Correct.

10   Q.  The fact that this money order was found in the Federal

11   Reserve directory, does that confirm that it was cashed as it

12   appears here as it's written?

13   A.  Yes.

14           MS. HOULE:  Your Honor, may I please publish

15   Government Exhibit 203, which is already in evidence?

16           THE COURT:  Yes, you may.

17           MS. HOULE:  Ms. Lee, if you could please bring that

18   up.  I apologize, your Honor.  It's not in evidence.  I

19   apologize.

20           THE COURT:  200, 201 and 202 are in evidence.

21   BY MS. HOULE:

22   Q.  Inspector, if you could please turn to Exhibit 203 in your

23   binder.  Do you recognize this document?

24   A.  Yes.

25   Q.  Does this document reflect the results of a query you made

G9KQROD1                        Slavkovsky – direct

1    in a postal service database?

2    A.  Yes.

3    Q.  Does that database maintain information about sales of

4    items at post offices?

5    A.  Yes, it reflects our point of sale data.

6    Q.  Is the information contained in this report selected by

7    individuals at the post office at the time of purchase and

8    input into the system?

9    A.  Yes.

10   Q.  And are those sale records kept by the postal service in

11   the regular course of business?

12   A.  Absolutely.

13              MS. HOULE:  Your Honor, the government offers

14   Government Exhibit 203 into evidence.

15              THE COURT:  Any objection, Mr. Handwerker?

16              (Pause)

17              THE COURT:  Mr. Handwerker.

18              MR. HANDWERKER:  Yes, I'm just looking at the

19   document.  I won't object.  I'll wait until cross-examination.

20              THE COURT:  203 is received in evidence.

21              (Government's Exhibit 203 received in evidence

22              MS. HOULE:  Thank you, your Honor.  May I publish it

23   to the jury?

24              THE COURT:  Yes, you may.

25              MS. HOULE:  Ms. Lee, could you please zoom in on the

G9KQROD1                          Slavkovsky – direct

1    first half of this chart.

2    BY MS. HOULE:

3    Q.  Inspector, I'd like to review the columns in this document

4    with you starting from the left and moving to the right of the

5    page.  What is the date ID?

6    A.  It's the date of the transaction listed.

7    Q.  And is that the transaction at the post office?

8    A.  Yes, the physical transaction at the post office.

9    Q.  What is the SSA DESC?

10   A.  It's our identification number for postal service employee

11   who was creating the sale.

12   Q.  What is the RDM number ID?

13   A.  It is the unique identifying number for that transaction

14   between that clerk.

15   Q.  So if someone purchased more than one item as part of the

16   same transaction at the post office, would all of those items

17   have the same RDM number?

18   A.  Yes.

19   Q.  What is the tender type?

20   A.  Tender type would be the method of payment.

21   Q.  What is the product AIC?

22   A.  It's a product code listed for accounting purposes.

23   Q.  Here product AIC 0100 is listed.  What does that represent?

24   A.  A domestic money order sale.

25   Q.  And what about product AIC 0101 which is also listed?

A.   It's the money order fee that postal charges to create the
money order.

Q.   What is the serial number ID?

A.   Serial number ID corresponds to the money order that was
purchased and transacted by that clerk.

Q.   So is that the same serial number ID we just reviewed on
those executed money orders; meaning, is that what would fall
in that field?

A.   Yes.

Q.   What does the start time and end time represent?

A.   Start time is the start the clock for the clerk between the
transaction beginning with the customer and when tender -- when
the money is exchanged and there's tender for payment.

Q.   So that's the time frame in which the transaction is made?

A.   That is correct.

          MS. HOULE:   Ms. Lee, could you please zoom in on the
second half of the chart.

Q.   Inspector, what is the walk-in rev amount?

A.   That is the amount of profit that the post office is taking
in for sale of product or service.

Q.   What is the non-rev amount?

A.   That would be the face value of the money order.

Q.   What is the tender amount?

A.   Tender amount was the amount of money that was handed over
from the customer to pay for services or products.

1    Q.   What is the change amount?

2    A.   That was the change handed back from the sales and service

3    associate back to the customer.

4    Q.   Does this report provide information about the money orders

5    you reviewed at Government Exhibit 200?

6    A.   Yes.

7    Q.   Can you tell that based on the serial numbers listed and

8    the dates listed?

9    A.   Yes.

10   Q.   So, taking the information in this chart, what are you able

11   to tell about the money orders in Government Exhibit 200?

12   A.   These money orders were bought at the same location by the

13   same clerk and the same transaction on June 4, 2015 between

14   9:38 and 9:41.

15   Q.   Which location is that?

16   A.   This is 633 St. Ann's Avenue in the Bronx.

17        MS. HOULE:   Your Honor, may I publish Government

18   Exhibit 201 to the jury which is already in evidence?

19        THE COURT:   Yes, you may.

20   Q.   Inspector, Government Exhibit 201, is this also a set of

21   money orders?

22   A.   Yes.

23   Q.   Do these money orders bear the same features that you just

24   reviewed in Government Exhibit 200?

25   A.   Yes, it does.

G9KQROD1                          Slavkovsky – direct

1    Q.   Looking at this first page where Ms. Lee has already zoomed

2    in, what is the date that this money order was issued?

3    A.   August 5, 2015.

4    Q.   Where was it issued?

5    A.   700 Columbus Avenue.

6    Q.   Is that in Manhattan?

7    A.   Yes, in Manhattan.

8    Q.   So 700 Columbus Avenue is the post office with ID 100253?

9    A.   Yes.

10   Q.   In what amount is this money order issued?

11   A.   $1,000.

12   Q.   What is listed in the "pay to" field?

13   A.   CitiCard at a PO box.

14   Q.   What is listed in the "from" field?

15   A.   Michael Rodriguez, 175 West 95th Street.

16          MS. HOULE:   Ms. Lee, could you please turn to the

17   second page, and if you could zoom in on the image again

18   please.

19   Q.   Is this also a money order like the ones you've reviewed?

20   A.   Yes.

21   Q.   What is the date that this money order was issued?

22   A.   August 5, 2015.

23   Q.   Where was it issued?

24   A.   Also 700 Columbus Avenue, Manhattan.

25   Q.   What is the amount?

G9KQROD1                          Slavkovsky – direct

1    A.  $1,000.

2    Q.  And the "pay to" field?

3    A.  1199 Housing Corp.

4    Q.  What is listed in the "from" field?

5    A.  Ramon Cartegena, 420 East 111th Street.

6    Q.  Is there an apartment listed?

7    A.  Apartment 909.

8    Q.  The fact that this money order was found in the Federal

9    Reserve directory that you described, does that confirm that it

10   was cashed as it's written here?

11   A.  Yes.

12   Q.  Inspector, if you could please turn back in your binder to

13   Government Exhibit 203.  Does this report provide information

14   about the money orders that you just reviewed at Government

15   Exhibit 201?

16   A.  Yes.

17   Q.  Can you tell that based on the serial numbers and the dates

18   listed?

19   A.  That's correct.

20   Q.  Taking the information in this chart, what are you able to

21   tell about the money orders in Government Exhibit 201?

22   A.  Those two money orders were sold by the same clerk at the

23   same location on August 5, 2015, paid for with cash between

24   1517 and 1521 on August 5.

25   Q.  Are you able to tell if they are part of the same

1    transaction?

2    A.   Yes.

3    Q.   Were they?

4    A.   Yes, they were.

5    Q.   And you indicated that it's the same location.  Which

6    location is that?

7    A.   Post office located at 700 Columbus Avenue, Manhattan.

8    Q.   Inspector, you just testified that the transaction took

9    place between 1517 and 1521?

10   A.   Yes.

11   Q.   Is that another way of saying between 3:17 p.m. and

12   3:21 p.m.?

13   A.   Yes, that is.

14          MS. HOULE:  Your Honor, may I publish Government

15   Exhibit 202 to the jury, which is already in evidence?

16          THE COURT:  Yes, you may.

17          MS. HOULE:  Ms. Lee, if you could please zoom in on

18   the image.

19   Q.   Is this also a money order bearing the same fields as those

20   that you reviewed at Government Exhibits 200 and 201?

21   A.   Yes, it is.

22   Q.   What is the date that this money order was issued?

23   A.   July 21, 2010.

24   Q.   And the post office number?

25   A.   100253, 700 Columbus Avenue.

G9KQROD1                          Slavkovsky - cross

1   Q.   And the amount?

2   A.   $127.50.

3   Q.   And the "pay to"?

4   A.   1199 Housing Corp.

5   Q.   And the "from"?

6   A.   Michael Rodriguez, 420 East 111th Street, apartment 909.

7            MS. HOULE:  Just one moment, your Honor.

8            Thank you, your Honor.  No further questions.

9            THE COURT:  Mr. Handwerker.

10  CROSS-EXAMINATION

11  BY MR. HANDWERKER:

12  Q.   Mr. Slavkovsky, is that how you pronounce it, sir?

13  A.   Yes.

14  Q.   You've been with the postal service for three years?

15  A.   Yes, as an agent for three years.

16  Q.   Did you work in any capacity for the postal service prior

17  to that?

18  A.   I was an intelligence analyst with the U.S. Postal

19  Inspection Service.

20  Q.   Is there evidence of any fraud or any impropriety in the

21  money orders?

22  A.   No.

23  Q.   Did anyone misidentify themselves?

24  A.   Not from the images.

25  Q.   If you know?

1    A.  No.

2    Q.  Can you tell --

3    A.  No.

4    Q.  -- who purchased the money orders?

5    A.  No.

6    Q.  All you know is you received from the Federal Reserve the

7    finished product, right?

8    A.  Yes.

9    Q.  Indicating the postal, the location of the postal service,

10   and who filled in the information, correct?

11   A.  Yes.

12   Q.  Do you know who filled in the information?

13   A.  No.

14   Q.  Just another question or two.  How did you get into this

15   case?

16   A.  I had a routine request.

17   Q.  By whom?

18   A.  The U.S. Attorney's Office of Southern District of New

19   York.

20   Q.  These persons sitting at the government table?

21   A.  Yes.

22   Q.  Did they give you anything to start your task with?

23   A.  The serial numbers.

24   Q.  The serial numbers.  Did they give you copies of any money

25   order receipts?

G9KQROD1                          Astrakhan – direct

1   A.  They provided me with the serial numbers.

2   Q.  And that's how you began your research?

3   A.  Correct.

4              MR. HANDWERKER:  Judge, I have no further questions of

5   this witness.

6              THE COURT:  Any redirect?

7              MS. HOULE:  No.  Thank you, your Honor.

8              THE COURT:  Mr. Slavkovsky, you're excused.  Thank you

9   very much.

10             (Witness excused)

11             THE COURT:  Next witness.

12             MS. ESTES:  Your Honor, the government calls Vadim

13  Astrakhan.

14   VADIM ASTRAKHAN,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MS. ESTES:

19             THE COURT:  All right, go ahead.

20  Q.  Good morning.

21  A.  Good morning.

22  Q.  Who are you employed by?

23  A.  DEA, Drug Enforcement Administration.

24  Q.  How long have you been with the drug enforcement

25  administration?

1    A.   14 years now.

2    Q.   What is your title?

3    A.   I'm a senior forensic chemist.

4    Q.   How long have you been a senior forensic chemist with the

5    DEA?

6    A.   Six years.

7    Q.   What was your position before that?

8    A.   Forensic chemist.

9    Q.   How long were you a forensic chemist?

10   A.   I started in 2002.

11   Q.   Do you work in a particular department?

12   A.   I work in the northeast laboratory.

13   Q.   What are your duties and responsibilities as a senior

14   forensic chemist at the northeast laboratory?

15   A.   I analyze submitted evidence for the presence of controlled

16   and non-controlled substances.

17   Q.   Have you received training from the DEA on testing

18   materials for controlled substances?

19   A.   Yes.

20   Q.   Mr. Astrakhan, I'd like to now talk about how the

21   laboratory goes about testing materials generally.  What types

22   of materials does the lab receive for testing?

23   A.   All kinds of materials:  Powders, plants, anything.

24   Q.   When the laboratory gets the materials, what is done?

25   A.   The evidence is submitted to the laboratory, either by

G9KQROD1                          Astrakhan – direct

1    agents in person or by mail.  It is then stored in the vault.

2    The case is then assigned to each chemist.  The chemists pick

3    up the evidence from the vault, analyze them, generate their

4    report, submit their evidence back to the vault.

5    Q.  Mr. Astrakhan, I'd like you to now turn in your exhibit

6    binder to what has been previously marked for identification

7    purposes as Government Exhibit 1000.

8    A.  I'm not sure what I'm looking at.

9    Q.  It should have a tab for Government Exhibit 1000.

10   A.  1000, you said?

11   Q.  1000.

12   A.  GEX 1000?

13   Q.  Yes.

14   A.  OK.  Sorry.

15   Q.  Do you recognize this?

16   A.  Yes, this is my lab report.

17   Q.  When was this report made?

18   A.  It was made on 10th of February, 2016.

19   Q.  Does the laboratory keep these reports in the regular

20   course of business?

21   A.  Yes.

22           MS. ESTES:  Your Honor, the government offers

23   Government Exhibit 1000.

24           THE COURT:  Any objection?

25           MR. HANDWERKER:  Just one second, Judge, please.

1            (Pause)

2            MR. HANDWERKER:  I just have one question to try to

3     clarify something.

4            Is there an address on this document where the

5     evidence was seized from?

6            THE WITNESS:  Not on this one.  There is a form called

7     DEA 7.  I think it might have an address on it but not always.

8            MR. HANDWERKER:  That would be pretty important,

9     wouldn't you think?

10           THE WITNESS:  I don't know.  I don't even look at it.

11           MR. HANDWERKER:  No further questions, Judge.

12           THE COURT:  1000 is received in evidence.

13           (Government's Exhibit 1000 received in evidence)

14           MS. ESTES:  Your Honor, may I publish Government

15    Exhibit 1000?

16           THE COURT:  Yes, you may.

17    BY MS. ESTES:

18    Q.  Mr. Astrakhan, prior to this report being finalized, was it

19    reviewed by anyone other than you?

20    A.  Yes, by my supervisor and then by an associate laboratory

21    director.

22    Q.  During the course of the analysis undertaken in this

23    report, did you adhere to all policies and procedures of the

24    DEA?

25    A.  I did.

1   Q.  I'd like to go over the report.

2              MS. ESTES:  Ms. Lee, could you please zoom into the

3   text of the report.  Mr. Astrakhan, what does the report say

4   was tested?

5   A.  The sample was tested and -- do you want me to go over the

6   procedures or the findings or --

7   Q.  Could you describe what kind of sample this was.

8   A.  This was plant material.  Basically it came in in five

9   boxes.  One box had just what I describe as a root, root plant

10  material.  I should say root material.  And the other four

11  boxes contained plant material, and there were also two

12  separate plastic bags inside these four boxes.  So all in all

13  it was six units.  You can see number of units it says six, so

14  this was six separate units.  And then I tested each one.

15             MS. ESTES:  Your Honor, may I approach the witness?

16             THE COURT:  Yes, you may.

17  Q.  Mr. Astrakhan, I've handed you what has been previously

18  entered into evidence as Government Exhibit 100.  Do you

19  recognize this box?

20  A.  This is a DEA evidence box.  It has my seal on the top, but

21  the seal has been broken, so it must have been opened.

22  Q.  Why do you generally put your seal on the top?

23  A.  Everything that I analyze I end up sealing and putting a

24  seal that I sign and date at the top.

25  Q.  So does the seal on the top indicate that you've analyzed

1    what is in this box?

2    A.  Yes, that's right.

3    Q.  Mr. Astrakhan, would you open the box with the scissors

4    I've handed up.  Could you pull out the material from the box?

5             THE WITNESS:  Can I step outside --

6             THE COURT:  Yes.

7    Q.  Mr. Astrakhan, do you recognize this material?

8    A.  I do.

9    Q.  How do you recognize it?

10   A.  I've seen it many times.  The inner bag does not show it

11   has any signatures, but this case I actually remember.

12   Q.  And is this the material that is the subject of the testing

13   in Government Exhibit 1000?

14   A.  Yes.

15   Q.  Thank you, Mr. Astrakhan.  You can put the material back in

16   the box.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Mr. Astrakhan, let's go back to the exhibit detail section

2    of the report.  Could you lead us through what the lines in

3    this section mean.

4    A.  Yes.  I will start at the bottom, where it says "exhibit

5    analysis."

6    Q.  What does that mean?

7    A.  That's the procedures that I used to analyze this evidence

8    that you just saw.  Again, the exhibit was six separate units

9    and treated as such.  So I analyzed each of the units

10   separately and I used three separate techniques on each.

11           The first technique that I used was microscopic

12   examination.  Basically, I look at the sample under a

13   microscope and I observed the characteristic bear-claw-shaped

14   hair, which are usually indicative of marijuana blend.

15           The second test was a Duquenois-Levine color test.

16   Q.  And what was the result of that test?

17   A.  It's a multi-part test.

18           First I extract a sample with a petroleum ether

19   solvent, then treat it to a Duquenois reagent, then add

20   hydrochloric acid to it, and the solution turned blue.  I then

21   added chloroform to it; it formed two separate layers, deep

22   purple at the top, light purple at the bottom, which again is

23   very indicative of marijuana presence.

24           And then the last technique is called GCMS, which

25   stands for gas chromatography-mass spectrometry test.  And it's

1    an instrumental technique.  Basically, I extract a sample with

2    methanol solvent, then inject it into an instrument.  And it

3    produces a result in the form of chromatogram.  Basically, it

4    separates any mixture into its individual components and then

5    identifies each component.

6            In this case, all six individual units were found to

7    contain Delta-9 THC, tetrahydrocannabinol, which is a main

8    ingredient in marijuana, and also some other alkaloids of

9    marijuana.  So all three of these tests in conjunction prove

10   that the substance contains marijuana.

11           And so at the top, if you see "observations, results,

12   and conclusions," it says that this exhibit, Exhibit 3,

13   contains marijuana, and the net weight of it, this entire bag,

14   is 3,128 grams.

15   Q.  Mr. Astrakhan, just going to the exhibit detail section,

16   where it lists the gross weight there, what does that refer to?

17   A.  The gross weight is the weight of the entire evidence in

18   boxes as I receive it, including the weight of the box.  Net

19   weight, which is a little bit higher, that's just the weight of

20   the sample.  In other words, if I remove all the packaging from

21   it, just the weight of the sample, in this case the plant

22   material that I analyzed, was --

23           THE COURT:  The weight is a little bit lower.

24           THE WITNESS:  Yes.

25           THE COURT:  You said higher.

G9KVROD2                        Astrakhan - direct

1              THE WITNESS:  I mean higher on the report.

2              MR. HANDWERKER:  Where it's located on the page.

3              THE WITNESS:  Yes.  Sorry, your Honor.

4              THE COURT:  Go ahead.

5   BY MS. ESTES:

6   Q.  So to clarify for the record, when you said you referred to

7   it being a bit higher, you meant higher on the page?

8   A.  Yes, higher on the page.  I'm sorry.

9   Q.  As to the weight, the net weight is lower here; is that

10  right?

11  A.  Yes, that's correct.  The gross weight is 7,300 grams, and

12  the net weight is 3,128 grams.

13  Q.  And to summarize, what was the result of the test?

14  A.  The sample contains marijuana.

15             MS. ESTES:  One moment, your Honor.

16             No further questions.

17             THE COURT:  Mr. Handwerker.

18             MR. HANDWERKER:  No questions, Judge.

19             THE COURT:  Mr. Astrakhan, you are excused.

20             THE WITNESS:  Thank you.

21             (Witness excused)

22             THE COURT:  Ms. Houle, do you want to call your next

23  witness.

24             MS. ESTES:  Thank you, your Honor.

25             The government calls Special Agent Richard Demurjian.

G9KVROD2                         Demurjian – direct

1           Your Honor, may I approach and get the marijuana?

2           THE COURT:  Yes, please.

3    RICHARD DEMURJIAN,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6           THE COURT:  Okay, Ms. Houle.

7           MS. HOULE:  Thank you, your Honor.

8    DIRECT EXAMINATION

9    BY MS. HOULE:

10   Q.  Special Agent, where are you employed?

11   A.  I'm employed with the DEA.

12   Q.  Is that also known as the Drug Enforcement Administration?

13   A.  That's correct.

14   Q.  What is your title there?

15   A.  I'm a special agent.

16   Q.  For how long have you been a special agent with the DEA?

17   A.  I've worked for DEA for approximately 28 years.

18   Q.  What generally are your duties and responsibilities as a

19   special agent?

20   A.  We investigate violations of the federal narcotics laws

21   primarily.

22   Q.  Are you assigned to a particular group?

23   A.  I am.

24   Q.  What is that?

25   A.  I'm assigned to group D22.

G9KVROD2                          Demurjian - direct

1   Q.  Do you have any prior experience executing search warrants

2   at marijuana grow-houses?

3   A.  I do.

4   Q.  About how many times?

5   A.  To the best of my recollection, 10, 15.

6   Q.  Let me direct your attention to August 21st, 2015.

7           Were you involved in a search of an Apartment 909 at

8   the address 420 East 111th Street in Manhattan that day?

9   A.  Yes, I was.

10          MS. HOULE:  Your Honor, may I publish Government

11  Exhibit 131, which has already been admitted into evidence?

12          THE COURT:  Yes.

13  Q.  Special Agent, do you recognize this photo?

14  A.  I do.

15  Q.  What is shown here?

16  A.  This is the address you mentioned, 420 East 111th Street.

17  Q.  What generally did you find during the course of that

18  search?

19  A.  We found an apartment that was completely converted over to

20  the illicit manufacture of marijuana.

21  Q.  Can you describe for the jury the atmosphere in that

22  apartment?  What was the temperature?

23  A.  When we forced the door open, there were air-conditioning

24  units, pumps, heat lamps.  It was very high-temperature, but

25  there was also a high degree of noise.

G9KVROD2                          Demurjian – direct

1            I can go on.

2     Q.  Was there any odor?

3     A.  Yes.

4     Q.  What was that?

5     A.  Through my gas mask I can detect the odor of marijuana.

6     Q.  And what was the lighting like?

7     A.  There were a series of heat lamps arrayed across the

8     ceiling of two rooms.  The entire rooms were converted into

9     these high-temperature grow-houses.

10    Q.  Was there any natural light in the room?

11    A.  All the windows had been boarded over so that people

12    couldn't see from the outside what was actually going on inside

13    the apartment.

14          MS. HOULE:  Your Honor, may I publish Government

15    Exhibit 112 to the jury, which has already been admitted into

16    evidence?

17          THE COURT:  Yes, you may.

18    Q.  Do you recognize what is being reflected in this picture?

19    A.  I do.

20    Q.  Does this accurately depict what you saw when you entered

21    Apartment 909 on the day that you conducted your search?

22    A.  Yes.

23          MS. HOULE:  Your Honor, may I publish Government

24    Exhibit 124, which has already been admitted into evidence?

25          THE COURT:  Yes, you may.

G9KVROD2                        Demurjian - direct

1   Q.  Do you recognize the person in this picture?

2   A.  I believe it's myself.

3   Q.  You described earlier that you were wearing a gas mask.  Is

4   that what you are wearing here?

5   A.  Yes, ma'am.

6   Q.  Why were you wearing that?

7   A.  When we enter any of these facilities, any of these

8   apartments, there's a lot of chemicals, particulate matter, so

9   we don't know what we are going to be breathing.  It's to

10  protect ourselves from getting sick.

11          MS. HOULE:  Your Honor, may I publish Government

12  Exhibit 118, which has already been admitted previously into

13  evidence?

14          THE COURT:  Yes.

15  Q.  Special Agent, what does this picture show?

16  A.  Inside the room there's various pieces of equipment.  In

17  particular -- as you're looking at this photograph, you'll see

18  this board.  And on what would be in the upper right corner of

19  the image that you're looking at is a metal box.  That's a $CO_2$

20  generator.  If you look from the bottom, there's a rubber hose.

21  That rubber hose contains natural gas.  They've tapped off the

22  gas in the kitchen, punched this aquarium hose through the

23  wall, ran it up into this box, and this box has a flame burning

24  inside of it.  If you notice, it's approximately six inches

25  from the ceiling of the apartment.

G9KVROD2                          Demurjian - direct

1   Q.  You described this as a CO² generator.  Is that a carbon

2   dioxide generator?

3   A.  Yes, ma'am.

4           MS. HOULE:  Your Honor, may I publish Government

5   Exhibit 119, which has already been admitted into evidence?

6           THE COURT:  Yes, you may.

7   Q.  What does this picture show?

8   A.  This is a close-up of the aforementioned CO² generator.  If

9   you look at it, there's discoloration, and that's from the heat

10  that's generated from this box.

11  Q.  Is there a brand listed on this CO² generator?

12  A.  Yes, ma'am.

13  Q.  What is that?

14  A.  Green Air Products.

15          MS. HOULE:  Your Honor, may I publish Government

16  Exhibit 116, which has already been admitted?

17          THE COURT:  Yes.

18  Q.  Special Agent, what is shown here on the left side of the

19  picture?

20  A.  As you're looking at the photograph, if you start at the

21  lower left corner, you see a barrel, some tubes with filters.

22  This is a liquid; I believe it's water and fertilizer that's

23  pumped through the grow trays.

24          As you move further along to the right in the center

25  of the image, you'll see what looks like an air-conditioning

1   unit is, in fact, a freestanding air-conditioning unit, because

2   the temperatures are so high inside the apartment, just to make

3   it so that they can work inside there and also so they don't

4   kill the plants, they modify the temperature with numerous

5   air-conditioning units.  This is just one of them.

6          As you move to the right, you can see root pots; and

7   in the far right you can actually see some of the marijuana

8   plants.

9   Q.  The equipment that you described, the air-conditioning, the

10  lamps, the $CO_2$ generators, did you see how those were powered

11  in the apartment?

12  A.  Yes, I did.

13  Q.  How were they powered?

14  A.  They had run electricity from the main panel and created a

15  subpanel in one of the grow rooms.

16          MS. HOULE:  Your Honor, may I publish Government

17  Exhibit 125, which has already been admitted into evidence?

18          THE COURT:  Yes, you may.

19  Q.  Special Agent, what does this picture show?

20  A.  This is a subpanel.  Now, as you're looking at the

21  photograph, you start on the left side, you can see this

22  rectangular gray box.  It has no cover on it, so that's exposed

23  to what I'm guessing is about 240-volt service.  There should

24  be a metal cover on the outside as part of the hazards that we

25  deal with when we go into these places, because you have

1    natural gas pumped through the walls and you have an exposed

2    electrical panel where if anything fell against it, you have a

3    significant fire hazard; there's also an electrocution hazard.

4            As you move to the right, there's various timers.

5    These are for the lights and for the heating system inside the

6    apartment.

7    Q.  Special Agent, is this how the electric panel appeared when

8    you entered the apartment?

9    A.  Yes, exactly as we found it.

10   Q.  Thank you.

11           Was any person found in the apartment?

12   A.  Yes.

13   Q.  What, if anything, was that person doing when you entered

14   the apartment?

15   A.  When we entered the apartment and forced open the main

16   door, the kitchen was to the left, the main grow room had the

17   door closed.  When we forced this open, we found this person

18   inside there trimming marijuana buds.

19           MS. HOULE:  Your Honor, may I publish Government

20   Exhibit 129, which has already been admitted?

21           THE COURT:  Yes.

22   Q.  Special Agent, do you recognize this person?

23   A.  I do.

24   Q.  Who is it?

25   A.  That's Nanette Rodriguez.

G9KVROD2                         Demurjian - direct

1    Q.  Is this how she appeared on the day you executed the search

2    warrant?

3    A.  Yes.  We took her outside the apartment where the air was

4    fresh.  That's her leaning against the outside of the building.

5    Q.  Is this the person who you observed trimming the marijuana

6    plants?

7    A.  Yes, it was.

8            MS. HOULE:  Your Honor, may I publish Government

9    Exhibit 133, which has also already been admitted?

10           THE COURT:  Yes.

11   Q.  Do you recognize the woman in this photo?

12   A.  I do.

13   Q.  Who is that?

14   A.  The same person, Nanette Rodriguez.

15   Q.  Let me direct your attention to November 10th, 2015.

16           Did you go to a U-Haul moving and storage facility

17   that day?

18   A.  I did.

19   Q.  Is that located at 780 East 138th Street in the Bronx, New

20   York?

21   A.  Yes, it is.

22   Q.  Based on your observations of that facility, what types of

23   services does it provide?

24   A.  It's a storage unit.  They rent storage units.

25   Q.  Did you meet with a U-Haul employee that day?

G9KVROD2                           Demurjian - direct

1    A.  I did.

2    Q.  Based on your discussions with that U-Haul employee, did

3    you identify Unit 2324 as being rented by the defendant?

4    A.  I did.

5    Q.  Did you review any surveillance video with that U-Haul

6    employee?

7    A.  I did.

8    Q.  What did you review?

9    A.  We asked to see what footage, if any, they had of the last

10   person who paid rent for the storage unit.

11   Q.  Could you please turn to the tab marked GX 400 in the

12   binder in front of you.  This has previously been marked for

13   identification purposes.

14   A.  GX 400?

15   Q.  Yes.

16   A.  Ma'am, if you could locate it for me.

17           MS. HOULE:  May I approach, your Honor?

18           THE COURT:  400?

19           MS. HOULE:  Yes.  Thank you, your Honor.

20           THE WITNESS:  Thank you, your Honor.

21           THE COURT:  The witness has 400 before him.

22   Q.  Do you recognize this?

23   A.  I do.

24   Q.  How do you recognize it?

25   A.  It's a photograph I took off the camera system at the

G9KVROD2                        Demurjian - direct

1   storage unit.

2   Q.  Does this photo fairly and accurately depict the image that

3   you saw on the surveillance video system at the U-Haul?

4   A.  Yes, it does.

5           MS. HOULE:  Your Honor, the government offers

6   Government Exhibit 400 into evidence.

7           MR. HANDWERKER:  No objection, Judge.

8           THE COURT:  400 is received in evidence.

9           (Government's Exhibit 400 received in evidence)

10          MS. HOULE:  May I publish it to the jury, your Honor?

11          THE COURT:  Yes, you may.

12  Q.  Special Agent, what happened after you spoke with the

13  U-Haul employee?

14  A.  We executed the warrant on the storage unit.

15  Q.  If you could please turn in the binder in front of you to

16  tab GX 402.

17  A.  I have it in front of me.

18  Q.  Do you recognize this?

19  A.  I do.

20  Q.  How do you recognize it?

21  A.  It's a photograph I took of the outside of the storage unit

22  prior to opening it.

23  Q.  Does this photo fairly and accurately depict how the

24  exterior of the storage unit looked on the day that you

25  executed the warrant?

G9KVROD2                          Demurjian - direct

1    A.  Yes, it does.

2           MS. HOULE:  Your Honor, the government offers

3    Government Exhibit 402.

4           MR. HANDWERKER:  No objection.

5           THE COURT:  402 is in evidence.

6           (Government's Exhibit 402 received in evidence)

7           MS. HOULE:  May I publish it to the jury, your Honor?

8           THE COURT:  Yes, you may.

9    Q.  Special Agent, on this photo, what is the number listed on

10   the exterior of the unit?

11   A.  2324.

12   Q.  While you were outside the unit, was a canine ranger

13   utilized?

14   A.  Yes.

15   Q.  What is a canine ranger?

16   A.  "Ranger," I believe is the name of the dog, a drug

17   detection dog.

18   Q.  And what is the dog trained to do?

19   A.  He's trained to indicate for the presence of narcotics.

20   Q.  What, if anything, did you observe the canine to do?

21   A.  I didn't observe the canine handler.  The officer who's

22   trained in the use of the dog exposed the dog to the grow and

23   the officer informed me that the dog indicated --

24           MR. HANDWERKER:  Objection to what he's informed.

25           THE COURT:  Overruled.

G9KVROD2                         Demurjian - direct

1   A.   The dog -- the handler told me that the dog indicated that

2   there was the presence of narcotics at this unit.

3   Q.   Did the DEA obtain a search warrant to search that storage

4   unit?

5   A.   Yes, we did.

6   Q.   Did you participate in that search?

7   A.   I did.

8   Q.   Could you please review the tabs marked GX 403 through 410

9   in the binder in front of you.

10  A.   I've done it.

11  Q.   Do you recognize these photographs?

12  A.   I do.

13  Q.   How?

14  A.   These are photographs I took.

15  Q.   And what do they depict?

16  A.   They are the contents of various equipment we found inside

17  the storage unit.

18  Q.   Do these photos fairly and accurately depict the items that

19  you found in the unit on the day that you executed your search

20  warrant?

21  A.   Yes.

22          MS. HOULE:   Your Honor, the government offers

23  Government Exhibits 403 through 410 in evidence.

24          MR. HANDWERKER:   No objection, Judge.

25          THE COURT:   403 to 410 are received in evidence.

G9KVROD2                           Demurjian – direct

1              (Government's Exhibits 403 through 410 received in

2    evidence)

3              MS. HOULE:  Your Honor, may I publish each one in turn

4    as I review it with the jury?

5              THE COURT:  Yes, you may.

6              MS. HOULE:  Ms. Lee, if you could please pull up

7    Government Exhibit 403.

8    Q.  Special Agent, what is this?

9    A.  That is a high-intensity grow light.

10   Q.  Where did you find this?

11   A.  This particular one was found inside the storage unit.

12   Q.  As part of this investigation, have you seen a

13   high-intensity grow light at any other location?

14   A.  Yes.

15   Q.  Where was that?

16   A.  Inside the grow-house at 420 East 111th Street.

17             MS. HOULE:  Ms. Lee, could you please pull up

18   Government Exhibit 404.

19   Q.  What does this picture show?

20   A.  These are grow trays.

21   Q.  And where did you find these?

22   A.  Also found it inside the storage unit.

23   Q.  Does this reflect all the grow trays that you found in the

24   storage unit?

25   A.  No.

```
 1   Q.  Do you recall approximately how many grow trays you found?
 2   A.  I don't recall the exact amount, but there was more than
 3   one.
 4           MS. HOULE:  Ms. Lee, could you please pull up
 5   Government Exhibit 405.
 6   Q.  Special Agent, are you able to identify any of the items in
 7   this picture?
 8   A.  I can, yes.
 9   Q.  Please do.
10   A.  As you're looking at the image, on the bottom left corner
11   you'll see that there's pH detectors that detects the base or
12   acidity of water.  It's apparently important when they are
13   doing a grow to maintain the proper pH of the water.
14           MS. HOULE:  Ms. Lee, could you zoom out.  Thank you.
15   A.  I don't know what these different chemicals are, but we
16   assumed that they were --
17           MR. HANDWERKER:  Objection to what he assumes, Judge.
18           THE COURT:  Yes.  If you know what they are, you can
19   testify to them.
20           THE WITNESS:  Yes, sir.
21           THE COURT:  What are --
22           THE WITNESS:  I do not know.
23           MS. HOULE:  That's fine.  Thank you, your Honor.
24   Q.  Above those substances, is there something there that you
25   recognize?
```

G9KVROD2                          Demurjian - direct

1   A.  There's an electrical panel.

2   Q.  And all the items in this photo, where were they found?

3   A.  These were found inside the storage unit.

4   Q.  Have you seen an electrical panel in the course of this

5   investigation at any other location?

6   A.  Yes.

7   Q.  Where was that?

8   A.  This was, as we discussed before, the open electrical panel

9   inside the grow-house.

10          MS. HOULE:  Ms. Lee, could you please pull up

11  Government Exhibit 406.

12  Q.  What is shown in this picture?

13  A.  It's a series of fans.

14  Q.  Are these all the fans that you identified in the storage

15  unit?

16  A.  No.

17  Q.  Do you recall approximately how many fans you identified?

18  A.  I don't recall.  There were several.

19          MS. HOULE:  Ms. Lee, could you please pull up

20  Government Exhibit 410.

21  Q.  What is shown in this picture?

22  A.  This is duct work from an air-conditioning unit.

23  Q.  Where did you find this piece from an air-conditioning

24  unit?

25  A.  I believe it's actually attached to the top of the

G9KVROD2                         Demurjian - direct

1   air-conditioning unit.  This was found inside the storage unit.

2   Q.  As part of this investigation, have you seen similar tubing

3   at any other location?

4   A.  Yes.

5   Q.  Where was that?

6   A.  Inside the grow-house.

7          MS. HOULE:  Ms. Lee, could you please pull up

8   Government Exhibit 407.

9   Q.  What is shown in this picture?

10  A.  There are two $CO_2$ generators.

11  Q.  Where did you find these generators?

12  A.  These were also found inside the storage unit.

13  Q.  As part of this investigation, have you seen $CO_2$ generators

14  at any other location?

15  A.  Yes.

16  Q.  Where was that?

17  A.  Inside the grow-house.

18         MS. HOULE:  Ms. Lee, could you please pull up

19  Government Exhibit 408.

20  Q.  What is shown in this picture?

21  A.  This is a fan unit for an air scrubber.

22  Q.  Where did you find this air scrubber?

23  A.  Inside the storage unit.

24  Q.  As part of this investigation, have you seen an air

25  scrubber at any other location?

G9KVROD2                         Demurjian - direct

1   A.  Yes, I have.

2   Q.  Where was that?

3   A.  Inside the grow-house.

4           MS. HOULE:  Finally Ms. Lee, could you please pull up

5   Government Exhibit 409.

6   Q.  What is shown in this picture?

7   A.  This is equipment -- just trying to see the -- I believe

8   it's a timer for the lights, for the grow lights.

9   Q.  Is there a brand written on this?

10  A.  Yes.

11  Q.  What brand is that?

12  A.  Green Air Products.

13  Q.  Did you identify any other items in the storage units that

14  are relevant to your investigation that we haven't reviewed in

15  the photos?

16  A.  Yes.

17  Q.  What was that?

18  A.  We found tubing, construction equipment, filters, pumps,

19  all consistent with an indoor marijuana grow.

20  Q.  And tubing and construction equipment, did you observe

21  anything similar at Apartment 909?

22  A.  Yes.

23  Q.  Can you explain that please.

24  A.  In each of the -- in the two main grow rooms, a platform is

25  built so that the plants are a correct distance from the

G9KVROD2                      Demurjian - cross

1    lights.  It also gives the ability to run plumbing underneath
2    the grow trays and the plants.  The windows were boarded over
3    and painted white.  So from the outside, at least from the
4    street, if you looked up, it just looked like a regular window,
5    but nobody could possibly see inside.  And also to help conceal
6    the odor of the growing marijuana.
7              MS. HOULE:  One moment, your Honor.
8              Thank you.  No further questions.
9              MR. HANDWERKER:  Just a few, Judge.
10   CROSS-EXAMINATION
11   BY MR. HANDWERKER:
12   Q.  Good afternoon, Agent Demurjian.
13   A.  Good afternoon, Mr. Handler.
14   Q.  I think it's still the morning.
15             THE COURT:  Still morning.
16             MR. HANDWERKER:  Thank you, Judge.
17   Q.  Agent Demurjian, you're the case agent in this case;
18   correct?
19   A.  I am one of the case agents, yes.
20   Q.  And when this investigation began, there was some
21   surveillance of Mr. Rodriguez; is that correct?
22   A.  There was some surveillance, yes.
23   Q.  Over what period of time was the surveillance?
24   A.  I couldn't give you the exact amount of time.  Several
25   weeks.

G9KVROD2                        Demurjian – cross

1    Q.  Let's call it three or four weeks, is that fair?

2    A.  I would have to refer to my notes.

3    Q.  If I would show you the complaint, would that refresh your

     recollection?

5    A.  Absolutely.

6            MR. HANDWERKER:  May I approach the witness?

7            THE COURT:  Yes, you may.

8    Q.  Can you tell us if this refreshes your recollection as to

9    how long the surveillance was?

10   A.  Three or four weeks.

11   Q.  Thank you.

12           During that period of time, you had surveilled

13   Mr. Rodriguez on how many occasions?

14   A.  I couldn't tell you off the top of my head.  Several times.

15   Q.  More than five?  More than ten?

16   A.  Probably not more than ten.

17   Q.  Okay.  So less than ten in a three-week period of time?

18   A.  Yes.

19   Q.  Did you ever see him at the U-Haul facility?

20   A.  Inside the U-Haul facility, no.

21   Q.  Did you ever see him outside the U-Haul facility?

22   A.  I saw him in the vicinity.

23   Q.  In the vicinity?  What does "the vicinity" mean?

24   A.  We followed his vehicle in that area.  We lost him in

25   surveillance.

G9KVROD2                          Demurjian - cross

1   Q.   Any furtive movements or gestures?

2   A.   Furtive movements or gestures by?

3   Q.   By him.  That's who you were surveilling, right?

4   A.   Describe a furtive movement.

5   Q.   Did he carry or try to hide anything?

6   A.   We followed his vehicle.

7   Q.   Okay.

8         Let me ask you this:  Did you ever see him in the

9   vicinity of 400 East 111th Street?

10  A.   400?  No.

11  Q.   420 East 111th Street.

12  A.   No.

13  Q.   And that's where the grow-house was located, right?

14  A.   That is correct.

15  Q.   And over the three-week period on at least ten occasions,

16  you never saw him at the grow-house?

17  A.   I said less than ten.

18  Q.   Less than ten.  Between five and ten?

19  A.   Perhaps, yes.

20  Q.   But you never saw him at the grow-house?

21  A.   I did not see him at the grow-house.

22  Q.   And the U-Haul facility, you're telling us you saw him in

23  the vicinity?

24  A.   That's correct.

25  Q.   Now, the U-Haul facility had items that you believe is

G9KVROD2                         Demurjian - cross

1    consistent with a grow-house; correct?

2    A.  That is correct.

3    Q.  Do you know when that stuff was placed there?

4    A.  I do not know.

5    Q.  Do you know who placed it there?

6    A.  I do not know.

7    Q.  When you met with George Parker from U-Haul, did you

8    discuss Unit 2324?

9    A.  Yes, I did.

10   Q.  You said before with regard to the search of the U-Haul

11   facility that there were narcotics located there; is that true?

12          MS. HOULE:  Objection, your Honor.

13          THE COURT:  I don't think he said that.

14   Q.  What was your testimony regarding what was found in that

15   facility?

16   A.  I could ask for a readback.

17   Q.  Well, that's up to the judge.

18          I'm asking to the best of your recollection, as the

19   agent who executed the search warrant, were narcotics found in

20   that location?

21   A.  I did not find narcotics.

22          THE COURT:  You found equipment.

23          THE WITNESS:  I found equipment.

24          MR. HANDWERKER:  I have nothing further, Judge.

25          Judge, one second.

G9KVROD2                         Demurjian - redirect

1            THE COURT:  Are you finished, Mr. Handwerker.

2            MR. HANDWERKER:  Yes, I am, Judge.

3            THE COURT:  Anything from the government?

4            MS. HOULE:  Just very briefly, your Honor.

5            THE COURT:  All right.

6   REDIRECT EXAMINATION

7   BY MS. HOULE:

8   Q.  Special Agent, you just testified that you conducted

9   surveillance on a limited number of occasions on Mr. Rodriguez;

10  is that correct?

11  A.  That's right.

12  Q.  When you were conducting that surveillance, was that 24/7

13  surveillance?

14  A.  No, absolutely not.

15  Q.  During the course of the time that you were conducting that

16  surveillance, were you working on other cases as well?

17  A.  Yes, we were.

18            MS. HOULE:  One moment, your Honor.

19            Thank you.  No further questions.

20            THE COURT:  Agent, you are excused.

21            Thank you very much.

22            (Witness excused)

23            THE COURT:  Call your next witness.

24            MS. HOULE:  Your Honor, the government calls Special

25  Agent Bruce Hom.

G9KVROD2                         Hom – direct

1    BRUCE HOM,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Okay, Ms. Houle.

5              MS. HOULE:  Thank you.

6    DIRECT EXAMINATION

7    BY MS. HOULE:

8    Q.  Where are you employed?

9    A.  With the Drug Enforcement Administration.

10   Q.  Is that also known as the DEA?

11   A.  Yes.

12   Q.  How long have you been with the DEA?

13   A.  Over ten years.

14   Q.  What is your title?

15   A.  Special agent.

16   Q.  Approximately how long have you been a Special Agent?

17   A.  Over ten years.

18   Q.  Where did you work before the DEA?

19   A.  I was a police officer with the New York City Police

20   Department.

21   Q.  For how long?

22   A.  About a year and-a-half.

23   Q.  What are your duties and responsibilities generally as a

24   special agent with the DEA?

25   A.  To enforce the federal drug laws.

G9KVROD2                              Hom - direct

1    Q.  Are you assigned to any particular group?

2    A.  Yes.

3    Q.  What is that?

4    A.  D22.

5    Q.  Do you have any prior experience executing search warrants

6    on marijuana grow-houses?

7    A.  Yes.

8    Q.  Approximately how many times?

9    A.  Say about four or five.

10   Q.  Let me direct your attention to August 21st, 2015.  Were

11   you involved in surveillance that day?

12   A.  Yes, I was.

13   Q.  Were you conducting that surveillance in the vicinity of

14   175 West 95th Street in Manhattan, New York?

15   A.  Yes, I was.

16   Q.  Why were you at that location?

17   A.  That was the residence of Michael Rodriguez.

18   Q.  Is that in northern Manhattan?

19   A.  Yes.

20   Q.  Are you familiar with northern Manhattan?

21   A.  Yes, I am.

22   Q.  Could you please turn in the binder in front of you to the

23   tab marked GX 600.

24            What is this?

25   A.  This is a map of northern Manhattan.

G9KVROD2                          Hom - direct

1   Q.  Is this a fair and accurate representation of northern

2   Manhattan?

3   A.  Yes, it is.

4   Q.  Would this map aid your testimony today?

5   A.  Yes.

6           MS. HOULE:  Your Honor, the government offers

7   Government Exhibit 600 for demonstrative purposes.

8           MR. HANDWERKER:  No objection, Judge.

9           THE COURT:  600 is received for demonstrative

10  purposes.

11          (Government's Exhibit 600 received in evidence)

12          MS. HOULE:  Your Honor, may I publish it to the jury?

13          THE COURT:  Yes, you may.

14  Q.  Special Agent, you just testified that you were conducting

15  surveillance in the area of 175 West 95th Street.

16          There is a blue dot on the left side of this map.

17  Does that blue dot accurately note the area of 175 West 95th

18  Street?

19  A.  Yes.

20  Q.  As part of your surveillance, did you observe that

21  building, 175 West 95th Street?

22  A.  Yes.

23  Q.  Based on your observation, how many entrances does that

24  building have?

25  A.  Two.

G9KVROD2                          Hom - direct

1   Q.  And on what streets are those entrances?

2   A.  One of them was on West 95th Street, the other one was on

3   Amsterdam Avenue.

4   Q.  Approximately what time did you begin your surveillance?

5   A.  Around 6 in the morning.

6   Q.  In relation to this surveillance, were you taking

7   instructions from anyone?

8   A.  Yes.

9   Q.  Who was that?

10  A.  Some other members of the surveillance team.

11  Q.  What specifically were you instructed to do?

12  A.  I was to follow a dark-colored Mercedes that was parked

13  near that 175 West 95th Street entrance.

14  Q.  Approximately where were you when you first observed that

15  Mercedes?

16  A.  I was around the corner.  I was down the street from 95th

17  Street, on the other side of Amsterdam Avenue.

18  Q.  Did that Mercedes eventually move?

19  A.  Yes.

20  Q.  Did you follow it?

21  A.  Yes.

22  Q.  Where?

23  A.  I followed it all the way to the East Side.

24  Q.  Could you see who was driving the Mercedes?

25  A.  Later that day, yes.

G9KVROD2                          Hom - direct

1  Q.  Did you ultimately learn the driver's name?

2  A.  Yes.

3  Q.  Who was that?

4  A.  Her name was Nanette Rodriguez.

5          MS. HOULE:  Your Honor, may I publish Government

6  Exhibit 133, which is already in evidence?

7          THE COURT:  Yes, you may.

8  Q.  Special Agent, do you recognize this person?

9  A.  Yes.

10  Q.  Who is it?

11  A.  Nanette Rodriguez.

12  Q.  Is that the same person who was driving the Mercedes that

13  you observed?

14  A.  Yes.

15  Q.  Did you observe anyone else in the car?

16  A.  No.

17  Q.  Did the Mercedes eventually park at another destination?

18  A.  Yes.

19  Q.  And where was that?

20  A.  Could we go back to Exhibit 600?

21  Q.  Yes.  Thank you.

22  A.  By that blue dot on the right-hand side, 420 East 111

23  Street.

24          MS. HOULE:  Your Honor, may I publish Government

25  Exhibit 131, which is already in evidence?

G9KVROD2                          Hom - direct

1            THE COURT:  Yes, you may.

2    Q.  What is this?

3    A.  That's the front door to 420 East 111 Street.

4    Q.  Later that same day, on August 21st, 2015, did you approach

5    Apartment 909 in this building, 420 East 111th Street?

6    A.  Yes, I did.

7    Q.  While you were standing outside of Apartment 909, did you

8    smell anything?

9    A.  Yes.

10   Q.  What was that?

11   A.  An odor of raw marijuana coming out that front door.

12   Q.  What happened next?

13   A.  As I was standing in front with another agent, we saw

14   another target of the investigation walk by the front door.

15   Q.  Walk by the front door of Apartment 909?

16   A.  Yes.

17   Q.  Did that person provide a name?

18   A.  Yes.

19   Q.  What was that?

20   A.  Ivan.

21           MS. HOULE:  Your Honor, may I publish Government

22   Exhibit 401, which is already in evidence?

23           THE COURT:  Yes, you may.

24           MS. HOULE:  Apologies, your Honor.  I misspoke.  I'll

25   withdraw that request.

G9KVROD2                          Hom - direct

1              May I publish Government Exhibit 601, which is already

2       in evidence?

3                   THE COURT:  Yes.

4                   MS. HOULE:  602, your Honor.  Apologize again.

5                   THE COURT:  601 is not here either, is it?  Exhibit

6       600 and then 602.

7                   MS. HOULE:  I apologize, your Honor.  There's been

8       much confusion about the number here.  It is Government Exhibit

9       400.

10                  THE COURT:  Do you have 400?

11                  THE WITNESS:  Yes, I do.

12                  MS. HOULE:  This is already in evidence, your Honor.

13                  THE COURT:  400 is in evidence.

14                  MS. HOULE:  May I publish it?

15                  THE COURT:  Yes, you may.

16                  MS. HOULE:  Thank you.

17      BY MS. HOULE:

18      Q.  Thank you for your patience, Special Agent.

19              Do you recognize the individual in this photograph?

20      A.  Yes, yes, I do.

21      Q.  Who is that?

22      A.  That's the person who walked past us earlier who identified

23      himself as Ivan.

24      Q.  When you say "earlier," you mean at Apartment 909?

25      A.  Yes.

G9KVROD2                           Hom - direct

1   Q.   Could you please turn to tab GX 602 in the binder in front

2   of you which has been previously marked for identification

3   purposes.

4        What is depicted in this exhibit?

5   A.   That's a photo of Ivan -- of Ivan.

6        MS. HOULE:   The government offers Government Exhibit

7   602 into evidence.

8        MR. HANDWERKER:   Subject to connection, Judge, no

9   objection.

10       THE COURT:   Okay.   602 is received in evidence.

11       (Government's Exhibit 602 received in evidence)

12       MS. HOULE:   Your Honor, may I publish it to the jury?

13       THE COURT:   Yes, you may.

14  Q.   Did you collect anything from Ivan while you were standing

15  outside of Apartment 909?

16  A.   Yes, a cell phone and a couple business cards.

17       MS. HOULE:   Your Honor, may I approach the witness?

18       THE COURT:   Yes, you may.

19  Q.   I've just handed up to you what has been previously marked

20  for identification purposes as Government Exhibit 601.

21       Do you recognize this?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's the cell phone I took from Ivan.

25  Q.   When you retrieved the phone from Ivan, did you record its

1    serial number in a report?

2    A.  Yes, I did.

3    Q.  Have you compared the serial number from that report to the

4    one of the phone in that bag?

5    A.  Earlier I did, yes.

6    Q.  And did they match?

7    A.  Yes, they did.

8    Q.  Did you initial the exhibit sticker after doing so and seal

9    the bag?

10   A.  Yes.

11   Q.  And did you write a label on the bag?

12   A.  Yes, I did.

13   Q.  Could you please read what that label says.

14   A.  Iran Puello phone.

15          MS. HOULE:  Your Honor, the government offers Exhibit

16   601 into evidence.

17          MR. HANDWERKER:  Same objection, Judge.

18          THE COURT:  601 is received in evidence.

19          (Government's Exhibit 601 received in evidence)

20   Q.  Turning back to while you were standing outside of

21   Apartment 909, did the DEA eventually obtain a search warrant

22   to search that apartment?

23   A.  Yes.

24   Q.  As part of that search, did you enter the apartment?

25   A.  Yes, I did.

G9KVROD2                          Hom - direct

1   Q.  Was anyone arrested from that apartment?

2   A.  Yes.

3   Q.  Who was that?

4   A.  Nanette Rodriguez.

5   Q.  Is that the same woman who you followed in the Mercedes?

6   A.  Yes.

7   Q.  Can you describe generally for the jury what, if anything,

8   you saw in Apartment 909 that day.

9   A.  The kitchen, they pulled back the stove and they ran some

10  hosing -- hose from the kitchen area to one of the back rooms

11  where they hooked up the carbon dioxide generator.  Also they

12  hooked up some hoses from the kitchen sink to one of the back

13  rooms.  There's some large air-conditioning units in one of the

14  rooms.  There's also an active marijuana grow where there are

15  plants growing, several plants were there.  Several lights were

16  also in that active marijuana grow.  There were some other

17  marijuana trims that was left out to dry.

18          They also put plywood over the two exterior windows to

19  prevent any other light coming in.  The bathroom also had

20  numerous buckets in there, and there is some other fertilizer,

21  other chemicals, to help them with the marijuana grow.

22          MS. HOULE:  Your Honor, may I publish Government

23  Exhibit 112 to the jury, which is already in evidence?

24          THE COURT:  Yes, you may.

25  Q.  Do you recognize what is being reflected in this picture?

G9KVROD2

1    A.   Yes.

2    Q.   Does this accurately depict what you saw when you entered

3    Apartment 909?

4    A.   One of the rooms, yes.

5              MS. HOULE:   Thank you, your Honor.

6              No further questions.

7              MR. HANDWERKER:   No questions, Judge.

8              THE COURT:   Agent, you are excused.   Thank you.

9              (Witness excused)

10             THE COURT:   Do you want to call your next witness?

11             MS. ESTES:   Your Honor, the government would at this

12   time seek to move Government Exhibit 1201, which is a

13   stipulation between the parties, into evidence.

14             THE COURT:   All right.   Go ahead.

15             MS. ESTES:   May we publish Government Exhibit 1201?

16             THE COURT:   Yes, you may.

17             MS. ESTES:   "It is hereby stipulated and agreed by and

18   among the United States of America, by Preet Bharara, United

19   States Attorney for the Southern District of New York, Jordan

20   Estes, Amanda Houle, and Timothy Howard, Assistant United

21   States Attorneys, of counsel, Michael Earl Rodriguez, the

22   defendant, by and with the consent of his attorney, Michael

23   Handwerker, Esquire, that Government Exhibit 700 is true and

24   accurate subscriber information from Sprint for the cellular

25   telephone assigned telephone number 917-407-8320.

G9KVROD2

1          "Government Exhibit 701 includes true and accurate

2     telephone records, including toll records information from

3     Sprint, for the cellular telephone assigned telephone number

4     917-407-8320 for the time period March 7, 2015 through

5     September 1, 2015.

6          "Government Exhibits 702-A, 702-B, 702-C, 702-D, and

7     702-E include true and accurate cellular site/tower location

8     from Sprint.

9          "The original records underlying the above-described

10    government exhibits were made at or near the time that the

11    activity reflected in those records took place.  They were made

12    by or based on information transmitted by a person with

13    knowledge of the matter set forth in the records.  They were

14    kept in the course of a regularly-conducted business activity,

15    and it was the regular practice of that business to maintain

16    the records.

17         "It is further stipulated and agreed that this

18    stipulation and Government Exhibit 700, 701, 702-A, 702-B,

19    702-C, 702-D, and 702-E may be received in evidence as

20    government exhibits at trial.  Dated New York, New York,

21    September 2016."

22         Ms. Lee, if you could scroll down.

23         It says:  "Preet Bharara, United States Attorney for

24    the Southern District of New York -- "

25         THE COURT:  We've got that.

G9KVROD2

1            So 1201 and 700, 701, 702-A, B, C, D, E are received

2      in evidence.

3            (Government's Exhibits 700, 701, 702-A, 702-B, 702-C,

4      702-D, 702-E, 1201 received in evidence)

5            MS. ESTES:  Thank you, your Honor.

6            At this time, the government would call Investigator

7      Reginald Donaldson.

8            MR. HANDWERKER:  Can we approach for a second, Judge?

9            THE COURT:  Why don't we take a short recess.  Morning

10     recess.

11           (Jury excused)

12           MR. HANDWERKER:  Judge, you read my mind.  I was going

13     to ask if we could take a break.

14           THE COURT:  That's what you wanted?  You didn't have

15     an issue?

16           MR. HANDWERKER:  I wanted to discuss scheduling.  It

17     might not be a bad idea.

18           THE COURT:  You have how many more?

19           MS. HOULE:  We have two more witnesses, your Honor.

20     We expect one of them will take approximately 45 minutes, the

21     other will take approximately 20 minutes.

22           THE COURT:  That's Mr. Donaldson and Ms. Guzman.

23           MS. HOULE:  Yes, your Honor.

24           THE COURT:  Then you're finished.

25           MS. ESTES:  We have one stipulation as well.

G9KVROD2

1          THE COURT:  One stipulation.

2          Okay.  You may be finished before the lunch break.

3          MS. ESTES:  That's right, your Honor.

4          THE COURT:  What do you want to do then?

5          MR. HANDWERKER:  My request is we have a charging

6    conference this afternoon and we sum up tomorrow morning.

7          THE COURT:  Government?

8          MS. HOULE:  We would prefer to proceed today, your

9    Honor.

10          THE COURT:  We have an awful lot to -- have you taken

11    a look at the charge?

12          MS. HOULE:  We haven't.

13          THE COURT:  Why don't we take a break.  I'll let you

14    know.

15          MS. HOULE:  Your Honor, if I may, there is one point

16    the government would like to put on the record.

17          THE COURT:  What's that?

18          MS. HOULE:  Mr. Handwerker's cross of the postal

19    inspection worker, there were a series of questions asked about

20    where the information was provided to the postal worker, to

21    look up the serial numbers and how he pulled those orders.  I

22    think this goes back to a point that Mr. Handwerker raised at

23    our final pretrial conference.

24          The government just wants to make clear that the

25    management company records contain the serial numbers for the

G9KVROD2

1    money orders that were used to pay the rent at Apartment 909.

2    Those have been produced to the defense and it is through those

3    serial numbers that the money orders were pulled by the postal

4    inspection service.

5              MR. HANDWERKER:  No issue here, Judge.

6              THE COURT:  What's the point?

7              MS. HOULE:  Your Honor, we just wanted to make clear

8    that we have not pulled the serial numbers from the documents

9    that were in the defendant's bag that were suppressed.

10             THE COURT:  Okay.

11             You have an alternative source is what you're saying.

12             MS. HOULE:  Yes, your Honor.

13             THE COURT:  I didn't understand Mr. Handwerker would

14   be making that objection.  Were you making that objection?

15             MR. HANDWERKER:  I did.  I did ask questions about

16   that earlier on, not in front of this judge and not in front of

17   this courtroom at this time.  And I have no issue to raise.

18             MS. HOULE:  Thank you.

19             THE COURT:  Okay.

20             (Recess)

21             THE COURT:  How long do you think your summation will

22   be, Ms. Estes, Ms. Houle?

23             MS. ESTES:  Your Honor, I think it will be

24   approximately 40 minutes.

25             THE COURT:  Forty minutes?

G9KVROD2

1            Mr. Handwerker, how about for you?

2            MR. HANDWERKER:  Maybe 20, 25 minutes.

3            THE COURT:  Okay.  The instructions are going to take

4    longer than the summations, I think.

5            I think it would be prudent for us to wind up today

6    with the testimony, and then this afternoon review the jury

7    charge, tomorrow morning start with the summations and the jury

8    charge.  So the case will be in the hands of the jury by

9    noontime tomorrow.  We'll take the luncheon orders in the

10   morning.

11           I think we have plenty of time, so there's no need to

12   rush and jam it in, the summations and the charge to the jury

13   today.

14           MR. HANDWERKER:  Thank you, Judge.

15           THE COURT:  You don't have to thank me; I think it's

16   the prudent thing to do.

17           So we'll go until the government -- who's going to

18   testify now, Mr. Donaldson?

19           MS. ESTES:  Yes, your Honor.

20           THE COURT:  And then Ms. Guzman?

21           MS. ESTES:  Yes, your Honor.

22           THE COURT:  The statements that were made at the

23   proffer, how are they coming in?

24           MS. ESTES:  Through Ms. Guzman.

25           THE COURT:  Is she also going to introduce the

G9KVROD2

1    statements from the MCC?

2           MS. ESTES:  No, your Honor.  We have a stipulation for

3    that.

4           THE COURT:  All right.

5           Marlon, call the jury in.

6           THE DEPUTY CLERK:  The charge conference?

7           THE COURT:  I've got to take a plea at 12:45, so we'll

8    do the jury charge -- did you get a copy of the jury charge?

9           MS. ESTES:  Yes, your Honor.

10          THE COURT:  We'll start at 2:30 on that.

11          MS. ESTES:  Yes, your Honor.

12          THE COURT:  Is that all right, Mr. Handwerker?

13          MR. HANDWERKER:  Yes, sir.  Thank you, Judge.

14          THE COURT:  Are you Reginald Donaldson?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Come on up here and sit down.

17          (Jury present)

18          THE COURT:  Ms. Estes, do you want to call your next

19   witness.

20          MS. ESTES:  Yes, your Honor.

21          The government calls Investigator Reginald Donaldson.

22    REGINALD DONALDSON,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25          THE COURT:  All right, Ms. Estes.

G9KVROD2                          Donaldson - direct

```
1   DIRECT EXAMINATION

2   BY MS. ESTES:

3   Q.  Good morning.

4   A.  Good morning.

5   Q.  Where do you work?

6   A.  I work for the U.S. Attorney's Office here in the Southern

7   District.

8   Q.  What is your position?

9   A.  I'm an investigative analyst.

10  Q.  How long have you been an investigative analyst at the U.S.

11  Attorney's Office?

12  A.  Six and-a-half years.

13  Q.  What are your duties and responsibilities as an

14  investigative analyst?

15  A.  My main duties are I perform cell phone forensics, cell

16  site analysis, and call analysis.

17  Q.  Prior to working for the U.S. Attorney's Office, what did

18  you do?

19  A.  I was working with the NYPD as a police officer and then a

20  detective for 20 years.  Most of those years were in narcotics.

21  And I was on the federal task force.

22  Q.  Did you also conduct any analysis of computers?

23  A.  Yes.

24  Q.  Can you explain.

25  A.  I'm sorry, analysis of computers?
```

G9KVROD2                         Donaldson - direct

1    Q.  Yes.

2    A.  When I was on the task force?  No.

3    Q.  When you were at NYPD, did you conduct any analysis of

4    computers?

5    A.  Not analysis of computers, but, yes, I did analysis on

6    narcotics enforcement activity.

7    Q.  Investigator Donaldson, have you had training in the

8    analysis of electronic evidence?

9    A.  Yes, I have.

10   Q.  Does that training include the analysis of cell phones?

11   A.  Yes.

12   Q.  Can you describe that training?

13   A.  I've had extensive training with the National White Collar

14   Crime Center on computer forensics, phone forensics, call

15   analysis, GPS.  I've had training from a company called Sumuri,

16   where I was certified on the Cellebrite forensic tool.  I

17   received training from a company called MSAB on the XRY

18   forensic tool.  I had training from the New York Department of

19   Justice on cell phone forensics.

20   Q.  Have you had training on cell sites?

21   A.  Yes.  Cell sites, I had training from the FBI cellular

22   analysis survey team, on cell site analysis, call analysis, and

23   GPS.  I had training from a company named Geocell on cell site

24   analysis.  And I've attended numerous seminars and conferences

25   on all of the above.

G9KVROD2                           Donaldson - direct

1  Q.  In your work at the U.S. Attorney's Office, have you

2  analyzed cell site records before?

3  A.  Yes.

4  Q.  Approximately how many times?

5  A.  Well over 100.

6  Q.  Have you previously been qualified as an expert on cell

7  site analysis?

8  A.  Yes.

9  Q.  How many times?

10 A.  At least twice.

11 Q.  How many times have you testified as an expert on cell site

12 analysis?

13 A.  Twice.

14       MS. ESTES:  Your Honor, at this time we would

15 respectfully request that Investigator Donaldson be qualified

16 as an expert in cell site analysis.

17       MR. HANDWERKER:  No objection, your Honor.

18       THE COURT:  Inspector Donaldson is qualified as an

19 expert on cell sites.

20 Q.  Investigator Donaldson, in preparing to testify today, have

21 you reviewed phone records?

22 A.  Yes, I have.

23       MS. ESTES:  Your Honor, may I publish what has

24 previously been admitted into evidence as Government Exhibit

25 700?

G9KVROD2                          Donaldson – direct

1                  THE COURT:  Yes.

2                  MS. ESTES:  Ms. Lee, could you publish Government

3      Exhibit 700.

4      Q.   Investigator Donaldson, what is this document?

5      A.   This is a subscriber record from the Sprint Telephone

6      Company.

7      Q.   What phone number is it for?

8      A.   The phone number 917-407-8320.

9                  (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9KQROD3                          Donaldson – direct

1    Q.  Is that a phone number you analyzed in connection with this

2    case?

3    A.  Yes.

4              THE COURT:  Can you read from the screen?

5              THE WITNESS:  Yes.

6              THE COURT:  Would it be more convenient if you read

7    from the exhibit book?  Turn to 700.  I noticed you squinting

8    there.

9              THE WITNESS:  OK.

10             THE COURT:  700 is right in the middle.

11             THE WITNESS:  OK.

12   BY MS. ESTES:

13   Q.  What company are these records from?

14   A.  Sprint.

15   Q.  Did you review these records in preparing to testify today?

16   A.  Yes, I did.

17   Q.  Can you briefly describe what subscriber records are for a

18   cell phone?

19   A.  It identifies the accountholder for that phone.

20             MS. ESTES:  Ms. Lee, could you zoom into the account

21   detail section of this document.

22   Q.  Investigator Donaldson, does that section state as to whom

23   this account is subscribed?

24   A.  Yes.

25   Q.  Can you read who it's subscribed to?

1    A.  Michael Rodriguez.

2    Q.  What's the address?

3    A.  733 Amsterdam Avenue, Apartment 27A, New York, New York.

4    Q.  Does this document reflect when the account was

5    established?

6    A.  Yes.

7    Q.  When was it established?

8    A.  October 16, 2011.

9    Q.  Investigator Donaldson, have you reviewed reports of the

10   extraction of data from certain cell phones associated with

11   this case?

12   A.  Yes, I have.

13              MS. ESTES:  Your Honor, may I approach the witness?

14              THE COURT:  Yes, you may.

15   Q.  Investigator Donaldson, my apologies, if we could go back

16   briefly to Government Exhibit 700.  Does this document reflect

17   how long the account was active?

18   A.  Yes.

19   Q.  What date does it reflect?

20   A.  Well, it was active -- became active October 16, 2011

21   through at least August 5 of 2015.

22   Q.  When you say "at least," you mean it could have been active

23   for longer; this record just doesn't reflect that?

24   A.  Right.

25              MR. HANDWERKER:  Judge, I would object to that leading

1   question.

2           THE COURT:  Overruled.

3   Q.  Investigator Donaldson, if you could turn back to

4   Government Exhibit 106.  Is this one of the phones that data

5   was extracted from?

6   A.  Yes.

7   Q.  Can you please read the white sticker on Government Exhibit

8   106?

9   A.  Phone recovered from grow house.

10  Q.  Generally, could you describe the process for extracting

11  data from a phone?

12  A.  Well, usually we use a Cellebrite tool.  What we have to do

13  is connect the phone to the tool.  It extracts the data from

14  the phone, and then we use another part of Cellebrite which is

15  a software program which analyzes that data that we pulled off

16  the phone, and it creates a report for us.

17  Q.  What kinds of data can you get from the phone when you

18  perform an extraction?

19  A.  Most of the time we get everything on the phone, which

20  would include contact information, call logs, text messages,

21  MMS messages, photos, and other third-party apps we get off

22  also.

23          MS. ESTES:  Your Honor, may I approach the witness?

24          THE COURT:  Yes.

25  Q.  Investigator Donaldson, I've handed you what has been

1    previously marked for identification as Government Exhibit 704.

2    Do you recognize this disk?

3    A.  Yes.

4    Q.  How do you recognize it?

5    A.  My initials are on it.

6    Q.  What does this disk contain?

7    A.  It contains the extracted report for this phone, for phone

8    106.

9    Q.  Is that the phone labeled phone recovered from grow house?

10   A.  Yes.

11   Q.  Investigator Donaldson, can you turn in your exhibit binder

12   to what has been previously marked for identification purposes

13   as Government Exhibit 705.  Do you recognize this document?

14   A.  Yes.

15   Q.  How do you recognize it?

16   A.  I recognize it -- this is actually an excerpt of the report

17   contained on this disk.

18   Q.  The report contained in Government Exhibit -- what's been

19   marked for identification as Government Exhibit 704?

20   A.  Yes.

21   Q.  Does the document you're looking at now contain an IMEI

22   number?

23   A.  Yes.

24   Q.  What's an IMEI number?

25   A.  It's like a serial number.  Every phone has a unique IMEI

G9KQROD3                          Donaldson - direct

1    number.

2    Q.  Have you compared the IMEI number in this document to the

3    IMEI number on Government Exhibit 106?

4    A.  Yes, I have.

5    Q.  Does that IMEI number match that IMEI number for Government

6    Exhibit 106?

7    A.  Yes, it does.

8    Q.  What is this document that you're looking at now?

9    A.  I'm sorry?

10   Q.  Can you explain what the document you're looking at now is?

11   A.  This is just an excerpt of the report that's contained on

12   the disk.  It's just the first two pages.

13            MS. ESTES:  Your Honor, the government offers

14   Government Exhibit 705.

15            THE COURT:  Any objection?

16            MR. HANDWERKER:  I'm not following the testimony,

17   Judge.

18            THE COURT:  705 is received in evidence.

19            (Government's Exhibit 705 received in evidence)

20            MS. ESTES:  Your Honor, may I publish Government

21   Exhibit 705?

22            THE COURT:  Yes.

23            MS. ESTES:  Ms. Lee, could you turn to the second

24   page.  Could you zoom into the device information section?

25   Q.  Investigator Donaldson, does this report indicate the phone

1    number for Government Exhibit 106?

2    A.   Yes.

3    Q.   The phone labeled as the grow house phone?

4    A.   Yes, it does.

5    Q.   Where does it indicate that?

6    A.   Under the caption MSISDN.

7    Q.   What is the number listed?

8    A.   9549937267.

9    Q.   Let me direct your attention to the line stating Apple ID.

10   What is the Apple ID associated with this report?

11   A.   I'll spell it out.  N-A-N-R-O-D-R-A-N @yahoo.com.

12          MS. ESTES:  Your Honor, may I approach the witness?

13          THE COURT:  Yes, you may.

14   Q.   Investigator Donaldson, I've handed you what has been

15   previously entered into evidence as Government Exhibit 601.  Is

16   this another phone that data was extracted from?

17   A.   Yes.

18   Q.   Can you please read the white sticker on Government Exhibit

19   601?

20   A.   Ivan Puello phone.

21          MS. ESTES:  Your Honor, may I approach the witness?

22          THE COURT:  Yes, you may.

23   Q.   Investigator Donaldson, I've handed you what has been

24   marked for identification as Government Exhibit 706.  Do you

25   recognize this disk?

G9KQROD3                          Donaldson - direct

1    A.  Yes.

2    Q.  How do you recognize it?

3    A.  It has my initials.

4    Q.  What is contained in the disk?

5    A.  This contains the report from the data extracted from

6    Exhibit 601.

7    Q.  And that's the Ivan Puello phone?

8    A.  Yes.

9    Q.  Investigator Donaldson, could you turn in your exhibit

10   binder to what has been marked for identification as Government

11   Exhibit 707.  Do you recognize this document?

12   A.  Yes.

13   Q.  Does this document list an IMEI number?

14   A.  Yes.

15   Q.  Have you compared the IMEI number on this document to the

16   IMEI number on Government Exhibit 601, the Ivan Puello phone?

17   A.  Yes.

18   Q.  Does the IMEI number on this document match the IMEI number

19   on the Ivan Puello phone?

20   A.  Yes, it does.

21   Q.  What is this document you're looking at now?

22   A.  This is the first two pages from the extraction report

23   obtained from this phone.

24   Q.  To confirm, that's Government Exhibit 601?

25   A.  Yes.

1              MS. ESTES:  Your Honor, the government offers

2     Government Exhibit 707.

3              MR. HANDWERKER:  No objection.

4              THE COURT:  707 is received in evidence.

5              (Government's Exhibit 707 received in evidence)

6              MS. ESTES:  Your Honor, may I publish 707?

7              THE COURT:  Yes, you may.

8              MS. ESTES:  Ms. Lee, could you turn to page 2 of this

9     document.

10    BY MS. ESTES:

11    Q.  Investigator Donaldson, does this report indicate the phone

12    number for Government Exhibit 601, the phone labeled the Ivan

13    Puello phone?

14    A.  Yes, it does.

15    Q.  What is the phone number listed?

16    A.  It's 12019605037.

17    Q.  Let me direct your attention to the line stating Apple ID.

18    What is the Apple ID listed here?

19    A.  Ivpuello@yahoo.com.

20    Q.  Investigator Donaldson, could you turn in your exhibit

21    binder to what has been premarked for identification purposes

22    as Government Exhibits 710, 711 and 712.  Do you recognize

23    these documents?

24    A.  Yes.

25    Q.  What are they?

G9KQROD3                           Donaldson - direct

1    A.   These are excerpts of text messages pulled from these

2    reports, from the reports from the previous phones.

3    Q.   Did you assist in the preparation of these excerpts?

4    A.   Yes.

5    Q.   Do these excerpts accurately compile selected text message

6    conversations from the Ivan Puello phone?

7    A.   Yes, they do.

8    Q.   Do they also accurately compile cellular subscriber

9    information already admitted into evidence in Government

10   Exhibit 700?

11   A.   Yes, they do.

12           MS. ESTES:   Your Honor, the government offers

13   Government Exhibits 710, 711 and 712.

14           MR. HANDWERKER:   No objection, Judge.

15           THE COURT:   710, 711 and 712 are received in evidence.

16           (Government's Exhibits 710, 711 and 712 received in

17   evidence)

18   Q.   Investigator Donaldson, could you turn in your exhibit

19   binder to what has been premarked for identification purposes

20   as Government Exhibit 713.   Do you recognize this document?

21   A.   Yes.

22   Q.   How do you recognize it?

23   A.   I've viewed it before.

24   Q.   What is this document?

25   A.   It's another page from the reports.

G9KQROD3                          Donaldson - direct

1    Q.  Is that from the report for the Ivan Puello phone?

2    A.  Yes.

3             MS. ESTES:  Your Honor, the government offers

4    Government Exhibit 713.

5             MR. HANDWERKER:  No objection, Judge.

6             THE COURT:  713 is in evidence.

7             (Government's Exhibit 713 received in evidence)

8             MS. ESTES:  Your Honor, may I publish Government

9    Exhibit 713?

10            THE COURT:  Yes.

11            MS. ESTES:  Ms. Lee, could you zoom into the text of

12   this document.

13   BY MS. ESTES:

14   Q.  Investigator Donaldson, what is the date of this message?

15   A.  February 25, 2015.

16   Q.  In reviewing the entirety of the extraction report for the

17   Ivan Puello phone, have you learned who sent this message?

18   A.  Yes.

19   Q.  Who sent it?

20   A.  The 917 phone -- I'm sorry, the 201 phone.

21   Q.  Who was the message sent to?

22   A.  The 917 phone.

23   Q.  Is the 917 phone the number subscribed to Michael

24   Rodriguez?

25   A.  Yes.

G9KQROD3                          Donaldson - direct

1   Q.  What was sent in this message?

2   A.  A news article.

3   Q.  Does the second page of this exhibit show that news

4   article?

5   A.  Yes, it does.

6          MS. ESTES:  Ms. Lee, could you turn to the second page

7   of Government Exhibit 713 and zoom in to the text.

8   Q.  Investigator Donaldson, could you read the lines in this

9   article?

10  A.  "Police say the owner of a cherry factory in Brooklyn

11  killed himself as city and state officials were searching his

12  building for possible environmental crimes and instead found a

13  marijuana growing operation."

14  Q.  Investigator Donaldson, let's turn to cell site.  Can you

15  describe what cell site analysis involves?

16  A.  Cell site analysis is the analysis of where a device cell

17  site it connects to when it makes and receives a call.

18  Q.  What is the purpose of undertaking this analysis?

19  A.  To determine where a phone may have been used.

20  Q.  How precise is cell site analysis?

21  A.  It can put you in the general area.

22  Q.  So, for example, using cell site analysis, can you tell if

23  someone is in a particular apartment?

24  A.  No.

25  Q.  Can you tell whether someone is in a particular building?

1    A.   No.

2    Q.   So in terms of location, what can you tell?

3    A.   You can tell within a few blocks or so or maybe, you know,

4    ten blocks where that phone was being used.

5    Q.   Investigator Donaldson, could you turn in your exhibit

6    binder to what has been premarked for identification purposes

7    as Government Exhibit 703A through P?

8              THE COURT:  A through what, Ms. Estes?

9              MS. ESTES:  A through P.

10   Q.   Do you recognize these documents?

11   A.   Yes.

12   Q.   What are they?

13   A.   This is a PowerPoint presentation of the analysis I

14   performed that I created for this trial.

15   Q.   Did you prepare these documents after examining records for

16   the 917 phone number subscribed to Michael Rodriguez?

17   A.   Yes.

18   Q.   Do these documents accurately describe certain portions of

19   those records?

20   A.   Yes.

21   Q.   Do these documents also contain your analysis of those

22   records?

23   A.   Yes.

24             MS. ESTES:  Your Honor, the government offers

25   Government Exhibit 703A through P into evidence.

1          MR. HANDWERKER:  No objection, Judge.

2          THE COURT:  703A through P is received in evidence.

3          (Government's Exhibits 703A through 703P received in

4     evidence)

5          MS. ESTES:  Your Honor, we'd like to go through

6     Government Exhibit 703A through P.  May we publish these in

7     turn as we address them?

8          THE COURT:  Yes, you may.

9          MS. ESTES:  Ms. Lee, could you bring up Government

10    Exhibit 703A.

11    Q.  Investigator Donaldson.  Let's start with the basics.  How

12    does a cell phone connect to the network of a provider?

13    A.  When a phone wants to make a call or receive a call, it has

14    to ask permission of the network to use the cell site.  The

15    network grants permission to the cell site and the phone could

16    either make or receive a call.

17    Q.  What is a cell site?

18    A.  Cell site is a -- it's a site that contains antennas and

19    electronic cellular equipment to power and control the

20    antennas.

21    Q.  Investigator Donaldson, could you turn to Government

22    Exhibit 703B in the PowerPoint presentation.  I believe you

23    have the clicker in front of you.  What are we looking at here?

24    A.  This is a cell tower.  These cell towers you usually don't

25    see in the city.  You see them more rural and suburban areas.

1    This particular cell tower is a three-sector tower, which most

2    cell sites are, and you can tell it's three sectors by looking

3    at the top, on the right picture is triangular.  Each flat side

4    of that triangle is a sector of the cell site.  So this one has

5    three sectors, which most of them are.

6    Q.  What does it mean to be a three-sector tower?

7    A.  They want to cover a 360-degree area from the tower, so

8    it's better to -- so that they can enable more phones to

9    connect, they divide it into three sectors, instead of having

10   one sector where you can only have a few -- a number of phones

11   connected, if they divide it into three sectors, they can

12   triple that number.

13   Q.  Investigator Donaldson, can you turn to Government Exhibit

14   703C.  What is shown here?

15   A.  These are -- these are cell site locations that you see in

16   urban areas.  These photos were taken in New York City.  The

17   photo on the left shows you four rectangular objects in the

18   middle.  That's a cell site.  That's just a sector.  That's

19   showing one sector.  This particular cell site, the other

20   sectors are on the other sides of the building.  The photo on

21   the right shows you right on top of the T-Mobile building

22   there's three sets of antennas which covers like three sectors.

23   And if you look further up on the next building, there are

24   other antennas on top of that building.

25   Q.  Are the antennas those rectangular objects you described?

1    A.   Yes.

2    Q.   Can you tell us how antennas on cell towers are generally

3    arranged?

4    A.   In sectors, like three sectors.

5    Q.   As you explained earlier?

6    A.   OK.

7    Q.   Investigator Donaldson, could you turn to Government

8    Exhibit 703D.  Could you click through the first point of this

9    slide?

10   A.   This is just a map.  It doesn't apply to this case.  It's

11   just a map I picked out just to demonstrate how a cell tower is

12   set up.  Say the provider wants to cover the area surrounded by

13   the dotted line on the outside.  In the middle would be the

14   cell tower.  This is going to be a three-sector cell layout, so

15   the first sector is usually always -- let me put this on first.

16   It uses geometry like in compasses.  A circle is 360 degrees.

17   They would have set it up so zero on every cell site in North

18   America zero and 360 is always facing north.  The opposite of

19   that would be 180 degrees which would face south.  East would

20   be at 90 degrees.  And west would be 270 degrees.  And then

21   there's other points in between.

22   Q.   Investigator Donaldson, to clarify what does the circle in

23   the center represent?

24   A.   This would represent the coverage that the provider wants

25   to cover for that -- it wants to cover that area.  We're

1    looking an aerial view and down, and it wants to cover the area

2    depicted by the dotted line on the outside.

3    Q.  What is the small dot in the center?

4    A.  That's a cell tower.

5    Q.  If you could click through the slide.

6    A.  In this example, I'm using 60 degrees as the first sector.

7    As I previously stated, most first sectors always start

8    somewhere north, northeast, most of them.  So if a direction of

9    the first sector is 60 degrees, which is a northeast direction,

10   the actual bandwidth of the antenna covers between zero and

11   120 degrees.  So the area between the two red dotted lines is

12   the area that that antenna is going to cover.

13   Q.  When you say antenna, do you mean this is the coverage for

14   that sector?

15   A.  For that sector, yes.

16   Q.  What does the black line represent with the arrow?

17   A.  The black line is just showing the orientation of the

18   direction that the antennas are facing.  The red lines show the

19   coverage.  So when an antenna -- it's like a slice.  They

20   direct the antenna so it goes straight out, but it spreads so

21   that it covers that area.

22   Q.  Could you continue to go through the slide?

23   A.  So your second sector would be 180 degrees.  That would

24   cover the area between 120 and 240 degrees.  And then your

25   final sector would be 300 degrees, and that would cover the

G9KQROD3                      Donaldson - direct

area between 240 and zero or 360.  So it completes the entire

circle.

          Now, this is an ideal layout.  This is what you use

when you see the cell towers.  The out -- rural, the suburban,

there's no structures blocking the antenna so they can actually

set them up like this.  It doesn't have to be 60 degrees.  It

can start at another angle, and it will go around where each

one is probably 120.

          But in suburban -- I'm sorry -- urban areas like New

York City, you can't do that because there's buildings all

around, and they have to put the antennas wherever they can.

So, two reasons for that:  First of all, they don't want to

have an antenna facing a building; and also, even though this

looks nice and covers the whole 360, a lot of antennas in urban

areas won't complete the 360.  There's so many cell sites that

even if they have gaps in coverage on this cell site, another

cell site will pick up that area.

          So you will see sometimes in urban, New York City,

that they actually overlap some sectors a lot because -- and

that's due because they want more capacity in that area.  You

have an area -- like I see a lot like in midtown Manhattan

where you have a lot, not only people live and work there, but

you have a lot of tourists.  You'll see a bunch of sectors

overlapped just to provide coverage for that area so everyone

will have phone service.

Q. So, Investigator Donaldson, the red dashed lines

representing the boundaries of the sectors, are those exact?

A. No. That's another thing. What happens is if they tried

to lay it out -- if they laid it out exactly like this, what

would happen is because of radio signals the way they are, any

obstruction could change the signal. So if they laid it out

exactly like this along those red lines between the boundaries,

you would have a lot of dead spots. You'd have spots where

you'd have dropped calls. So what they all do, all the

providers do this, they overlap it by at least five degrees.

So each sector actually blends into the next sector so to

ensure that they have coverage.

     Also, around the blue line on the outside, the

provider is just trying to provide coverage there, but that

radio signal goes beyond that blue line. It's just that the

further the signal goes away from the sector, it decreases in

power. So a phone beyond that most likely wouldn't want to

connect to that phone because the power is too low.

Q. So turning back to the red dashed line, Investigator

Donaldson, for example, if a phone was located somewhere near

that red dashed line, which sector would it connect to?

A. It would connect to either sector on the side of that line

because both signals would be strong in that area.

Q. So, stepping back a bit, when does a cell phone connect to

a cell site?

G9KQROD3                         Donaldson – direct

1   A.  Either when it wants to make or receive a call, a text or

2   data.

3   Q.  About how many Sprint cell sites are there in New York

4   City?

5   A.  Hundreds.

6   Q.  How does a phone decide what cell site to connect to?

7   A.  It connects to the cell site with the strongest signal.

8   Q.  Does proximity to that cell site affect whether the signal

9   is strongest?

10   A.  Usually the signal is stronger when you're closer to a cell

11   site.

12   Q.  What sort of records do phone companies keep about the cell

13   site connections?

14   A.  They keep records of the call –– whatever is done with the

15   phone, the time and date, the –– who's calling who, the

16   telephone numbers involved, the duration of a call and what

17   cell sites the call connects to.

18   Q.  At what point during a phone call does the phone company

19   have information as to what cell site it connected to?

20   A.  Usually at the start of the call and at the end of the

21   call.

22   Q.  Does a cell phone connect to a cell tower to send text

23   messages?

24   A.  Yes, it does.

25   Q.  Does Sprint keep a record of when a cell phone connects to

1    a cell site to send a text message?

2    A.  It keeps a record of the text message that was sent and to

3    what parties, but it doesn't show the cell site that it

4    connects to.

5    Q.  Generally, do phone companies like Sprint keep a record

6    where cell sites are located throughout New York City?

7    A.  Yes, they keep a list of all the cell sites.

8    Q.  Do those records include information about the relevant

9    sectors of the cell site as you described?

10   A.  Yes, they do.

11   Q.  Investigator Donaldson, can you turn in your exhibit binder

12   to what has been admitted into evidence as Government Exhibit

13   701.  If you could just flip through this document.  What is

14   this document?

15   A.  These are the provider call detail records for the phone

16   number 9174078320.

17   Q.  Is that the phone number subscribed to Michael Rodriguez?

18   A.  Yes.

19   Q.  Did you analyze these records in connection with this case?

20   A.  Yes.

21   Q.  What time period do these call records cover?

22   A.  From March to August of 2015.

23   Q.  Investigator Donaldson, could you turn in your Exhibit

24   binder to what has already been admitted into evidence as

25   Government Exhibit 702A.  Did you review this record in

G9KQROD3                          Donaldson - direct

1    preparing to testify today?

2    A.   Yes.

3    Q.   What does this record contain?

4    A.   This is the provider -- this is the list of all their cell

5    sites in the area.

6    Q.   Is that Sprint cell site?

7    A.   Sprint, yes.

8            MS. ESTES:  Ms. Lee, could you please display

9    Government Exhibit 703E on the screen.

10   Q.   Investigator Donaldson, does Government Exhibit 703E

11   contain an excerpt of call records contained in Government

12   Exhibit 701?

13   A.   Yes.

14   Q.   Where are those located on this slide?

15   A.   The top part of the -- the top spreadsheet.

16   Q.   Does it also contain an excerpt of the cell site location

17   data contained in Government Exhibit 702A --

18   A.   Yes.

19   Q.   -- for those on the bottom of the slide?

20   A.   Yes.

21           MS. ESTES:  Ms. Lee, could you zoom into the headings

22   at the top of the slide.

23   Q.   Investigator Donaldson, could you lead us through what

24   these headings mean.

25   A.   These are the call detail record headings.  Calling number

G9KQROD3                    Donaldson - direct

1    is the number making the call.

2              Called number is the number that was called.

3              Dialed digits are the numbers entered into the

4    network.

5              Mobile role will show if the phone is either inbound,

6    an incoming call, or outbound or routed call.  Routed calls are

7    usually voicemails.

8              Start date gives you the date and time of the

9    beginning of a call.

10             End date gives you the date and time of the end of the

11   call.

12             Duration is in seconds, and it gives you the length of

13   the call.

14             Call type will tell you if it's a voice message or

15   it's text -- I'm sorry -- if it's a voice call or it's text.

16             And then you have NEID, which is like an area code for

17   all the cell sites.  It's a switch for all the cell sites.

18   Q.  So, for example, there, Investigator Donaldson, what is the

19   NEID listed on the second row of this excerpt?

20   A.  72.

21   Q.  What area does NEID 72 cover?

22   A.  Manhattan and part of lower Bronx.

23   Q.  So turning to the next column labeled first cell, what does

24   that refer to?

25   A.  First cell is the cell site that the phone connected to at

1    the start of the call.  And last cell would be the cell that

2    the phone ended on when it ended the call.

3    Q.  In that first cell column, does that column contain both

4    the cell site and the relevant sector?

5    A.  Yes.

6    Q.  Now, looking through the columns for the first cell and

7    last cell, it looks like could some entries contain a zero.

8    What does that mean?

9    A.  Zero is either a text or a voicemail.

10   Q.  Why is there a zero for text?

11   A.  Because text -- even though the text uses an antenna, it's

12   so quick it doesn't register any time.  It's only 160

13   characters, and they just don't register.  This company just

14   doesn't use it.  And voicemails are not actually calls,

15   connections to the cell site.  Voicemails go to a voicemail

16   switch.

17   Q.  Can a cell phone connect to multiple cell sites during a

18   single call?

19   A.  Yes.

20   Q.  Can you explain?

21   A.  If the phone is moving, it has -- and the signal gets weak

22   on one cell site, it will have to connect to the next cell site

23   with strongest signal, and it will move that way.

24   Q.  So the cell sites listed in the first cell column and last

25   cell column will not always be the same?

G9KQROD3                          Donaldson - direct

1    A.   Correct.

2         MR. ESTES:   Ms. Lee, could you zoom into the heading

3    of the cell site records at the bottom of the slide.

4    Q.   Investigator Donaldson, starting from the left, what is

5    indicated by the first two columns labeled cell number and

6    cascade ID?

7    A.   They mean the same thing.   Cell number is just an easy way

8    of looking at what cell site it is, 30, 31.   Cascade ID is the

9    internal name the network uses to identify that cell site.

10   Q.   Turning to the next three columns:   Switch, NEID and repoll

11   number.   What do these refer to?

12   A.   Those all mean the same thing.   NEID, like I said, is just

13   an easy way of knowing what area that covers.

14        Switch is like the internal name for the switch.

15        The repoll is a number that Sprint is getting rid of.

16   It's -- they mean the same thing, but a few years ago Sprint

17   started switching to NEID instead of repoll.   They just haven't

18   gotten rid of the repoll yet.

19   Q.   Turning to the next two columns, latitude and longitude,

20   what do those refer to?

21   A.   That's the GPS position of the actual cell site.

22   Q.   So, if you plotted those on a map, could you determine

23   where the cell site is located?

24   A.   Yes.

25   Q.   Turning to the next column, BTS manufacturer, what does

G9KQROD3                        Donaldson - direct

1    that mean?

2    A.   That's the manufacturer of the antenna.

3    Q.   Next is sector.  What does sector refer to?

4    A.   Sector, like I explained in the demonstration, the first

5    the second and the third sectors.

6    Q.   After that is azimuth.  What does that refer to?

7    A.   Azimuth is the direction that the antenna is facing.

8    Q.   Turning to the last column, CDR status.  What does that

9    refer to?

10   A.   It tells if it's active or non-active cell sites.  These

11   are active cell sites.

12          MR. ESTES:  Ms. Lee, could you zoom out so we can see

13   both charts.

14   Q.   Investigator Donaldson, turning back up to the second

15   chart, what does the second line of the bottom of that chart,

16   the first cell column where it says 20040.  Could you explain

17   what 20040 refers to?

18   A.   In CDMA networks such as Sprint and Verizon, they have

19   different antennas they use.  Whenever they use Lucent

20   antennas, which is most of the voice calls, they -- let me

21   explain.  The first cell and the last cell, that number means

22   the first number in that column is the sector.  The last four

23   digits would be the cell site.  But what they do is in the

24   details, whenever they use Lucent antennas, instead of using

25   one for sector one, they'll use two.  Instead of using two,

they'll use three.  Instead of using three, they'll use four.

It's usually easily recognizable from doing this because if you

see a four there, I know it's a three sector.  In that column

where it says 20040, that's actually sector one, cell site 40.

Q.  Does that correspond to any of the numbers that we were

talking about at the bottom of the screen?

A.  Yes.

Q.  Could you indicate where?

A.  It's in the middle of the bottom, the first 40, cell 40,

and that indicates that it's sector one, and it's facing in the

direction of 40 degrees.

Q.  Investigator Donaldson, does that line indicate the

latitude and longitude for that cell site?

A.  Yes.

Q.  As you testified earlier, that gives you the GPS position

of the cell site?

A.  Yes.

        MR. ESTES:  Ms. Lee, could you please pull up

Government Exhibit 703F.

Q.  Investigator Donaldson, what is depicted on this exhibit?

A.  This is an analysis of the most frequent calls that the 917

number made or received.

Q.  What's the time frame for this analysis?

A.  March 7, 2015 to September 1, 2015.

Q.  Is the 917 number the number subscribed to Michael

G9KQROD3                          Donaldson – direct

1    Rodriguez?

2    A.   Yes.

3    Q.   Directing your attention to the inbound column, what does

4    that reflect?

5    A.   That's the calls that were made to the 917 number.

6    Q.   What does the outbound column reflect?

7    A.   Those are the calls that the 917 number called.

8    Q.   Let's look at the second line of this chart.  What is the

9    number shown there?

10   A.   9549937267.

11   Q.   Is that the number from the phone recovered from the grow

12   house?

13   A.   Yes.

14   Q.   How many inbound calls involved this number?

15   A.   608.

16   Q.   How many outbound calls?

17   A.   602.

18   Q.   How many total calls?

19   A.   1,210.

20   Q.   Is that the second most frequent number the 917 number

21   connects to?

22   A.   Yes.

23   Q.   Let me direct your attention to the fifth line.  What is

24   the number shown there?

25   A.   2019605037.

G9KQROD3                        Donaldson - direct

1    Q.  Is that the number for the Ivan Puello phone?

2    A.  Yes, it is.

3    Q.  How many inbound calls involve this number?

4    A.  144.

5    Q.  How many outbound calls?

6    A.  129.

7    Q.  What are the total calls?

8    A.  273.

9    Q.  So that was the fifth most frequent number the 917 number

10   connected to?

11   A.  Yes.

12        MR. ESTES:  Ms. Lee, could you please publish

13   Government Exhibit 703G.

14   Q.  Investigator Donaldson, in preparation for your testimony

15   today, were you asked to plot 175 West 95th Street on this map?

16   A.  Yes.

17   Q.  Could you indicate where that location is on the map?

18   A.  Where the green arrow points to a little square on the map.

19   Q.  In preparation for your testimony today, were you also

20   asked to determine whether the phone subscribed to Michael

21   Rodriguez connects to cell sites in the vicinity of that

22   address?

23   A.  Yes.

24   Q.  What was the result of your analysis?

25   A.  I found that the two cell sites depicted were -- actually,

G9KQROD3                           Donaldson - direct

1    sectors depicted were the ones that the phone connected to the

2    most while it was in that area.

3    Q.   Could you indicate where the cell sites you're referring to

4    are located?

5    A.   OK.   The red arrows indicate the bandwidth, as I explained

6    earlier, of the cell site.   So right in the middle where they

7    veer -- where they --

8            THE COURT:   Cross?

9    A.   Where they cross -- thank you -- they cross, that would be

10   the cell site.

11   Q.   So the cell site is the intersection of those two red

12   lines?

13   A.   Yes.

14   Q.   And what's in between the two red lines, that's the sector?

15   A.   That's the sector, yes.

16   Q.   Turning to these cell sites, are these the two cell sites

17   this phone was connecting to in your analysis?

18   A.   Most times, yes.

19           MR. ESTES:   Ms. Lee, could you please publish

20   Government Exhibit 703H.

21   Q.   Investigator Donaldson, what is illustrated on this slide?

22   A.   This indicates how often the phone was in the area of 175

23   West 95th Street.

24   Q.   What do the red circles indicate?

25   A.   The red circles mean the phone was in those areas on those

G9KQROD3                        Donaldson - direct

1    days.

2    Q.  So here that's almost every day?

3    A.  Almost every day.

4    Q.  Based on your experience, could this indicate that the

5    person lived at that location?

6    A.  Yes.

7    Q.  And based on your review of the call records for this phone

8    number is there anything else that could indicate the person

9    lived at this location?

10   A.  Yes.  Usually when we try to determine where a phone may be

11   at a residence, we look at the first calls made during the day

12   and the last calls made at night because that usually means

13   that's where the phone is living.  And for the majority of the

14   times, the phone, the first calls and the last calls were made

15   in the vicinity of 175 West 95th Street.

16          MS. ESTES:  Ms. Lee, could you please pull up

17   Government Exhibit 703I.

18   Q.  Investigator Donaldson, in preparation for your testimony,

19   were you asked to plot 420 East 111th Street on this map?

20   A.  Yes.

21   Q.  Could you indicate where that location is on the map?

22   A.  The box at the bottom.  And the green points to the little

23   green square, and that's the 420 East 111th Street.

24   Q.  Were you also asked to determine whether the cell phone

25   subscribed to Michael Rodriguez connects to cell sites in the

G9KQROD3                          Donaldson - direct

1    vicinity of 420 East 111th Street?

2    A.   Yes.

3    Q.   What was the result of your analysis?

4    A.   The three-sector cell sites depicted indicate the most

5    frequent connections in the area near 420 East 111th Street.

6    Q.   Again, are the cell sites where the red lines intersect?

7    A.   Yes.

8    Q.   How many cell sites were depicted here?

9    A.   Three.

10   Q.   Which of those cell sites did the phone connect to the most

11   frequently?

12   A.   The lower left one, 72/271.

13   Q.   Ms. Lee, could you please zoom in.  Investigator Donaldson,

14   approximately how far is that cell site from 420 East 111th

15   Street?

16   A.   A block and a half.

17           MR. ESTES:  Ms. Lee, could you please turn to

18   Government Exhibit 703J.

19   Q.   Investigator Donaldson, what is shown on this slide?

20   A.   This indicates the dates that the phone was near 420 East

21   111th Street.

22   Q.   Is that indicated by the red circles?

23   A.   Yes.

24           MS. ESTES:  Ms. Lee, could you please turn to

25   Government Exhibit 703K.

G9KQROD3                         Donaldson - direct

1   Q.  Investigator Donaldson, in preparation for your testimony,

2   were you asked to plot 780 East 138th Street on this map?

3   A.  Yes.

4   Q.  Will you indicate where that location is on the map?

5   A.  The box at the bottom in green points to the little green

6   square.

7   Q.  Were you also asked to determine whether the phone

8   subscribed to Michael Rodriguez connects to cell sites in the

9   vicinity of that location?

10  A.  Yes.

11  Q.  What was the result of your analysis?

12  A.  Most often the phone connected to either the one on the

13  left 72/188 or 72/167 on the right.  On the left I'm showing

14  all three sectors because it equally connected to the first and

15  second sectors on either side of the line pointing towards the

16  location.

17  Q.  Based on your training and experience, what did that

18  indicate?

19  A.  That the phone is somewhere in the area of that line.

20  Q.  Just to confirm, is that the line pointing southeast?

21  A.  Yes.

22          MS. ESTES:  Ms. Lee, could you please turn to

23  Government Exhibit 703L.

24  Q.  Investigator Donaldson, what is shown on this slide?

25  A.  These are the dates that the phone was in the area of 780

G9KQROD3                        Donaldson – direct

1    East 138th Street.

2    Q.   Again, is that indicated by the red circles?

3    A.   Yes.

4          MS. ESTES:  Your Honor, may I publish Government

5    Exhibit 710 which has previously been entered into evidence?

6          THE COURT:  Yes.

7          MR. ESTES:  Ms. Lee, could you please zoom in.

8    Q.   Investigator Donaldson, turning back to the text messages

9    that were previously entered into evidence, let's look at this

10   text message displayed here.  What is the date of this text

11   message?

12   A.   October 6, 2014.

13   Q.   Where was this text message obtained from?

14   A.   From the phone extractions.

15   Q.   Which phone number?

16   A.   The 201 number.

17   Q.   Is that the Ivan Puello phone?

18   A.   Yes.

19   Q.   Investigator Donaldson, what numbers are involved in this

20   text message exchange?

21   A.   The 917 number and the 201 number.

22   Q.   Is the 917 number the number subscribed to Michael

23   Rodriguez?

24   A.   Yes.

25   Q.   What is the time of the first text message displayed here?

G9KQROD3                          Donaldson – direct

1    A.  7:47 a.m.

2    Q.  What phone sent that message?

3    A.  The 917 number.

4    Q.  Is that the phone subscribed to Michael Rodriguez?

5    A.  Yes.

6    Q.  What does that message say?

7    A.  9:00 a.m. 9th.

8    Q.  Who was the message sent to?

9    A.  To 201, the Ivan Puello phone.

10   Q.  What is the time of the second text message?

11   A.  7:51 a.m.

12   Q.  What phone sent that text message?

13   A.  201, the Ivan Puello phone.

14   Q.  Who was the message sent to?

15   A.  917, the Michael Rodriguez phone.

16   Q.  Could you read that text message?

17   A.  K.

18   Q.  Now, Investigator Donaldson, going back to the cell site

19   data, do we have cell site records in Government Exhibit 701

20   for this date in 2014?

21   A.  No.

22   Q.  Why not?

23   A.  The records only cover March through August of 2015.

24            MS. ESTES:  Your Honor, may I publish Government

25   Exhibit 711 for the jury?

G9KQROD3                          Donaldson - direct

1           THE COURT:  Yes, you may.

2           MS. ESTES:  Ms. Lee, could you please zoom in?

3   Q.  Investigator Donaldson, turning back to this text message

4   exchange, what is the date?

5   A.  May 18, 2015.

6   Q.  What phone numbers are involved in these text messages?

7   A.  The 917 number and the 201 number.

8   Q.  And the 917 number is the number subscribed to Michael

9   Rodriguez?

10  A.  Yes.

11  Q.  And the 201 number is the number subscribed to Ivan --

12  sorry -- the Ivan Puello phone?

13  A.  Yes.

14  Q.  What is the time of the first message?

15  A.  7:22 a.m.

16  Q.  Who is it sent from?

17  A.  From 917, the Michael Rodriguez phone.

18  Q.  What phone is it sent to?

19  A.  201, the Ivan Puello phone.

20  Q.  What does the text message say?

21  A.  9:15, the 9th.

22  Q.  Turning to the next message, what time is it sent?

23  A.  8:19 a.m.

24  Q.  What phone is it sent from?

25  A.  917, the Michael Rodriguez phone.

G9KQROD3                          Donaldson - direct

1   Q.  What phone is it sent to?

2   A.  201, the Ivan Puello phone.

3   Q.  What does the message say?

4   A.  Make it 9.

5   Q.  Turning to the next message, what is the time of the

6   message?

7   A.  8:21 a.m.

8   Q.  What phone is it sent from?

9   A.  201, Ivan Puello phone.

10  Q.  What phone is it sent to?

11  A.  917, the Michael Rodriguez phone.

12  Q.  What does the message say?

13  A.  K.

14          MR. ESTES:  Ms. Lee, could you pull up Government

15  Exhibit 703M.

16  Q.  Investigator Donaldson, in preparation for your testimony

17  today, were you asked to review cell site data for the number

18  subscribed to Michael Rodriguez for May 19, 2015?

19  A.  Yes.

20  Q.  Is that the date after the text message exchange we just

21  reviewed?

22  A.  Yes.

23  Q.  Specifically, were you asked to review cell site data from

24  approximately 9:00 a.m. to 9:20 a.m.?

25  A.  Yes.

1    Q.  Does this slide reflect what cell site, if any, the phone

2    connected to during that time frame?

3    A.  Yes.

4    Q.  What cell site is that?

5    A.  72/271.

6    Q.  And where is it indicated on this slide?

7    A.  At the intersection of the three red lines.

8    Q.  Were you also asked to plot 420 East 111th Street on this

9    map?

10   A.  Yes.

11   Q.  How far is that cell site from 420 East 111th Street?

12   A.  A block and a half.

13   Q.  Let me direct your attention to 9:12 a.m. specifically.

14   Does the data show any phone calls at that time?

15   A.  Yes.

16   Q.  How many calls?

17   A.  Two.

18   Q.  According to the cell site data, what cell site did the

19   phone connect to during those specific calls?

20   A.  To the 72/271.

21   Q.  When it connected during those calls, what sectors did it

22   connect to?

23   A.  The first and second sectors.  For those calls?  I'm sorry.

24   Yeah, the first call was the first sector, and the second call

25   connected to the second sector.

G9KQROD3                        Donaldson – direct

1    Q.  Based on your training and experience, what did that mean?

2    A.  Well, the calls were close together.  The second call was

3    seven seconds after the first call so that shows me that -- it

4    tells me that the phone was somewhere near the -- that red line

5    that points through the location.  So somewhere along that

6    line.

7    Q.  As to the red line, are you referring to the red line

8    running southeast?

9    A.  Yes.

10   Q.  So based on your experience, is that consistent with the

11   phone being in the area of 420 East 111th Street?

12   A.  Yes.

13   Q.  According to the toll records, who were those two calls to?

14   A.  The first call was from the 917 to the 201 number.  And the

15   second call was from the 917 to the 954 number.

16   Q.  And the 201 number, is that the number for the Ivan Puello

17   phone?

18   A.  Yes.

19   Q.  Is the 954 number the number for the phone recovered from

20   the grow house?

21   A.  Yes.

22        MS. ESTES:  Your Honor, may I publish Government

23   Exhibit 712 for the jury?

24        THE COURT:  Yes, you may.

25        MS. ESTES:  Ms. Lee, could you zoom in.

G9KQROD3                    Donaldson - direct

1    Q.   Investigator Donaldson, what is the date of this text

2    message exchange?

3    A.   August 20, 2015.

4    Q.   What phones are involved in this exchange?

5    A.   The 917 number subscribed to Michael Rodriguez, and the 201

6    number, the Ivan Puello phone.

7    Q.   What is the time for the first text message?

8    A.   7:41 a.m.

9    Q.   What phone is it from?

10   A.   The 917 number.

11   Q.   What phone is it to?

12   A.   The 201 number.

13   Q.   What does the text say?

14   A.   On the 9th.

15   Q.   Turning to the next message, what time was it?

16   A.   8:10 a.m.

17   Q.   What phone is it from?

18   A.   The 917 number.

19   Q.   What phone is it to?

20   A.   The 201 number.

21   Q.   What does it say?

22   A.   Van in garage.  Get Nanette's pocketbook from van.  If

23   problem, call my phones so she can talk to them.

24   Q.   Turning to the last text message.  What time is that?

25   A.   8:21 a.m.

G9KQROD3                          Donaldson - direct

1   Q.   What phone is it from?

2   A.   The 201 number.

3   Q.   What phone was it sent to?

4   A.   917.

5   Q.   What does it say?

6   A.   OK.

7           MR. ESTES:  Ms. Lee, could you please bring up

8   Government Exhibit 703N.

9   Q.   Investigator Donaldson, in preparation for your

10  presentation, were you asked to review cell site data for the

11  number subscribed to Michael Rodriguez for August 20, 2015?

12  A.   Yes.

13  Q.   Is that the date of the text message exchange we just

14  reviewed?

15  A.   Yes.

16  Q.   Specifically, were you asked to review cell site data from

17  approximately 7:38 a.m. to 7:52 a.m.?

18  A.   Yes.

19  Q.   Did that data reflect a call that ended at 7:38 a.m.?

20  A.   Yes.

21  Q.   Did it also reflect a call at 7:52 a.m.?

22  A.   Yes.

23  Q.   Does this slide reflect what cell site, if any, the phone

24  connected to during those calls?

25  A.   Yes.

G9KQROD3                         Donaldson - direct

1   Q.  And where are those cell sites located?

2   A.  At the intersection of the red line.

3   Q.  And this is what cell site?

4   A.  Yes, 72/271.

5   Q.  Were you also asked to plot 420 East 111th Street on this

6   map?

7   A.  Yes.

8   Q.  How far is that cell site from 420 East 111th Street?

9   A.  A block and a half.

10   Q.  Was that consistent with the cell phone being in the area

11   of 420 East 111th Street at that time?

12   A.  Yes, it is.

13             MS. ESTES:  Your Honor, may I publish Government

14   Exhibit 703-O?

15             THE COURT:  Yes.

16   Q.  Investigator Donaldson, in preparation for your testimony,

17   were you asked to review cell site data for the number

18   subscribed to Michael Rodriguez on June 4, 2015?

19   A.  Yes.

20   Q.  Specifically, were you asked to review data from

21   approximately 9:38 a.m. to 9:40 a.m.?

22   A.  Yes.

23   Q.  Does this slide reflect what cell site, if any, the phone

24   connected to during that time frame?

25   A.  Yes.

G9KQROD3                          Donaldson – direct

1    Q.  And what cell site is that?

2    A.  72/178.

3    Q.  Where is that indicated on the map?

4    A.  At the intersection of the red lines.

5    Q.  Were you also asked to plot 633 St. Ann's Avenue on this

6    map?

7    A.  Yes.

8    Q.  What is located there?

9    A.  A U.S. post office.

10          MR. ESTES:  Ms. Lee, could you please zoom in.

11   Q.  Investigator Donaldson, how far is that cell site from the

12   post office?

13   A.  Two short blocks.

14          MR. ESTES:  Your Honor, may I publish Government

15   Exhibit 703P?

16          THE COURT:  Yes, you may.

17   Q.  Investigator Donaldson, in preparation for your testimony,

18   were you asked to review cell site data for the number

19   subscribed to Michael Rodriguez for August 5, 2015?

20   A.  Yes.

21   Q.  Specifically, were you asked to review data from

22   approximately 3:17 p.m. to 3:21 p.m.?

23   A.  Yes.

24   Q.  Does this slide reflect what cell site, if any, the phone

25   connected to during that time frame?

G9KQROD3                          Donaldson - direct

1   A.  Yes.

2   Q.  What cell site?

3   A.  72/40.

4   Q.  And where is that indicated on the map?

5   A.  Between the intersection of the two red lines.

6   Q.  Were you also asked to plot 700 Columbus Avenue on this

7   map?

8   A.  Yes.

9           MR. ESTES:  Ms. Lee, could you please zoom in.

10  Q.  Approximately how far is that cell site from 700 Columbus

11  Avenue?

12  A.  About a block.

13          MS. ESTES:  Your Honor, may I have a moment?

14          THE COURT:  Yes, you may.

15          MS. ESTES:  No further questions.

16          MR. HANDWERKER:  No questions, Judge.

17          THE COURT:  Thank you.  Mr. Donaldson, thank you very

18  much.

19          THE WITNESS:  Thank you, sir.

20          (Witness excused)

21          THE COURT:  Ms. Houle.

22          MS. HOULE:  Your Honor, the government calls

23  Investigator Antoinette Guzman.

24   ANTOINETTE GUZMAN,

25      called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MS. HOULE:

4               THE COURT:  All right, Ms. Houle.

5     Q.  Ms. Guzman, where are you employed?

6     A.  The United States Attorney's Office here in the Southern

7     District of New York.

8     Q.  What is your title?

9     A.  Criminal investigator.

10    Q.  How long have you been an investigator with the U.S.

11    Attorney's Office?

12    A.  A little over three and a half years.

13    Q.  What did you do before you worked at the U.S. Attorney's

14    Office?

15    A.  I was a deportation officer with immigration and customs

16    enforcement.

17    Q.  What generally are your duties and responsibilities as an

18    investigator at the U.S. Attorney's Office?

19    A.  Among other things, I investigate violations of federal

20    criminal law.  In those investigations I conduct interviews as

21    well as examine evidence and things like that.

22    Q.  Turning your attention to March 30, 2016, did you

23    participate in a meeting that day?

24    A.  Yes, I did.

25    Q.  Who was present at that meeting?

G9KQROD3                        Guzman – direct

1    A.  Myself, an Assistant U.S. Attorney here from the Southern

2    District of New York, the defendant Michael Rodriguez, and his

3    defense lawyer.

4    Q.  The person who you understood to have met with Michael

5    Rodriguez that day on March 30, do you see him in the courtroom

6    today?

7    A.  Yes.

8    Q.  Could you identify him based on a piece of clothing that he

9    is wearing?

10   A.  He is the gentleman in the second table with the white

11   shirt and glasses.

12              MR. HANDWERKER:  Stipulate defendant.

13              THE COURT:  Ms. Guzman has identified Mr. Rodriguez.

14              MS. HOULE:  Thank you.

15   Q.  Ms. Guzman, if you could turn in that binder in front of

16   you to GX 800.

17              THE COURT:  Ms. Guzman, look at the tabs on the side.

18   800 is towards the back.

19         (Continued on next page)

20

21

22

23

24

25

1          THE WITNESS:  Okay.  Finally got to it.  Thank you,

2     your Honor.

3     Q.  Can you please review the document.

4     A.  Yes.

5     Q.  What is the date of that document?

6     A.  March 30th, 2016.

7     Q.  What is that document?

8     A.  This is an agreement that was signed at the meeting that

9     was held on March 30th.  It was signed by myself, the Assistant

10    U.S. Attorney that was present, Michael Rodriguez and his

11    attorney.

12    Q.  Did you observe Mr. Rodriguez sign that document?

13    A.  Yes, I did.

14          MS. HOULE:  The government offers Government Exhibit

15    800 into evidence.

16          MR. HANDWERKER:  No objection.

17          THE COURT:  800 is received in evidence.

18          (Government's Exhibit 800 received in evidence)

19    Q.  Investigator, what generally is your understanding of what

20    that agreement says?

21    A.  Generally, it states that the statements that the defendant

22    makes in this meeting can be used against him at a later time,

23    if necessary.

24    Q.  What did you understand the purpose of that meeting to be?

25    A.  It was to discuss the pending charges against the

1    defendant, specifically the charge of carrying a firearm in

2    furtherance of a drug conspiracy.

3    Q.  Was there any discussion of the terms of this agreement

4    before it was signed?

5    A.  Yes.

6    Q.  Can you explain.

7    A.  Yes.

8         The Assistant U.S. Attorney went over the document

9    with Rodriguez and detailing what I stated earlier in reference

10   to the statements being made can be used at a later time, if

11   necessary.  And she went on to say that we are just looking for

12   the truth into the circumstances of the charges.

13   Q.  Did the defendant say anything during that meeting

14   regarding drug sales?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He stated that he had two friends that he would -- that he

18   was childhood friends with, and they would typically come and

19   ask him for money.  And sometimes instead of lending them

20   money, since he was never repaid, he would give them marijuana

21   to sell instead.

22        He went on to say that he had high-quality marijuana;

23   that every time he would have a batch ready to sell, he had

24   customers ready and willing to purchase and it would sell out

25   quickly.

G9KVROD4                          Guzman – direct

```
 1   Q.  Did the defendant indicate why he was selling in particular
 2   with these childhood friends?
 3   A.  I'm sorry?
 4   Q.  Did the defendant indicate why he was selling in particular
 5   with these childhood friends?
 6   A.  I'm sorry, I don't understand.
 7   Q.  You indicated that the defendant said he would give
 8   marijuana to the childhood friend to sell?
 9   A.  Yes.
10   Q.  Did he indicate anything about why that was?
11   A.  He stated that they would always ask him to borrow money
12   because they looked at him as being well-off.  And instead of
13   giving them money that they would never pay him back for, he
14   would give them marijuana to sell instead.
15   Q.  Did the defendant say anything further about his
16   interactions with these childhood friends?
17   A.  Yes.  He stated that at one occasion he actually purchased
18   two firearms from them.  One of the friends, he described him
19   as using and selling crack cocaine, as also serving time
20   previously on a manslaughter conviction.  And he stated that
21   friend offered to sell him two firearms.
22           The way that he described it was one firearm was a
23   large firearm, one was small.  He decided that the small
24   firearm he would keep himself, and the larger firearm he would
25   give back to the friend that was selling it.
```

1  Q.  And when you just testified that someone said he would keep

2  the firearm, who are you referring to?

3  A.  Rodriguez, the defendant.

4  Q.  Did the defendant indicate how much money he paid for the

5  gun?

6  A.  I don't remember specifically.  I remember that it was a

7  couple hundred dollars.

8  Q.  Did the defendant say anything about why he bought the gun?

9  A.  He explained that he purchased the firearm because his

10  friend was selling it, the friend needed money, and instead of

11  just giving him money, he would get something in return.  And

12  he decided that he would purchase the firearm since the friend

13  needed money and he wanted something in return, since he knew

14  he wasn't going to get his money back.

15  Q.  What, if anything, did the defendant say about where he

16  kept the gun?

17  A.  He stated -- Rodriguez stated that he -- it was a small

18  firearm that he kept in a jewelry box.  He described it as a

19  Tiffany box.  He put the small firearm in the box, and then he

20  put the box in a drawer of some kind in his apartment.  He said

21  that he kept it there.  He has two kids that would come over,

22  believed it was around teenage years, that they would come

23  over.  And he always kept it there away from where they could

24  get it.

25  Q.  Did the defendant say anything about removing the firearm

G9KVROD4                         Guzman - direct

1    from that apartment?

2    A.  Yes.

3    Q.  What did he say?

4    A.  He stated that he had -- he has a child with another woman,

5    aside from the two teenagers, that came over one night.  And he

6    agreed with her that she would be able to spend the night.  The

7    child was left with Mr. Rodriguez while the baby's mother went

8    out.  She stayed out all night and returned early the following

9    morning.

10            That morning, Rodriguez stated that she was acting a

11   little off, as he described it.  And they were in the middle of

12   a custody battle with the small child.  So he decided that he

13   wanted to take everything out of the apartment that could be

14   used against him during that custody battle.  Among the things

15   that he took out from the apartment was the firearm, as well as

16   drugs and other items.

17   Q.  Did the defendant indicate if anything happened to him on

18   that day when he removed the firearm from the apartment?

19   A.  Yes.

20            That same day, the morning when she returned, his

21   baby's mother returned to the apartment, he decided to take

22   everything out of the apartment because he was leaving to go to

23   the gym.  Mr. Rodriguez stated that he would go to the gym

24   every morning, early in the morning.  There was a set time, and

25   it was time for that to happen.

1          So when he was leaving, he wanted to take everything

2     with him.  He put everything -- all of those items, the

3     marijuana, the weed, and the other items, into his gym bag.

4     And then he took the gym bag with him to the gym.

5          I don't remember if he was approached prior to going

6     to the gym or after, but sometime during that trip, he was

7     stopped by DEA agents and he was arrested and the items were

8     recovered.

9          THE COURT:  Excuse me, Ms. Guzman.

10          That's what he told you in the interview?

11          THE WITNESS:  Correct.

12   Q.  Ms. Guzman, just to be clear, the defendant indicated the

13   gym bag contained marijuana as well as the firearm that he had

14   purchased from those childhood friends?

15   A.  Correct.

16          MS. HOULE:  One moment, your Honor.

17   Q.  Just one more question, Ms. Guzman.

18          You indicated that the defendant stated to you that he

19   would sell high-end marijuana; is that right?

20   A.  Yes.

21   Q.  Did he say anything about the clients to whom he sold?

22   A.  The only thing he stated was that he had regular clients,

23   and that every time he had a batch of marijuana that was ready,

24   he had recurring clients that would continue to come back and

25   purchase.

1   Q.  Did he say anything about how quickly his marijuana would

2   sell?

3   A.  He said every time a batch would sell, it would sell very

4   quickly.  He didn't discuss a timeline.

5             MS. HOULE:  Thank you.

6             No further questions, your Honor.

7             THE COURT:  Mr. Handwerker.

8             MR. HANDWERKER:  Thank you, Judge.

9   CROSS-EXAMINATION

10  BY MR. HANDWERKER:

11  Q.  Ms. Guzman, good afternoon.

12  A.  Good afternoon.

13  Q.  We've met each other at that meeting you're referring to,

14  right?

15  A.  Correct.

16  Q.  Mr. Rodriguez told you the Assistant United States Attorney

17  with me present the truth, didn't he?

18  A.  I'm not sure if he was told to tell the truth.  I'm not

19  sure if he told the truth or not.

20  Q.  I'm not asking what he was told.  I'm asking you if you

21  thought he told the truth.

22            MS. HOULE:  Objection, your Honor.

23            THE COURT:  Overruled.

24  A.  I did believe some of the items that we discussed.

25  Q.  For instance, you didn't mention on direct examination, but

G9KVROD4                        Guzman - cross

1    the firearm didn't have bullets; isn't that correct?

2    A.  He did say that it did not have bullets.

3    Q.  And when the firearm was recovered, did it have bullets, if

4    you know?

5    A.  I'm not sure.

6    Q.  Was he polite that afternoon?

7    A.  Yes.

8    Q.  Was he respectful?

9    A.  Yes, he was.

10   Q.  Was he angry?

11   A.  Didn't seem to me.

12   Q.  Was he credible?

13   A.  I thought in some instances he was credible.

14   Q.  Now, with regard to these friends, alleged friends, it

15   seemed to you like he was talking about them like they were a

16   nuisance?

17   A.  Not so much a nuisance.

18   Q.  How would you describe it?

19   A.  I described it as -- I would describe it as he spoke about

20   these childhood friends as people that he knew from child and

21   continued to have a relationship with.  And he described that

22   they would always come to him for money because they viewed him

23   as being well-off.

24   Q.  And that's what I meant by them being a nuisance.

25   A.  He didn't seem very bothered by it, so that's why I

G9KVROD4                         Guzman - cross

1    wouldn't say nuisance.  I think he pointed it out.

2    Q.  Ms. Fender asked questions and he answered, right?

3    A.  Correct.

4    Q.  Did she ask him if he ever had a firearm prior to this?

5    A.  Yes, she did.

6    Q.  What did he say?

7    A.  He said no.

8    Q.  Did he seem to be concerned in terms of the woman being out

9    all night and being irrational?

10   A.  He stated that that wasn't the agreement.  He was surprised

11   that she had stayed out.

12   Q.  And when he left in the morning, he took his stuff with him

13   because he wasn't sure what she was capable of doing; isn't

14   that correct?

15   A.  That's correct.

16   Q.  He wanted custody of that child, didn't he?

17   A.  Well, he explained that he wanted to be able to see the

18   child.  He was fine with joint custody, but he wanted to be

19   able to see the child as well.

20   Q.  In terms of the relationship or lack of relationship, the

21   gun that he had on that day did not have bullets; correct?

22   A.  He said it did not have bullets.

23   Q.  And he told you he did not have any need for protection;

24   isn't that correct as well?

25   A.  Yes.  When he explained that his customers -- he had

G9KVROD4                    Guzman – cross

1    regular customers and he wasn't the same type of drug dealer

2    that would sell on the street, that he had no need for

3    protection, he did say that.

4    Q.  He wasn't of the same ilk as these two other persons who

5    were selling firearms; isn't that correct?

6    A.  He did not say that.

7              MR. HANDWERKER:  If I can just have a second, Judge.

8              THE COURT:  Yes.

9    Q.  I just want to ask this question:  Did you say he purchased

10   two guns?

11   A.  Yes, he said he purchased two guns.

12   Q.  And did he say he gave one back?

13   A.  Yes, he gave -- he gave one back to the person that was

14   selling it.  They requested to keep it.

15   Q.  Why would they sell it and give it back, does that make any

16   sense?

17   A.  I have no idea.

18   Q.  He wanted nothing to do with these two, didn't he?

19             MS. HOULE:  Objection.

20             THE COURT:  Sustained.

21   Q.  Did it seem to you as if he wanted nothing to do with these

22   two individuals?

23             THE COURT:  Sustained.

24             MR. HANDWERKER:  I have nothing further, Judge.

25             THE COURT:  Any redirect?

G9KVROD4

1        MS. HOULE:  One moment, your Honor.

2        (Pause)

3        MS. HOULE:  No further questions.  Thank you.

4        THE COURT:  Ms. Guzman, you are excused.  Thank you.

5        (Witness excused)

6        THE COURT:  We'll take our luncheon recess now and

7    resume at 2 o'clock.

8        (Jury excused)

9        THE COURT:  Do you have the stipulation to read?

10       MS. HOULE:  Yes, your Honor.

11       THE COURT:  Then what?

12       MS. HOULE:  Then we have two calls that we will play

13   into the record and one email that goes into the record as part

14   of the stipulation.

15       THE COURT:  So we start at 2.  What time is your best

16   estimate?

17       MS. HOULE:  2:10.

18       THE COURT:  2:10.

19       We'll rest before the jury then this afternoon, and

20   we'll take a 15-minute break and then resume with the charge,

21   charging conference.

22       MS. HOULE:  Thank you, your Honor.

23       THE COURT:  So everybody read the charge during lunch.

24       Okay.  We've got another matter now.

25       (Luncheon recess)

G9KQROD5

```
 1                         AFTERNOON SESSION

 2                              2:00 p.m.

 3            (Jury present)

 4            THE COURT:  Good afternoon.  Please be seated.

 5            Ms. Estes.

 6            MS. ESTES:  Your Honor, at this point the government

 7  offers Government Exhibit 1202, which is a stipulation between

 8  the parties into evidence.

 9            THE COURT:  All right.  1202 is received in evidence.

10            (Government's Exhibit 1202 received in evidence)

11            MS. ESTES:  Your Honor, may I publish Government

12  Exhibit 1202?

13            THE COURT:  Yes, you may.

14            MS. ESTES:  Ms. Lee, could you zoom into the text.

15            I will now read from Government Exhibit 1202.

16            It is hereby stipulated and agreed by and among the

17  United States of America, by Preet Bharara, United States

18  Attorney for the Southern District of New York, Jordan Estes,

19  Amanda Houle and Timothy Howard, Assistant United States

20  Attorneys, of counsel, Michael Earl Rodriguez, the defendant,

21  by and with the consent of his attorney, Michael Handwerker,

22  Esquire, that:

23            If called to testify, a representative of the

24  Metropolitan Correctional Center (MCC) located in New York, New

25  York, would testify that:
```

G9KQROD5

1        Inmates at the MCC are advised that prison calls and

2   emails are monitored.

3        Government Exhibit 900 is an excerpt of a telephone

4   call that Michael Earl Rodriguez made from the MCC on

5   August 31, 2016.

6        Government Exhibit 901 is an excerpt of an email that

7   was sent from the MCC email account assigned to Michael Earl

8   Rodriguez on September 9, 2015.

9        Government Exhibit 902 is an excerpt of a telephone

10  call that Michael Earl Rodriguez made from the MCC on

11  September 19, 2015.

12       Government Exhibit 903 is an excerpt of a telephone

13  call that Michael Earl Rodriguez made from the MCC on

14  August 26, 2015.

15       Government Exhibits 900T, 902T and 903T are true and

16  accurate transcripts of the communications in Government

17  Exhibit 900, Government Exhibit 902 and Government Exhibit 903.

18       It is further stipulated and agreed that this

19  stipulation and Government Exhibits 900, 901, 902, 903, 900T,

20  902T, and 903T may be received in evidence as Government

21  Exhibits at trial.

22       This stipulation is dated New York, New York,

23  September 2016, and it's signed by members of both of the

24  parties.

25       THE COURT:  1202, 900, 901, 902, 903, 900T, 902T and

G9KQROD5

1      903T are received in evidence.

2                  (Government's Exhibits 900, 901, 902, 903, 900T, 902T

3      and 903T received in evidence)

4                  MS. ESTES:  Your Honor, may I publish Government

5      Exhibit 900T?

6                  THE COURT:  Yes.

7                  I'll read from the top of 900T.

8                  Excerpt of call between Michael Earl Rodriguez and

9      631-703-6925, August 31, 2016, 7:31 p.m.

10                 Your Honor, may I publish Government Exhibit 900?

11                 THE COURT:  Yes, you may.

12                 (Audio played)

13                 MS. ESTES:  Your Honor, may I publish Government

14     Exhibit 901?

15                 THE COURT:  Yes, you may.

16                 MS. ESTES:  Ms. Lee, could you zoom in on the top half

17     of the document.

18                 So, reading from the top, it says:  Sensitive but

19     unclassified message from 72722054 Rodriguez, Michael, to

20     Zuheida.  Subject RE: RE: blank.  Date September 9, 2015 at

21     1:23 p.m.

22                 The excerpt of the email states:  I got caught with

23     less than a half pound of weed and an unloaded small caliber

24     handgun.

25                 Your Honor, may I publish Government Exhibit 902T?

G9KQROD5

1              THE COURT:  Yes, you may.

2              MS. ESTES:  Reading from the top, it says:  Excerpt of

3    call between Michael Earl Rodriguez and 631-703-6925,

4    September 19, 2015 at 7:37 p.m.

5              Your Honor, may I publish Government Exhibit 902?

6              THE COURT:  Yes, you may.

7              (Audio played)

8              MS. ESTES:  Your Honor, may I publish Government

9    Exhibit 903T?

10             THE COURT:  Yes, you may.

11             MS. ESTES:  Reading from the top, it says:  Excerpt of

12   call between Michael Earl Rodriguez and 212-316-2878,

13   August 26, 2:01:57 p.m.

14             Your Honor, may I publish Government Exhibit 903?

15             THE COURT:  Yes, you may.

16             (Audio played)

17             MS. ESTES:  Your Honor, at this point the government

18   rests.

19             THE COURT:  OK.  Mr. Handwerker.

20             MR. HANDWERKER:  The defense rests, Judge.

21             THE COURT:  OK.

22             And you reserve any motions, Mr. Handwerker?

23             MR. HANDWERKER:  Yes.

24             THE COURT:  Ladies and gentlemen, that concludes the

25   government's presentation of evidence.  The defendant has

G9KQROD5

1    rested as well.  We have some work to do dealing with the

2    instructions that I will give you tomorrow morning.

3           So what we are going to do now is adjourn until 9:30

4    tomorrow morning.  You will have summations by the government

5    and by Mr. Handwerker on behalf of Mr. Rodriguez, and

6    instructions by the Court.  You will have this case in your

7    hands by 11:00, 11:15 to begin your deliberations.

8           In addition, because you will be having lunch with us,

9    we can take your lunch orders.  Marlon will do that now.  We

10   will resume tomorrow morning at 9:30.  We will be open for

11   business at 9:00.

12          Until then, don't talk about the case, keep open

13   minds, and get ready for tomorrow when you hear the summations

14   and the instructions and then your deliberations will begin and

15   conclude.

16          OK.  Thanks very much.  Safe home.

17          (Jury not present)

18          THE COURT:  For the record, Mr. Handwerker, do you

19   want to make your motion?

20          MR. HANDWERKER:  Sure, Judge.

21          Pursuant to Rule 29 and the Federal Rules of Criminal

22   Procedure, the defendant moves for a judgment of acquittal as

23   to both counts of the indictment.  It's our position the

24   government has not proven a prima facie case, and, therefore,

25   the Court should respectfully dismiss both counts.

G9KQROD5

1           THE COURT:  The motion is denied.

2           We will resume in about ten minutes -- how much time

3    do you need to get ready to review the jury charge?  Ten

4    minutes?

5           MS. HOULE:  We're prepared, your Honor.

6           MR. HANDWERKER:  We're ready now, Judge.

7           THE COURT:  Well, let's get started now then.

8           MS. HOULE:  Your Honor, the government does not have

9    any proposed edits to the charge.  I believe the defense has

10   two proposed word changes.  Otherwise, I'm prepared to review

11   with you the parties' collective position on the highlighted

12   portions of the charge.

13          THE COURT:  We will go through page by page.  That's

14   the only way to be sure.  I may have some changes myself, but

15   thank you, Ms. Houle.

16          MS. HOULE:  OK.

17          THE COURT:  We start at page 4, any objections, 4 or

18   5?  6?  7?

19          MR. HANDWERKER:  Judge, I have two requests regarding

20   page 7.

21          THE COURT:  Yes.

22          MR. HANDWERKER:  I mentioned it to the government.

23          THE COURT:  I can't hear you.

24          MR. HANDWERKER:  Under punishment, the category of

25   punishment it says:  "The question of Mr. Rodriguez's possible

G9KQROD5

1    punishment."  I would ask that it reads "potential punishment."

2              THE COURT:  OK.  So "possible" becomes "potential".

3              MR. HANDWERKER:  If you don't mind, Judge.

4              THE COURT:  I'll make the change.

5              MR. HANDWERKER:  Bottom of that page the sentence that

6    reads:  "Your function is to weigh the evidence, or lack of

7    evidence, in the case and to determine whether or not" and I

8    would ask that you include "the government has proven

9    Mr. Rodriguez's guilt beyond a reasonable doubt."

10             "Whether or not that the government has proven his

11   guilt beyond a reasonable doubt, solely on the basis of such

12   evidence."

13             THE COURT:  "Determine whether or not the government."

14             MR. HANDWERKER:  "Has proven Mr. Rodriguez's guilt."

15             THE COURT:  "Has proved."

16             OK, I'll make those two changes on page 7.

17             MR. HANDWERKER:  Thank you, Judge.

18             THE COURT:  Page 8?  9?  10?  11?  12?  Page 13, do we

19   need preparation of witnesses?

20             MS. HOULE:  The parties agree that that's not

21   necessary.

22             THE COURT:  We will strike that.  OK.

23             Law enforcement witnesses?  How many witnesses have

24   there been?  Law enforcement witnesses.  Guzman, Donaldson,

25   Demurjian, Walters, Hom, Astrakhan and Slavkovsky.

G9KQROD5

1              MS. HOULE:  And Slavkovsky, yes.

2              THE COURT:  I don't want to name them.  Why don't we

3    just say -- how many are there?

4              MS. HOULE:  Seven, your Honor.

5              THE COURT:  "You heard testimony of seven law

6    enforcement officials."

7              MR. HANDWERKER:  Or "several."

8              THE COURT:  How about "a number of"?

9              Expert witnesses?

10             MS. HOULE:  We agree that that's necessary.

11             THE COURT:  It is necessary?

12             MS. HOULE:  Yes, because of Mr. Donaldson's testimony.

13             THE COURT:  But this is way more than is necessary for

14   Mr. Donaldson.  Why don't we make it more specific as to

15   Mr. Donaldson?  He testified with regard to his expertise of

16   cell site.  Is that what he testified to?

17             MS. HOULE:  Yes, your Honor.

18             THE COURT:  And work in his -- and you have one

19   summary too; that is the product of Mr. Donaldson's expertise.

20             So what I would propose to do is work in expert

21   witness and modify it so it's only applicable to Mr. Donaldson

22   and work in the sentence about charts and summaries because

23   that's the only chart and summary you have.

24             MS. HOULE:  That's right, your Honor.

25             MR. HANDWERKER:  That would be fine with us, Judge.

G9KQROD5

```
 1              THE COURT:  So we'll work on that this afternoon.

 2    We'll send it around to you tonight.

 3              Persons not on trial.

 4              We are going to give G but not H on page 15, correct?

 5              MR. HANDWERKER:  Correct.

 6              THE COURT:  Similar acts is out?

 7              MS. HOULE:  Yes, we agree, your Honor.

 8              THE COURT:  How about J and K on page 17?

 9              MS. HOULE:  The parties agree that those are not

10    necessary.  The same for L and M on the next page.

11              THE COURT:  And use of informants.

12              MS. HOULE:  We do not believe that's necessary.

13              THE COURT:  How about uncalled witnesses, do we really

14    need that?

15              MS. HOULE:  We don't think it's necessary, your Honor.

16    I'm only stating the government's position.

17              MR. HANDWERKER:  If I could just have a second, Judge.

18    I would ask it remain in Judge.

19              THE COURT:  What do you say, Ms. Houle?

20              MS. HOULE:  We don't believe that it's necessary.  We

21    would be fine to have it in.

22              THE COURT:  Why do you think it's necessary,

23    Mr. Handwerker?

24              MR. HANDWERKER:  Because the burden is always with the

25    government, and this would relieve them of -- it could relieve
```

G9KQROD5

1    them of that burden if someone misinterprets it.

2              THE COURT:  All right.  I'll leave it in, but I think

3    it's a waste of time.

4              Paragraph O stays in.

5              P stays in.

6              Is Q OK, Mr. Handwerker?

7              MR. HANDWERKER:  Yes, it is Judge.

8              THE COURT:  Do we need R?

9              MS. HOULE:  Yes, your Honor, in relation to

10   Mr. Donaldson's testimony.

11             THE COURT:  OK.  Use of recordings on page 21.

12             MS. HOULE:  We believe that is necessary due to the

13   calls.

14             THE COURT:  "Stipulations.  You have heard evidence in

15   the form of stipulations of testimony."  Did we have any of

16   that?  I thought we just had stipulations.

17             MS. HOULE:  Yes, there were testimonial stipulations.

18   There was a management company stipulation, and there's also

19   testimony in the BOP stipulation.

20             THE COURT:  All right.  That will stay in.

21             Charts and summaries.  What I propose to do -- the

22   only chart and summary is Mr. Donaldson's, isn't it?

23             MS. HOULE:  Yes, your Honor.

24             THE COURT:  I'll work that in with the expert then.

25             MS. HOULE:  Thank you.

G9KQROD5

```
1          THE COURT:  Redaction of evidentiary items.  There's
2    that one page that we just had, right, that's the only
3    redaction?
4          MS. HOULE:  That's the only redaction.  I'm sorry,
5    your Honor.
6          THE COURT:  Do you have any further thoughts here,
7    Ms. Estes?
8          MS. HOULE:  We have redactions in the management
9    company documents.
10         THE COURT:  OK.  Summary of indictment Count One.
11         Page 24?  25?
12         One of the changes I made in your proposal that you
13   submitted on page 4, request number 3, multiple counts, I don't
14   think that's accurate.  "Whether you find the defendant guilty
15   or not guilty as to one offense should not affect your verdict
16   as to any other offense."
17         MR. HANDWERKER:  I'm sorry, Judge.  Where are you
18   reading from?  4 or 24?
19         THE COURT:  I'm reading from page 4 of the joint
20   request to charge that the parties submitted.
21         MS. HOULE:  Yes, your Honor, that's right.
22         THE COURT:  And page I think it's 24.  You say,
23   "However it is for you to determine the government has
24   proven -- if you find the defendant guilty or not guilty as to
25   Count One, you must find the defendant not guilty as to Count
```

G9KQROD5

Two."

So what do you want to do with request number 3?  I
can't leave it the way it is because it's erroneous.  It's not
an accurate statement.

MS. HOULE:  We agree, your Honor, that it's incorrect.

MR. HANDWERKER:  I'm sorry, Judge.  Where are you
reading from?

THE COURT:  I'm reading from two places,
Mr. Handwerker.  The original source is the joint request to
charge.  Do you have that?

MR. HANDWERKER:  Yes, page 4?

THE COURT:  At page 4, request number 3.  The last
sentence seems to be inaccurate.

MR. HANDWERKER:  I agree, yes.

THE COURT:  OK.  And the reason for its inaccuracy is
stated on page 24 in request number 13, because if
Mr. Rodriguez is not guilty as to Count One, he can't be guilty
of Count Two.

MR. HANDWERKER:  Agreed, Judge.

THE COURT:  So I don't know whether this has been
incorporated yet, but what I propose to do is strike the final
sentence of request number 3.  "If you find that defendant not
guilty as to Count One, you must find the defendant not guilty
as to Count Two."  I'm going to add:  "If you find the
defendant guilty as to Count One, you may or may not find the

G9KQROD5

1    defendant not guilty as to Count Two."  It has to be separately

2    considered or words to that effect.

3         OK.  Mr. Schwartzman advises me it's on page 35, so

4    we'll come to that.

5         I'm at page 25 now.  Any changes?  This is pretty much

6    what you submitted to me.  26?  27?  28?  29?  30?  33, do we

7    need the explanation of "involved"?

8         MS. HOULE:  Your Honor, we believe that we do need it

9    as they do need to make a finding on the drug type.

10        THE COURT:  Page 35.  The first element:  Commission

11   of a drug trafficking offense, the final paragraph in Roman

12   Numeral I.  "If you find the defendant not guilty as to Count

13   One, you must find the defendant not guilty as to Count Two.

14   On the other hand, if you find the defendant guilty as to Count

15   One, you have to consider Count Two separately to determine

16   whether the defendant is guilty or not guilty of Count Two."

17        Is that all right with you, Ms. Houle?

18        MS. HOULE:  Yes.  Thank you, your Honor.

19        THE COURT:  Mr. Handwerker?

20        MR. HANDWERKER:  Yes, Judge.

21        THE COURT:  Page 41 selection of foreperson, I select

22   Juror No. 1.  Juror No. 1 is Ms. Rosado.  Number 1 from the

23   Bronx.  Bronx is number 1.

24        Anybody have any changes to the balance?

25        MS. HOULE:  Not from the government.

G9KQROD5

```
 1              THE COURT:  Mr. Handwerker?

 2              MR. HANDWERKER:  None from defense, Judge.

 3              THE COURT:  Pardon me?

 4              MR. HANDWERKER:  None from the defense.

 5              THE COURT:  Now, you submitted a jury verdict form,

 6      Ms. Houle.  Did you give a copy to Mr. Handwerker.

 7              MS. HOULE:  Yes, he was copied on the email last

 8      night.

 9              THE COURT:  Is it OK with everybody?

10              MR. HANDWERKER:  Judge, I spoke with the government

11      earlier about that.  I think we should add something in there

12      that indicates if they have found the defendant not guilty as

13      to Count One, they don't have to go on to consider Count Two.

14      They should stop deliberations and that should be the end of

15      the case.

16              MS. HOULE:  Your Honor, all that we were seeking on

17      the verdict form is that they do need to find a verdict, guilty

18      or not guilty, on that form for Count Two.

19              MR. HANDWERKER:  Judge, if I may, if they come back

20      and fill in guilty, it's going to be a repugnant verdict.

21              THE COURT:  Well, I don't like to change the verdict

22      form.  I think I'll modify my language at page 35 and tell

23      them, "If you find the defendant not guilty as to Count One,

24      you must find the defendant not guilty as to Count Two."  At

25      that time I'll tell them on the verdict sheet, just fill in
```

G9KQROD5

1   question two not guilty, and that will take care of that.

2           MS. HOULE:  Thank you, your Honor.

3           MR. HANDWERKER:  Thank you, Judge.

4           THE COURT:  OK.  How long do you think -- who is going

5   to sum up Ms. Estes or Ms. Houle?

6           MS. ESTES:  I'll be summing up, your Honor.  I think

7   it will be approximately 40 minutes.

8           THE COURT:  Mr. Handwerker, approximately that length?

9           MR. HANDWERKER:  It's going to be less than that,

10  Judge.

11          THE COURT:  How much time for the rebuttal?

12          MS. HOULE:  Somewhat dependent on what the defense

13  says, your Honor.

14          THE COURT:  You're going to give the rebuttal,

15  Ms. Houle?

16          MS. HOULE:  I will, yes.

17          THE COURT:  So we'll allow 20 minutes for that.  So if

18  we start at 9:30, I'll be instructing the jury by 11:00 at the

19  latest.

20          Did you get the lunch orders Marlon?

21          THE DEPUTY CLERK:  I will do so tomorrow morning.

22          THE COURT:  Anything else to do tonight?

23          MS. HOULE:  Nothing from the government.

24          MR. HANDWERKER:  Nothing by the defense, Judge.

25          THE COURT:  Thank you very much.  Let me correct

G9KQROD5

1   something.  I said Ms. Rosado was the Juror No. 1.  I'm correct

2   that it's Ms. Davina Jackson who is Juror No. 1.  Juror No. 1

3   is going to be the forelady of the jury.  Thanks.

4                MS. HOULE:  Thank you, your Honor.

5                MS. ESTES:  Thank you, your Honor.

6                MR. HANDWERKER:  Thank you, Judge.

7                (Trial continued September 21, 2016 at 9:30 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MICHAEL SLAVKOVSKY

Direct By Ms. Houle  . . . . . . 88

Cross By Mr. Handwerker  . . . .102

VADIM ASTRAKHAN

Direct By Ms. Estes  . . . . . .104

RICHARD DEMURJIAN

Direct By Ms. Houle  . . . . . .113

Cross By Mr. Handwerker  . . . .130

Redirect By Ms. Houle  . . . . .134

BRUCE HOM

Direct By Ms. Houle  . . . . . .135

REGINALD DONALDSON

Direct By Ms. Estes  . . . . . .152

ANTOINETTE GUZMAN

Direct By Ms. Houle  . . . . . .199

Cross By Mr. Handwerker  . . . .207

                    GOVERNMENT EXHIBITS

Exhibit No.                               Received

 200, 201 and 202 . . . . . . . . . . . . . .90

 203   . . . . . . . . . . . . . . . . . . .95

 1000   . . . . . . . . . . . . . . . . . . 107

 400   . . . . . . . . . . . . . . . . . . 122

 402   . . . . . . . . . . . . . . . . . . 123

403 through 410 . . . . . . . . . . . . . 125

600 . . . . . . . . . . . . . . . . . . . 137

602 . . . . . . . . . . . . . . . . . . . 142

601 . . . . . . . . . . . . . . . . . . . 143

700, 701, 702-A, 702-B, 702-C, 702-D, . . . . 147

        702-E, 1201

705 . . . . . . . . . . . . . . . . . . . 160

707 . . . . . . . . . . . . . . . . . . . 163

710, 711 and 712 . . . . . . . . . . . . . 164

713 . . . . . . . . . . . . . . . . . . . 165

703A through 703P . . . . . . . . . . . . 168

800 . . . . . . . . . . . . . . . . . . . 201

1202 . . . . . . . . . . . . . . . . . . 212

900, 901, 902, 903, 900T, 902T and 903T . . 214