G9LVROD1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

            v.                         15 CR 756 (PAC)

MICHAEL EARL RODRIGUEZ,

                Defendant.             JURY TRIAL
------------------------------x

                                       New York, N.Y.
                                       September 21, 2016
                                       9:50 a.m.


Before:

                    HON. PAUL A. CROTTY,
                                       District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
AMANDA L. HOULE
JORDAN L. ESTES
TIMOTHY T. HOWARD
     Assistant United States Attorneys

GOLDSTEIN & HANDWERKER LLP
     Attorney for Defendant Rodriguez
MICHAEL HANDWERKER

-Also Present-
RICHARD DEMURJIAN, Special Agent (DEA)

SYLVIA LEE, Paralegal (SDNY USAO)
YOLANDA BUSTILLO, Paralegal (SDNY USAO)
```

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Is everybody set?

 3              MS. ESTES:  Yes, your Honor.

 4              THE COURT:  Mr. Handwerker?

 5              MR. HANDWERKER:  Yes, your Honor.

 6              THE COURT:  Okay.  Marlon.

 7              (Jury present)

 8              THE COURT:  Ms. Estes, are you ready?

 9              MS. ESTES:  Yes, your Honor.

10              THE COURT:  Go ahead.

11              MS. ESTES:  The defendant is a drug dealer who had a

12    gun, a gun that he bought from two other drug dealers, a gun

13    that provided protection to his marijuana growing operation.

14              Ladies and gentlemen, this is straightforward.

15              The defendant is guilty.

16              Over the past two days, you've heard and saw all of

17    the evidence that shows that the defendant, Michael Rodriguez,

18    conspired to distribute and possess with the intent to

19    distribute marijuana; that he possessed a gun in furtherance of

20    that marijuana conspiracy.

21              You know that from the defendant's statements at the

22    U.S. Attorney's Office, where he admitted that he sold

23    high-quality marijuana and that he bought a gun from two drug

24    dealers.  You know that from the evidence connecting him to the

25    grow-house, to the management company documents where he's
```

G9LVROD1                    Summation - Ms. Estes

1    listed as a resident of that apartment, from the cell site

2    evidence, and the testimony of the security guard, Jermel

3    Teague, putting him in the area of the grow-house regularly,

4    from the postal money orders that connect him to payments to

5    the grow-house.  You know that from the fact that he had a

6    U-Haul storage unit in his name where grow-house supplies were

7    kept.  And you know that from the defendant's prison calls and

8    email where he said again and again that he had a gun.

9            That's just a sample of the evidence you've heard over

10   the past two days.  This summation is my chance to pull it all

11   together and to show you how it points to one inescapable

12   conclusion:  The defendant is guilty as charged.

13           Now, you've heard Judge Crotty say that it's your job

14   to find the facts.  But as you can see, there are a number of

15   facts that are not in dispute; that is, the government and the

16   defense agree on them.  And I'm going to start by going over

17   what's not seriously disputed.

18           First, it is not seriously disputed that on March

19   30th, 2016, the defendant and his attorney attended a meeting

20   at the U.S. Attorney's Office.  Also present was Investigator

21   Antoinette Guzman and an Assistant United States Attorney.

22   During that meeting, the defendant admitted that he sold

23   high-quality marijuana.  He said that he had regular customers

24   and that his batches sell quickly.  He also admitted that he

25   bought a gun from two childhood friends, two friends that he

G9LVROD1                    Summation - Ms. Estes

1    gave marijuana to to sell, so his co-conspirators.  One of them

2    also sold crack cocaine.  He got a gun from those two drug

3    dealers.

4           He also admitted that he kept the gun in his apartment

5    where he kept a stash of marijuana.  And he admitted that on

6    the day he was arrested, which you know from other testimony

7    was August 21st, 2015, he took the gun and the marijuana out of

8    the apartment in a bag together.

9           What else is not seriously in dispute?  Apartment 909

10   at 420 East 111th Street was a marijuana growing operation.

11   You can see it here in Government Exhibit 111.  This is the

12   main grow room.

13          MR. HANDWERKER:  Judge, I just want to make clear, I'm

14   not acquiescing to anything.

15          THE COURT:  If that's an objection, Mr. Handwerker,

16   it's overruled.

17          MS. ESTES:  Now, Apartment 909 was in a large

18   residential building with hundreds of residents with families.

19   In the middle of that building on the ninth floor there's a

20   marijuana growing operation.  You can see the building here in

21   Government Exhibit 131.

22          Now, every room in that building was dedicated to the

23   marijuana growing operation.  You can see the kitchen here in

24   Government Exhibit 121.  There's tubing going from the kitchen

25   sink to the main grow room.  And Government Exhibit 127 on the

G9LVROD1                    Summation - Ms. Estes

1    right, you can see the bathroom where there are buckets and

2    there's tubing that also goes to the main grow room; it's for

3    irrigation.  On the bottom left, you see a bucket of trimmings,

4    the product of this marijuana growing operation.

5         There was a carbon dioxide generator in that

6    apartment.  You can see it here in Government Exhibit 118; it

7    had an open flame.  It connected to the kitchen by a tube you

8    see there in Government Exhibit 120.  That's where the stove

9    should have been, but there was no stove, there were no beds,

10   there was no furniture in the apartment.

11        There's no dispute that the defendant's sister,

12   Nanette Rodriguez, was caught red-handed in that apartment on

13   the day the search warrant was carried out.  She was trimming

14   buds off a marijuana plant.  You can see her there in

15   Government Exhibit 129.  On the left, Government Exhibit 114,

16   you see the marijuana plants again and the heat lamps.

17        There's no dispute that Ivan Puello was caught outside

18   the apartment the day the search warrant was executed.  And

19   there is no dispute that the defendant's name is on documents

20   from the management company related to that apartment.  Here is

21   just one example in Government Exhibit 1107:  Name, Michael

22   Rodriguez; home, 420 East 111th Street, Apartment 909.

23        There is also no real dispute that there was a storage

24   unit, Unit 2324, at U-Haul in the Bronx that was leased in

25   Michael Rodriguez's name.  You can see the storage rental

G9LVROD1                      Summation - Ms. Estes

1   agreement in Government Exhibit 500 at the top.  Customer name:

2   Michael E. Rodriguez.  You can also see his home phone number

3   listed there, 917-407-8320.

4           The bottom of the page you see a late notice for that

5   U-Haul storage unit.  It's going to Michael E. Rodriguez, and

6   it's dated August 2015.  So he's still leasing that same

7   storage unit in August 2015.

8           What was found in the unit?  Supplies consistent with

9   a grow-house.  You can see these here.  Government Exhibit 407,

10  you see a carbon dioxide generator.  Government Exhibit 409, a

11  lamp timer.  And you see the outside of the storage unit there

12  on the left.

13          There's also no real dispute that the defendant

14  possessed a gun.  As we discussed, he said this in his meeting

15  at the U.S. Attorney's Office, and he's also said it again and

16  again in prison calls and emails.

17          For instance, let's look at Government Exhibit 901, an

18  email from September 9th, 2015.  Quote:  "I got caught with

19  less than a half pound of weed and an unloaded small calibur

20  (sic) handgun."

21          So he got caught with a gun and drugs together.  He

22  admits that in this email.

23          Next, September 19, 2015, this was a prison call.

24  Quote:  "And there's a lot of people in here with guns that

25  don't get bail.  But they not putting up property.  They are

G9LVROD1                     Summation - Ms. Estes

1    not -- you know, they had -- their guns had bullets in it ready

2    to go.  Mine was in a bag, no bullets, no anything."

3         August 31st, 2016, this was just a few weeks ago,

4    here's another prison call:  "Because they're saying, cause I

5    had spoke to the DA, right?  Told her why I was carrying the

6    gun, gave her the whole story with Kacey and everything and who

7    gave me the gun and all that stuff."

8         So in this call, he's confirming everything that you

9    heard from Investigator Antoinette Guzman.  He's confirming

10   that he told the U.S. Attorney's Office why he was carrying the

11   gun and who gave him the gun.  And as you've heard, two drug

12   dealers gave him that gun.

13        Ladies and gentlemen, all of these facts are not

14   seriously disputed.

15        So what is in dispute?  Two things:

16        One, the defendant's involvement with the grow-house

17   in Apartment 909; and two, that the defendant possessed the gun

18   in furtherance of the marijuana conspiracy and carried the gun

19   during and in relation to a drug trafficking crime.

20        So first I'm going to explain to you why the evidence

21   shows that the defendant was involved in a marijuana conspiracy

22   that included this grow-house.  Then I'm going to explain why

23   the defendant's undisputed possession of the gun was in

24   furtherance of the marijuana conspiracy.

25        Now, as to the marijuana conspiracy, I expect that

G9LVROD1                    Summation – Ms. Estes

1  Judge Crotty will tell you that the government has to prove two

2  elements:  First, that there was an agreement to distribute or

3  possess with the intent to distribute marijuana; and second,

4  that the defendant knowingly and intentionally became a member

5  of that conspiracy.

6           Now, before I talk about the grow-house, I want to

7  remind you, you don't have to find that the defendant was

8  connected to that grow-house to find that he is guilty of a

9  marijuana conspiracy.  You know he is guilty of a marijuana

10 conspiracy because he said so in his meeting at the U.S.

11 Attorney's Office.

12          MR. HANDWERKER:  Judge, I object to what they know.

13 If she wants to say --

14          THE COURT:  It's argument, Mr. Handwerker.

15          The objection is overruled.

16          MR. HANDWERKER:  It's got to be based upon evidence.

17          THE COURT:  It is based on evidence.  It's argument

18 based on evidence.

19          The objection is overruled.

20          MS. ESTES:  In his meeting at the U.S. Attorney's

21 Office, he said he was a high-quality marijuana dealer.  He

22 said he gave his marijuana to two of his childhood friends who

23 dealt that marijuana.  Ladies and gentlemen, that is a

24 marijuana conspiracy right there.  Without anything else, you

25 can convict him on Count One.  End of story.

1          But there's so much more.

2          How else do you know that the defendant was involved

3    in a conspiracy to distribute marijuana?  You know that because

4    of the multitude of ways the defendant is connected to the

5    grow-house in Apartment 909.

6          There are the documents from the management company

7    where he's listed as a resident of that apartment.  There's the

8    testimony of security guard Jermel Teague, who saw him in the

9    area of that apartment building one or two times a week.

10   There's the cell site evidence putting him in the area of that

11   apartment on a regular basis.  There's the fact that he had a

12   U-Haul storage unit leased in his name that contained

13   grow-house supplies.  There's the fact that two of his

14   associates were found at the grow-house the day the search

15   warrant was executed.  There are text messages with his

16   associate Ivan Puello where he refers to "on the ninth," the

17   ninth floor, Apartment 909, that apartment.  And there are the

18   postal money orders where he is connected to payments made on

19   that apartment.

20         So let's talk about these connections.

21         First, the management company documents.

22         Now, as shown in the stipulation, the person listed as

23   the head of household for that apartment, Ramon Cartagena, was

24   required to submit an annual income affidavit listing the

25   residents of the apartment.  He had to do that from 2007 to

G9LVROD1                          Summation - Ms. Estes

1    2012.

2            Now, in the first few years, as you can see on the

3    screen here, Government Exhibits 1100, 1101, and 1102, Ramon

4    Cartagena is listed as living in the apartment, along with his

5    son, also named Ramon Cartagena.  But in 2010, Michael

6    Rodriguez was added as a resident of Apartment 909.  That's

7    shown here in Government Exhibit 1103.  He is listed as a

8    cousin.  He is listed again in Government Exhibit 1104.  You

9    can see it here on the screen.  This time he's listed as a

10   friend.

11           As explained in the stipulation, to be added as a

12   resident, you need to submit a lot of paperwork.  So Michael

13   Rodriguez submitted a birth certificate, a driver's license, a

14   Social Security card, and income tax returns.  You can see all

15   of those on the screen here in Government Exhibit 1107.  He

16   also had to pay a fee for a criminal background check and

17   credit check.  You can see that Rodriguez paid that fee on the

18   screen here in the money order from Government Exhibit 1107.

19   He also signed documents authorizing the background check, also

20   shown on the screen here.

21           Now, Rodriguez's name was no longer listed as a

22   resident in 2012.  Your common sense tells you why.  This

23   apartment was being used as a grow-house and he didn't want to

24   get caught.  But you know he was still involved in that

25   apartment in 2015 from the other evidence.

1          You have the testimony of the security guard, Jermel
2     Teague.  Teague identified Rodriguez in court as somebody that
3     he saw around the apartment complex frequently.  He said he'd
4     seen him there since he began working there, so that covers
5     2015.  You also have the cell site evidence, putting the
6     defendant in the area of that apartment multiple times a week,
7     and that's completely consistent with Mr. Teague's testimony.
8          So as to the cell site, there's no real dispute that
9     that number is the defendant's phone number.  It's subscribed
10    in his name and it's the number he gave the U-Haul facility.
11         There is also no real dispute where the defendant
12    lived.  He lived on the West Side, 175 West 95th Street, same
13    building as sometimes called 733 Amsterdam Avenue.  You saw
14    that his cell phone frequently hit cell towers in that area,
15    which makes sense because that's where he lives.
16         But what other cell sites is he connecting to
17    regularly?  Cell sites near the grow-house.  You can see that
18    here in Government Exhibit 703I.  That's what Investigator
19    Donaldson told you.  In particular, he told you that most
20    frequently he connects to Cell Site 271, the cell site a block
21    and-a-half from the grow-house.  That's the closest of these
22    three cell sites to the grow-house.
23         The cell site evidence shows that the defendant was in
24    that area multiple times a week.  You can see that on the
25    calendar here, Government Exhibit 703J.  All of those red

G9LVROD1                    Summation - Ms. Estes

1    circles, those are the dates he's in the area of the

2    grow-house.  Again, that lines up with Mr. Teague's testimony.

3            You also heard from Investigator Donaldson that he's

4    connecting to cell sites near the U-Haul storage facility where

5    you saw grow-house equipment.  You can see the cell sites here

6    in Government Exhibit 703K.

7            Now, as to the cell site on the left in particular,

8    Investigator Donaldson testified that he's connecting to two

9    sectors there:  The one facing south and the one facing east.

10   And he explained that that's probably because he's somewhere on

11   the border of those two sectors.  So he's somewhere along that

12   red line pointing southeast.  As you can see on this map,

13   what's near that red line pointing southeast?  The U-Haul

14   storage unit.

15           Again, turning back to the calendar, he's going to

16   that unit on a regular basis; you can see it on the days

17   circled here.

18           Now, ladies and gentlemen, that is not a coincidence.

19   The defendant lives on the far West Side; the grow-house is on

20   the far East Side, and the U-Haul is up in the Bronx.  There is

21   a reason he is connecting to those cell sites on a regular

22   basis.  You know he's connected to those locations from the

23   documents.  And the cell site evidence tells you he's going

24   there.  That's the simplest explanation.

25           Now, how else do we know the defendant is connected to

G9LVROD1                      Summation - Ms. Estes

1    the grow-house?  By the contents of the storage unit leased in

2    his name.  As you heard from Special Agent Demurjian, DEA

3    agents carried out a search warrant on that storage unit.  When

4    they did that, they found supplies consistent with the

5    grow-house.  There was a carbon dioxide generator, fans, tubing

6    for air-conditioners.  So let's look at some of those supplies.

7         You can see here on the screen the carbon dioxide

8    generator found in the storage unit.  That's Government Exhibit

9    407 on the left.  On the right, you can see the carbon dioxide

10   generator found in the grow-house.  You can see they are

11   virtually identical.

12        Next.  On the left you have a lamp timer found in the

13   storage unit from Green Air Products.  On the right you have

14   the carbon dioxide generator again, Green Air Products.  The

15   lamp on the left was found in the storage unit; the generator

16   on the right found in the grow-house.

17        And you have the air-conditioning parts.  On the left,

18   there's tubing found in the storage unit in Government Exhibit

19   410.  On the right, the same tubing in use in the grow-house,

20   Government Exhibit 116.  And again, there's a reason for these

21   similarities; that was Rodriguez's storage unit, and this is

22   his grow-house.

23        Now, as defense counsel has noted, Michael Rodriguez

24   was not found in the grow-house the day of the search.  But two

25   of his co-conspirators were, one inside and one right outside.

1    Nanette Rodriguez and Ivan Puello.  So you know they are

2    associated with the grow-house.  And the evidence shows that

3    they are his co-conspirators.

4          Let's look back at the call frequency analysis that

5    Investigator Donaldson testified about.  You can see an excerpt

6    of it here, Government Exhibit 703F.

7          The defendant had over 1200 calls over a six-month

8    period with the phone recovered from the grow-house.  And you

9    know that is Nanette Rodriguez's phone; she was the one found

10   in the grow-house on the day the search warrant was carried

11   out.

12         Also, Ivan Puello's phone, the phone he had on him,

13   the phone agents took from him the day the search warrant was

14   carried out, the defendant had 273 calls over that six-month

15   period with that phone.  So he's calling that phone multiple

16   times a day.

17         You also heard the prison call, Government Exhibit

18   903, where the defendant warns the other person on the call

19   about saying "Ivan" or his sister's name.  I'd like to play

20   that call again for you right now.

21         (Audiotape played)

22         MS. ESTES:  Now, on that call you heard the defendant

23   tell the other person on the call not to repeat "Ivan" again;

24   not to say his sister's name.  You know he's referring to Ivan

25   Puello and Nanette Rodriguez.  You know he's worried about the

G9LVROD1                     Summation - Ms. Estes

1    mention of his co-conspirators on that call.  He doesn't want

2    their names on this recorded call.  He doesn't want to get

3    caught or be associated with them.

4          You also know they are his co-conspirators because of

5    their connections to the U-Haul storage unit.  You heard the

6    testimony that Ivan Puello, shown in this surveillance footage

7    in Government Exhibit 400, was at the storage facility.  You

8    also heard the testimony of George Parker, that the defendant's

9    sister, Nanette Rodriguez, called about the storage unit after

10   he was arrested.  She wanted to clear out the unit and get rid

11   of the incriminating evidence.  She wanted to help her brother.

12         So the three of them, the defendant, Ivan Puello, and

13   Nanette Rodriguez, they are all involved in this marijuana

14   conspiracy.

15         Now, let's talk about the text messages between the

16   defendant and Ivan Puello.  The defendant was careful on the

17   phone.  He doesn't refer to marijuana in text messages and he

18   doesn't refer to 420 East 111th Street.  Instead, he and Puello

19   talk in coded language.

20         Let's look at the one on the top here, dated October

21   6th, 2014.  This is Government Exhibit 710.  The text was sent

22   at 7:47 a.m. from the phone subscribed to Michael Rodriguez to

23   the Ivan Puello phone.  It says, "9 a.m., ninth."

24         Next.  May 18, 2015.  This is Government Exhibit 711.

25   7:22 a.m.  It's from the Michael Rodriguez phone to the Ivan

G9LVROD1                    Summation - Ms. Estes

1    Puello phone.  "9:15 the ninth" is what it says.

2              And here's a third one.  August 20th, 2015, from

3    Michael Rodriguez to the Ivan Puello phone at 7:41 a.m.  He

4    says, "On the ninth."

5              Now, ladies and gentlemen, it's not hard to practice

6    code.  When he says "on the ninth," what is he referring to?

7    The grow-house, Apartment 909, the ninth floor.  When he is

8    sending these text messages, he's telling Ivan Puello when he's

9    going to be at the grow-house apartment.  And you know this

10   from the cell site data.

11             Now, we don't have the data for the 2014 texts because

12   it doesn't go back that far, so let's turn to the ones from

13   2015.

14             Now, on May 18th, the defendant texted Puello "9:15

15   the ninth."  And the next day, at 9:15, where was he?  In the

16   area of the grow-house, that's what Investigator Donaldson

17   testified.  You can see that here on the screen in Government

18   Exhibit 703M.  From 9:12 to 9:14, he makes multiple calls that

19   connect to the cell tower you see there, the cell tower a block

20   and-a-half from the grow-house.  And who does he call around

21   9:15?  His co-conspirators.  He makes one call to the Ivan

22   Puello phone and one call to the phone recovered from the

23   grow-house, Nanette Rodriguez's phone.  He's calling to see

24   where they are; he's calling to see when they are going to be

25   at the grow-house.  There's no other explanation for why the

1   cell site matches up perfectly with those text messages.

2              Now let's look at August 20, 2015.  This is when the

3   Michael Rodriguez phone texted Ivan Puello's phone at 7:41 a.m.

4   He says, "on the ninth."  The cell site evidence shows that

5   there was a call at 7:38 a.m. and a call at 7:52 a.m.  Both of

6   those calls hit off the cell tower you see there; the same cell

7   tower you keep seeing again and again, the one a block

8   and-a-half from the grow-house.  So you know what's happening

9   here.  He's telling Puello he's at the grow-house; he's on the

10  ninth, on the ninth floor in Apartment 909.  And he's telling

11  him this in coded language because he doesn't want to get

12  caught.

13             Now, we've talked about how the defendant was in the

14  area of the grow-house regularly.  But how else do you know

15  that this is his grow-house?  It's very simple.  He pays for

16  it.

17             So let's look at one of the money orders paying for

18  the grow-house, Government Exhibit 200.  This money order is

19  dated June 4th, 2015.  It's to 1199 Housing Corp.  That's the

20  management company for that apartment building.  As you can see

21  on the "from" line, it lists Ramon Cartagena, an address of 420

22  East 111th Street, Apartment 909.  This money order was

23  obtained from Post Office 104551.  As the postal inspector

24  testified, that's a post office located at 633 St. Ann's Avenue

25  in the Bronx.  The money order is for $1,000.

1              Now, remember the testimony of the postal inspector.

2       He told you that when this money order was purchased, other

3       money orders were purchased at that post office as part of the

4       same transaction.  That means the same person went up to the

5       same clerk and purchased multiple money orders.

6              One of those money orders was the one you see at the

7       bottom here, from Michael Rodriguez to Park Well LLC.  So from

8       the testimony of the postal inspector, you know that a money

9       order used to pay for the grow-house and a money order used to

10      make a payment for Michael Rodriguez were purchased as part of

11      the same transaction.

12             How do you know that the defendant is the one who

13      purchased these money orders?  From the cell site evidence.

14             Now, as the postal inspector testified, the relevant

15      transaction was between 9:38 and 9:48 a.m. at that post office,

16      633 Saint Ann's Avenue in the Bronx.  Where is the defendant's

17      phone at that time?  It's right by that post office.  That's

18      what Investigator Donaldson told you.  During that short time

19      frame, from 9:38 to 9:40 a.m., the defendant's phone connects

20      to a cell tower two blocks from the post office.  You can see

21      that here in Government Exhibit 703O, two short blocks away.

22      That is devastating evidence.

23             So let's think about this.  The cell site tells you

24      that the defendant purchased money orders at the post office,

25      one he uses to pay for the grow-house, one he uses to make a

1    payment in his name.  Your common sense tells you why he's not

2    making the grow-house payment in his name; he doesn't want to

3    get caught.  He knows that what is going on in that apartment

4    is illegal and he's trying to conceal his connection to it.

5           Let's look at another money order paying for the

6    grow-house, Government Exhibit 201.  This one is dated August

7    5th, 2015.  Again, it's to 1199 Housing Corp. the management

8    company.  And again, it lists Ramon Cartagena as who it's from,

9    420 East 111th Street, Apartment 909.

10          Again, as you've heard from the postal inspector, this

11   money order was purchased as part of the same transaction that

12   purchased the money order you see at the bottom here, also

13   Government Exhibit 201.  That money order you see is from

14   Michael Rodriguez and it's to City Cars.  These money orders

15   were purchased at a post office located at 700 Columbus Circle.

16   Now, that's close to the defendant's residence.  It's also the

17   same post office that the defendant used to purchase the money

18   order we looked at earlier.  This is the one he used to pay the

19   management company of the grow-house apartment in 2010, when he

20   wanted to be added as a resident of that apartment.  He went to

21   that post office and got a money order there.

22          Now, turning back to the ones from August 5th, 2015,

23   again, how do you know the defendant purchased those money

24   orders?  The cell site evidence.  You can see it here in

25   Government Exhibit 703P.  The post office is the green square

1    on the map; the cell site the defendant's phone connects to

2    during the time frame of the transaction is the one you see

3    where the two red lines intersect.  This one is only about a

4    block away.

5              So again, your common sense tells you why the

6    defendant is doing this.  He's putting postal money orders in

7    somebody else's name because he doesn't want to get caught

8    paying for the grow-house.

9              Now, ladies and gentlemen, let's review one more time

10   the many ways you know the defendant is connected to that

11   grow-house apartment.

12             You have the management company documents where he's

13   listed as a resident of that particular apartment.  You have

14   the cell site evidence and the witness testimony putting him in

15   the area of the apartment on a regular basis.  You have the

16   postal money orders that you know he bought that pay for the

17   grow-house apartment.  You have the U-Haul storage unit leased

18   in his name where grow-house supplies were found.  You have his

19   connection to Ivan Puello, his text messages with Ivan Puello,

20   where he's saying "on the ninth."  Puello was the one outside

21   the grow-house apartment the day the search warrant was carried

22   out, and he was also at the U-Haul storage facility.  You saw

23   him on surveillance there.

24             And finally, you have the defendant's frequent calls

25   with his sister who was caught in the grow-house apartment

1    trimming buds on a marijuana plant and who tried to clear out

2    the storage unit after the defendant was arrested.

3            Now, as you can see, the evidence against the

4    defendant and his co-conspirators is all intertwined.  But one

5    thing is crystal clear:  The defendant and his co-conspirators

6    were involved in a conspiracy to distribute marijuana from that

7    grow-house apartment.

8            Now, we've talked at length about the defendant's

9    involvement in the marijuana conspiracy.

10           So let's turn to the gun.

11           I expect that Judge Crotty will instruct you that you

12   may find the defendant guilty of Count Two if you find one of

13   two things:  One, that he possessed the gun in furtherance of a

14   drug trafficking crime; or, two, that he carried the gun during

15   and in relation to a drug trafficking crime.  If you find one

16   of these, the defendant is guilty.

17           So first I'll discuss the possession and furtherance

18   prong.

19           Now, here I expect that Judge Crotty will instruct you

20   that a firearm is possessed in furtherance of a drug

21   trafficking crime if it has a nexus to the drug trafficking

22   crime, for instance, if it's readily accessible to protect the

23   drug dealer, the drugs, or drug money, you can also consider

24   the type of gun, whether or not it's loaded, and how close it

25   is to drugs.

1      In contrast, a drug dealer might innocently possess a

2 firearm if it's an antique rifle that is used for hunting.

3      So you have to consider the circumstances of the

4 possession.  And here, those circumstances point to one

5 conclusion:  The defendant is guilty.  He had the gun to

6 protect his marijuana business.

7      Now, you know that the defendant is a drug dealer, so

8 let's look at the other circumstances surrounding his

9 possession.

10      First, let's talk about where he got the gun.  He got

11 the gun from two other drug dealers, from two co-conspirators

12 who dealt marijuana for him, one who also dealt crack cocaine.

13 The defendant bought the gun from them in order to resolve a

14 debt.  They were borrowing money from him.  He wanted to get

15 something in return, so he got the gun from those two friends.

16 He didn't go out and buy the gun legally; he didn't go to a

17 licensed dealer; he didn't go to a gun show.  He bought the gun

18 from two drug dealers.

19      Let's consider the type of gun.

20      Now, you saw in the defendant's prison email that he

21 calls it a small-caliber handgun.  In his interview at the U.S.

22 Attorney's Office he described it as small.  He said it fit in

23 a jewelry box, a Tiffany box.  So we are not talking about a

24 hunting rifle or something that could be used for sport.  We

25 are talking about something small, something easy to conceal,

G9LVROD1                     Summation - Ms. Estes

1     something readily accessible if there is any danger.

2            Third, let's think about where the defendant kept the

3     gun.  He kept it in his apartment, where he also kept a stash

4     of marijuana.  So again, it was readily accessible if there was

5     any danger to himself or to his marijuana stash.

6            The defendant also told you that on the day he was

7     arrested, which you know from the testimony of Special Agent

8     Walters was August 21st, 2015, he took the marijuana and the

9     gun out of his apartment together in a bag.  The defendant had

10    marijuana that he's going to sell and he took it out of the

11    apartment with the gun.

12           MR. HANDWERKER:  Judge, there's no evidence that he

13    was going to sell what he had with him.

14           THE COURT:  The objection is overruled.  It's fair

15    argument based on the evidence.

16           You can make your own arguments, Mr. Handwerker.

17           MR. HANDWERKER:  Thank you.

18           MS. ESTES:  Now, your common sense tells you why the

19    defendant had the gun.  He had the gun because he's a drug

20    dealer.  He had it to protect his high-quality marijuana, to

21    protect his grow-house enterprise.  You know that a gun is a

22    tool of the drug trade.  Having the gun made the defendant

23    safer.  It also protected his drug money.  And you know that he

24    had a lot of drug money, because that's what investigator

25    Guzman said.  She said his business was doing well; his batches

G9LVROD1                    Summation - Ms. Estes

1    were selling out very quickly; and his friends were borrowing

2    money from him.  So that gun also protected his drug money.

3           Now, I expect that Judge Crotty will instruct you that

4    alternatively you can find the defendant guilty of Count Two if

5    you find that he carried the gun during and in relation to a

6    drug trafficking crime.

7           Now, you've heard that the defendant carried the gun

8    in a bag out of the apartment.  He also said this in a prison

9    call, Government Exhibit 900.  He said he was carrying the gun.

10          So the defendant is a drug dealer and he's leaving the

11   apartment with drugs that he's going to sell.  Ladies and

12   gentlemen, of course he's carrying the gun during and in

13   relation to a drug trafficking crime.  He's a drug dealer; he's

14   going to sell that marijuana; and he has the gun for protection

15   if anything comes up.

16          Now, the defense has pointed out the gun was unloaded.

17   But even without bullets in it, that handgun provided the

18   defendant power.  If anything came up, he could flash the gun.

19   And if someone sees a gun, they don't know that it's not

20   loaded.

21          MR. HANDWERKER:  Judge, this is becoming prejudicial.

22   There's no evidence --

23          THE COURT:  Mr. Handwerker, this is all fair argument

24   based on the evidence that we've heard over the last day

25   and-a-half.

1          The objection is overruled.

2          MS. ESTES:  Now, if someone sees a gun, they don't

3   know that it's not loaded; they don't know that there are no

4   bullets in it.  It still can instill fear in someone.  And by

5   doing that, it can still provide protection by scaring someone

6   off.

7          So, ladies and gentlemen, let's step back and think

8   about all you know about the gun.

9          You know the defendant, a drug dealer, bought it from

10  two other drug dealers, his co-conspirators.  You know it was a

11  small handgun, something easy to conceal, something readily

12  accessible, if there was any danger to the defendant, to his

13  drugs, or to his drug money.  You know he kept it in his

14  apartment, where he kept a stash of marijuana.  And you know

15  that on the day he was arrested, August 21st, 2015, he took the

16  gun and the stash of marijuana out of his apartment together in

17  a bag.  So he's a drug dealer with a gun he bought from other

18  drug dealers, and he keeps the gun with his marijuana.

19          This is straightforward.

20          The defendant is guilty of Count Two.

21          Ladies and gentlemen, that is the case against the

22  defendant, Michael Earl Rodriguez.

23          After you review the evidence in the case, listen

24  closely to the judge's instructions and use your own common

25  sense.  I expect that you'll come to the only conclusion

G9LVROD1                    Summation - Mr. Handwerker

1    consistent with the evidence:  That the defendant is guilty of

2    both counts of the indictment.

3            THE COURT:  Thank you, Ms. Estes.

4            Mr. Handwerker.

5            MR. HANDWERKER:  Judge, I have an application to make

6    outside the presence of the jury.

7            THE COURT:  Do you want to make your closing

8    statement?

9            MR. HANDWERKER:  Yes.

10           THE COURT:  Please go ahead.

11           MR. HANDWERKER:  I think I'd rather be heard first.

12           THE COURT:  I'm not going to hear it.

13           Do you have a closing argument please.

14           MR. HANDWERKER:  Good morning, ladies and gentlemen of

15   the jury.

16           Permission of the Court --

17           THE COURT:  Yes.

18           MR. HANDWERKER:  -- staff, prosecution, Mr. Rodriguez.

19           I obviously have a very different take on the

20   prosecution's case, their theory and their evidence.  And I'd

21   ask you just to bear with me for a couple of minutes because I

22   will get there with you, especially that gun count.

23           You're going to hear the law from the judge.  You are

24   the judge of the facts.

25           Did he have it?  Yes.  Has he ever used it, brandished

1   it, shown it, threatened anyone, any evidence of that?  Have

2   you heard about that?  That's a theory that they can't prove.

3   And the judge will tell you if there's no nexus, if there's no

4   in furtherance of anything, you must vote not guilty as to

5   Count Two.

6           Let me not jump too quickly.  I want to go slow.

7           In the people's opening statement, which is not

8   evidence, they said to you by the end of this trial, you will

9   have seen photos and documents and you will have heard

10  testimony showing the defendant's marijuana operation, the

11  operation he worked with with others to maintain and the one

12  that he needed that gun to protect.

13          What are they talking about?

14          Investigator Guzman took the stand.  She was at the

15  meeting I was at.  Two very bad people were nuisances to

16  Michael Rodriguez, trying to sell him a gun.

17          Now, wait a second.  The transaction takes place.  Two

18  guns, but give one back, keep a small one in a Tiffany box with

19  no bullets?  What are we talking about here?

20          And let me ask you this:  A conspiracy to possess with

21  the intent to distribute marijuana, are they talking about the

22  two individuals that he referred to in the government's proffer

23  session or are they talking about Nanette Rodriguez and Ivan

24  Puello?  What are they talking about?  What conspiracy are they

25  asking you to find?  If you can't prove it, just say it.  Drug

G9LVROD1                    Summation - Mr. Handwerker

1    dealers, guns, weapons, fear.  That's not Michael Rodriguez.

2    Investigator Guzman told you, he was competent, he was calm, he

3    was respectful.  No talk about him lying.

4          She wavered a little.  I believe most of what he said.

5    She couldn't cite anything where she found him not credible and

6    not worthy of belief.  He went in there and he told them the

7    truth.

8          In my opening statement, I said the following

9    regarding the gun, and I stand by it:  There is not a scintilla

10   of evidence in this case in all of this testimony, these carts,

11   these lawyers, the whole ball of wax, that can connect the

12   weapon in this case that is found to any drug trafficking

13   crime.

14         I submit to you now that's where we stand on the gun,

15   but I'm going to come back to it.

16         Ladies and gentlemen, I want to thank you for being

17   with us these few days.  You'll be done soon.  You'll go back

18   to your normal life.  It's a beautiful morning this morning.  I

19   hope you enjoyed your presence here for a couple of days.

20   Sometimes you've seemed more alert than others.

21         I submit some of the government's case -- I'm not

22   going to review every witness with you.  See, what happens in

23   the federal court, which, I submit, is not fair, but that's the

24   way we have to play the game, prosecution goes first, defense

25   counsel, then prosecution goes again.  So if I forget anything,

G9LVROD1                    Summation - Mr. Handwerker

 1      they'll remind you.  But if they remind you, stick up for

 2      Michael Rodriguez; give Michael Rodriguez a fair trial.  Say

 3      what Mr. Handwerker would argue on behalf of Mr. Rodriguez.

 4              This is the finest system of justice in the world.

 5      Our Constitution, our democracy relies on people like you to

 6      become jurors, to weigh the evidence, to weigh it fairly and

 7      impartially, without prejudice.

 8              But I submit to you that talk about drug dealers --

 9      we'll go over the phone calls -- she's asking you to speculate.

10      I'm going to ask you to draw different conclusions from the

11      evidence or the lack of evidence.  He still sits here draped in

12      the flag and he says, I'm not guilty; bring forth evidence and

13      bring forth your evidence by trustworthy, reliable, competent,

14      and credible testimony.

15              Ladies and gentlemen, the judge is going to charge you

16      that you are to use your common sense in this case, and I ask

17      you to do that.  He's going to charge you if you have to

18      hesitate, if you have to hesitate reaching any conclusion in

19      this case, that's the equivalent of doubt.  Reasonable doubt,

20      that's what's here:  Doubt based upon reason, logic, the

21      evidence.

22              I'm not running away from the evidence.

23              They can call Donaldson, within ten blocks, how far

24      away the cell sites are, evidence or lack of evidence.

25      Narcotics conspiracy with who?  They have multiple choices

G9LVROD1                    Summation – Mr. Handwerker

1    here:  The two gentlemen that he spoke of or his sister and

2    Ivan Puello.

3            The indictment, as you know, is evidence of nothing in

4    this case.  I'd ask you just to consider it as a charging

5    document.

6            Let's talk about some of the testimony.

7            Richard Demurjian, the case agent, 28 years DEA,

8    obviously has been around.  I would assume, as you, I think,

9    can fairly assume, when he's going to be testifying, he reviews

10   his documentation, whatever he prepares in the course of the

11   case.

12           I asked him one question, because I think it's

13   relevant and I think you should consider it relevant also:  Did

14   you conduct surveillance?

15           I'm not sure.  Yeah, I conducted surveillance.

16           Well, how long did you conduct surveillance for?

17           He wasn't sure.

18           He made me show him the complaint in this case to

19   refresh his memory that it was over a three-to-four-week

20   period, a total of five to ten times.  He never saw the

21   defendant at the grow-house.  He can't get away from it.  With

22   all their fancy charts, what's circled, what's X'd, what's

23   within the cell sites, Donaldson, he never saw him at the

24   grow-house.

25           Let me stay with the grow-house for a second.

G9LVROD1                    Summation - Mr. Handwerker

1          420 East 111th Street, Apartment 909, you saw

2    documents in this case where Michael Rodriguez attempted to get

3    on the lease.  No alias, no fraud, no fake birth certificate.

4    I'm Michael Rodriguez in 2010 and I'd like to get on the lease.

5    And we know nothing after 2012.

6          Let them show you money orders.  This is not a money

7    laundering case.  Whatever is there, let them make fair

8    argument on.  But they have to prove a narcotics conspiracy, an

9    agreement.

10          Ladies and gentlemen, I'm telling you the evidence is

11    crystal clear.  On the day in question, the day he was

12    arrested, he had half a pound of pot and a small-caliber,

13    unloaded firearm.  Read the transcript; that's exactly what he

14    said.  Half a pound of pot narcotics conspiracy with whom?  Is

15    there any evidence that came from the grow-house?  That he

16    picked it up?  They delivered it to him?  He had a half a pound

17    of pot and an unloaded gun.  And the unloaded gun was in

18    furtherance of nothing.

19          Two pieces of you-know-what came in off the street and

20    he wanted to get rid of them.  I'll give you $300, take one

21    away.  Just leave me alone.  That's, in essence, what happened

22    here.  Maybe they wanted to charge him with crack cocaine

23    sales, like these other two pieces of you-know-what.  That's

24    not Michael Rodriguez.

25          Investigator Guzman got to know him in the meeting we

G9LVROD1                    Summation - Mr. Handwerker

1    had at the U.S. Attorney's Office.  He's a pleasant guy.  He

2    pays his bills.  There were tax returns submitted to 420 East

3    111th Street in furtherance of his application to be admitted

4    to the building.  No fraud.  Background checks, money orders,

5    birth certificate.  They put it up on the screen.  Yeah, it's

6    legit.  He tried it back then, he couldn't do it.

7            Is there any evidence in this case, besides their

8    speculation and evidence of phone calls and cell site

9    information, that he was still a part of a narcotics

10   conspiracy, a marijuana conspiracy?  Because all we know is on

11   the day in question, he had a half a pound of pot and an empty

12   gun.  That's what you have here.

13           U-Haul storage unit, more pictures.  They look like

14   the same types, the same H²O canister.  U-Haul in the Bronx,

15   not far from the East Side, cell site, whatever they want to

16   say.  But when was the stuff put there and who put it there?

17   Any evidence along those lines?

18           George Parker, when was it opened?  Who visited?  Who

19   had authority?  When was the stuff put there?  We know he had

20   the unit for a couple of years under his name.  But if he's no

21   longer in that trade, if he's no longer in that business, just

22   because his sister was found there doesn't mean he's a part of

23   it.

24           Where's Raymond Cartagena?  Could this be his

25   conspiracy?  Because this guy had half a pound of pot and an

G9LVROD1                    Summation - Mr. Handwerker

1   empty gun and that's all you're stuck with, no matter how they

2   want to dress it up.

3           Moises Walters did the search of 420 East 111th

4   Street.  No fingerprints lifted.  Why not?  What business are

5   you in?  To investigate and prosecute criminal conduct under

6   the federal laws.

7           Okay.  I respect that.

8           But what did you do?

9           Let me ask you this:  And I'm not making light of

10  this, but if they have to prove something beyond a reasonable

11  doubt, I'm what stands between Mr. Rodriguez and the U.S.

12  Constitution.

13          Vadim Astrakhan, do you remember him, the chemist?  He

14  seemed to think this was funny.  Well, let me ask you a

15  question, Vladim or Vadim, where does evidence come from?  Now,

16  am I poking holes in something or am I sleeping?  Am I missing

17  something?  He didn't know where it came from and he seemed to

18  think it was funny.

19          Oh, I remember this case.  And he held up the bag.

20          Do you remember that testimony?

21          I didn't think it was funny at all.  I'm not sure what

22  he thought was so funny about it.

23          The fact that Michael Rodriguez is seen in the

24  vicinity of the grow-house is evidence of nothing, I submit to

25  you.

G9LVROD1                          Summation - Mr. Handwerker

1          Let me go through a few things.  Let me just cover

2     what the government said in their closing statement.

3          They spoke about the gun, how it was used for

4     protection.  No evidence of that.  Calls to his sister.  I

5     think you folks call your siblings.  Nothing unusual there.

6          Let's go to the law the judge is going to charge you

7     on, the handgun.

8          I submit to you -- and please wait to hear the charge

9     from the Court -- he's going to tell you in words or substance,

10    Count Two alleges the violation of 924(c) of the federal

11    criminal code.  The provision makes it a crime for any person

12    during and in relation to any drug trafficking crime to use,

13    carry, or in furtherance of any such crime a firearm.  And the

14    allegation in the indictment is that the defendant during and

15    in relation to a drug trafficking crime for which he may be

16    prosecuted in a court of the United States, namely, the

17    conspiracy to distribute, possess, with the intent to

18    distribute marijuana charged in Count One in this indictment,

19    knowingly did use and carry a firearm and, in furtherance of

20    such crime, did possess -- it's a lot of words, but I'm going

21    to try to help you break it down.

22          The Court is going to speak to you and tell you in

23    words or substance that in order to prove the defendant used

24    the firearm, the government must prove beyond a reasonable

25    doubt an active employment, not a Tiffany box and a bag, active

G9LVROD1                     Summation - Mr. Handwerker

1    employment.  Michael Rodriguez, active employment.  Listen to

2    the judge's charge and look at the government and say, Where is

3    the active employment here?  Be fair.  Don't let them get away

4    with drug deal, guns, violence, fear.  That's not what we are

5    about.  Our country is better than that.  The mere possession

6    of a firearm at or near the site of the crime without active

7    employment as I just described it is not sufficient to

8    constitute use of a firearm.

9              A firearm is carried in relation to a drug trafficking

10   offense if the firearm had some purpose or effect with respect

11   to the drug crime.

12             Their theory is protection.  That requirement is

13   satisfied if the firearm facilitated -- they used that word

14   too -- or had the potential to facilitate the drug trafficking

15   offense.  Potential to facilitate.  Anything could potentially

16   facilitate that.

17             On the other hand, this requirement is not satisfied

18   if the carrying of the firearm was entirely unrelated to the

19   drug crime.  That's what you have here.  There's no question

20   about it.

21             To possess a firearm in furtherance of a narcotics

22   crime means that the firearm helped promote, accomplish,

23   advance, or achieve the goal or objective of the underlying

24   offense.

25             Let me stop for a second.

1          On August 21st, 2015, Mr. Rodriguez spent the night

2     with the mother of his child.  She was out all night.  He gets

3     up at 6:40 in the morning and goes to the gym.  She was out all

4     night.  He's fighting her for custody.  He says to himself,

5     This woman is irrational.  And Inspector Guzman told you about

6     this.  He was fighting for custody.  She's nuts.  She's out all

7     night.  She's capable of anything.  Let me take my stuff with

8     me so that she doesn't harm herself, harm me, cause me

9     problems, custody, so on and so forth.  So he took the bag with

10    him and that's when he was arrested.  No bullets.  Half pound

11    of pot.  That's it.  No grow-house.  U-Haul, when, where, who?

12    We don't know.

13         Ladies and gentlemen, the judge is going to also

14    charge you if you vote not guilty as to his involvement in a

15    drug trafficking crime, you must acquit as to Count Two, don't

16    even go to Count Two.  So if they can't prove him as a member

17    of a conspiracy -- and I submit to you they have not -- you

18    must acquit as to Count Two.

19         Just listen to this one.  I'm not going to do anything

20    more on the gun, I don't think.

21         The mere presence of a firearm at the scene of a drug

22    trafficking crime is not enough.  The firearm must have had

23    some nexus, that is, purpose or effect, with respect to the

24    underlying drug offense, such as where the firearm is readily

25    accessible to protect drugs, drug proceeds, or the drug dealer

G9LVROD1                    Summation - Mr. Handwerker

1    himself.

2          There has to be a nexus.  Not good enough to have a

3    bag with it in an enclosed box, but just being in a bag.  We've

4    heard nothing about money.  She was talking about money before.

5    We know the evidence had money orders; he pays his bills.

6          In deciding whether there is such a nexus, you may

7    consider the accessibility of the firearm.  Whether the firearm

8    was loaded, you can consider that, fair game, fair comment.

9          We are not sitting here running away.  We pled not

10   guilty because we are not guilty of being in a conspiracy, and

11   that gun is nonsense.  I don't like guns.  But here -- and I'll

12   read you his own words, small-caliber, unloaded firearm.  So

13   the Court will charge -- you consider whether the firearm was

14   loaded, the type of weapon, or whether or not the defendant

15   legally possessed it.

16         Let's review, if we may, some of the calls.

17         I don't have the fancy clickers or the tape-recording.

18   I'm going to read you the transcript and I hope that's

19   sufficient for me.

20         August 31st, 2016.  That's very recent; that's about a

21   month ago, less than a month ago.  Michael says on the phone:

22   Because they are saying cause I had spoke to the DA, right?

23   Told her why I was carrying the gun, custody.  Gave her the

24   whole story with Kacey, the lady who's out all night, who's the

25   mother of his child, who he's petrified of and doesn't want his

1   child with her.  See there's -- he's a defendant in a criminal

2   case and it's not easy to sit there.  And I'm making noise,

3   objecting.  And I apologize to you if I'm rude at times, if I

4   was rude.  But, ladies and gentlemen, they have to present

5   evidence, and they are only doing their job.  They have to

6   connect Mr. Rodriguez to the crime charged.  They can't just

7   say drug dealer, half a pound of pot and a firearm, because

8   that doesn't cut it.

9           And you know what?  I submit to you I'm going to read

10  these transcripts, you'll get a feel for who Mr. Rodriguez

11  really is.  And he has no burden.  So he didn't testify, didn't

12  called any witnesses.  That's okay.  You can't hold that

13  against him.

14          Told her why I was carrying the gun, gave her the

15  whole story with Kacey and everything, who gave me the gun and

16  all that stuff.  And the paper they had, it said -- I think

17  they can use against me later.

18          The email of 9/9/2015, where he says he admits, I got

19  caught with less than half a pound of weed and an unloaded,

20  small-caliber gun.

21          The conversation from September 19, 2015, this is the

22  conversation where he says, There's a lot of people here with

23  guns.  I just want to read the end of it.  He says, Mine was in

24  the bag.  No bullets, no nothing, so yeah.

25          Now, this last conversation which you heard the

G9LVROD1                    Summation - Mr. Handwerker

1    telephone conversation, Mr. Rodriguez and I are familiar with

2    that call.  And he gets angry during that conversation.  And

3    maybe you might say, That's the real Michael Rodriguez.  You

4    can think whatever you want to think.

5            Let's analyze what he's saying in this conversation.

6            And you don't even want to know the half, boy, you'd

7    be sick to your stomach.  And I'm not going to tell you, okay,

8    because I'm not going to tell you who it was that -- somebody

9    called the DEA because they had gotten in trouble.  So they

10   went in and said a whole bunch of crazy stuff about me and

11   that's what got me here.  So I'm not even going to tell you who

12   that is because I don't want you to approach them.  I don't

13   want you to say nothing.  You act like everything is fine and

14   you know nothing, okay?

15           Ladies and gentlemen, it's a man who's in jail, who's

16   being charged with serious crimes, who's not saying to somebody

17   out there, Go hurt somebody.  But he's telling this woman,

18   somebody has put me here.

19           (Continued on next page)

20

21

22

23

24

25

G9LQROD2                      Summation - Mr. Handwerker

1              MR. HANDWERKER:  (Continued) In essence, I think if
2        you read between the lines, please listen to it or ask for a
3        transcript of the conversation.  "They went in and said a whole
4        bunch of crazy stuff about me, and that's what got me here so
5        I'm not even going to tell you about it" -- I'm using my own
6        words now.  "I'm not even going to tell you who that is because
7        I don't want you to approach them."  In jail charged with
8        serious crimes, showing a little dignity.  I'll fight my battle
9        and I'll submit to you, you know who gave him up, those two
10       people that he's talking about that sold him the guns, those
11       indescribable human beings.  They sell him a gun.  Then they
12       get him locked up?  And he's sitting here?

13             Thank you for your patience, ladies and gentlemen.
14       I'll be with you in a moment.

15             Ladies and gentlemen, as I told you, I'm not going to
16       have another opportunity to address you.  We've only been here
17       a couple of days.  I sincerely want to thank you on behalf of
18       myself and this Honorable Court.  By the way, I've never had
19       the pleasure of trying a case in front of this judge.  This is
20       the way it's supposed to be done.  Fair and impartial.  And I'd
21       ask you to do your job the same.

22             If there is anything you need read back, that's what
23       the court reporters are for.  If you don't believe the
24       testimony or you want to hear the testimony, you want to hear a
25       tape-recording, just send the Judge a note.

G9LQROD2                        Rebuttal - Ms. Houle

1          Reasonable doubt based upon reason, logic, common

2     sense and the evidence.  Ladies and gentlemen, the Court will

3     charge you, or has already charged you, it is not the quantity

4     of the evidence but the quality of the evidence.  You're going

5     to make an important decision, and reaching a verdict in this

6     case, I submit to you, is an important decision.  It's your

7     duty as members of the citizenry to take this very seriously,

8     and I hope you do.  If you hesitate, that is the equivalent of

9     reasonable doubt.

10         Ladies and gentlemen, there is only one verdict you

11    can reach in this case, that's not guilty as to both counts of

12    the indictment.

13         Thank you very much.

14         THE COURT:  Thank you, Mr. Handwerker.

15         Does the government have a reply?

16         MS. HOULE:  Yes, your Honor.

17                        Ladies and gentlemen, you've just

18    heard a lot of argument from the defense.  Now let me be clear,

19    the defendant didn't have any burden here.  The defense didn't

20    need to get up and make any sort of argument, but he did.  So

21    now you are entitled to very carefully scrutinize those

22    arguments, the same way that you scrutinize the government's

23    arguments.  I think you need to pay very close attention to

24    what was just argued and to think about it carefully.

25         Let's walk through it, some of the points the defense

1     counsel just made, together.  Let's start with the gun.

2     Defense counsel has essentially just argued to you that the gun

3     in this case and the drugs in this case are entirely unrelated.

4     That doesn't make any sense.  Think about what the defense is

5     asking you to believe; that the defendant was an admitted drug

6     dealer.  He sold high-end marijuana.  He was successful, and he

7     kept a gun in his apartment where he also kept drugs, and that

8     he moved the gun and the drugs together but that they had

9     nothing to do with each other.  That doesn't make any sense.

10    By the defendant's own admissions, you know that that gun was

11    connected to drugs.  At every phase of the defendant's story,

12    the gun is connected to drugs.

13            Let's take it step by step.  First, what did you hear

14    that the defendant said about where he got that gun?  From drug

15    dealers.  From drug dealers who the defendant was selling drugs

16    with.  He said that they were selling drugs for him.  They owed

17    him money.  He bought the gun.  The gun is connected to --

18            MR. HANDWERKER:  Excuse me.  I hate to interrupt.

19    There is no testimony they were selling drugs for him.

20            MS. HOULE:  That is in the testimony.

21            THE COURT:  The objection is overruled.

22            Go ahead, Ms. Houle.

23            MR. HANDWERKER:  Judge, excuse me.  Would you tell

24    them it's their memory that controls?

25            THE COURT:  I have that in my instructions.

1              Go ahead, Ms. Houle.

2              MS. HOULE:  You remember what Inspector Guzman said

3    about what defendant said at that meeting at the U.S.

4    Attorney's Office.  The defense has focused on those two

5    individuals and described them in his closing as a nuisance to,

6    two pieces of you-know-what who he dealt with.  First of all,

7    ask yourself why we're hearing about these two pieces of

8    you-know-what.  Because the defendant associated himself with

9    them.  The defendant was working with them.  The defendant was

10   buying a gun from them.  That's why they're part of this story.

11   They were part of the defendant's drug business.  So from the

12   start the gun is connected to the drugs.

13             On that point that defense counsel has just made about

14   suggesting that the defendant was buying this gun as sort of a

15   favor he just wanted to get rid of them.  Why did he keep the

16   gun?  Why did he keep it with his drugs?  You know why.

17             Second, what does the defendant say about what happens

18   after he buys the gun?  Where does he keep it?  He keeps it in

19   an apartment where he keeps drugs.  You know that he keeps

20   drugs there.  The gun stays connected to the drugs.

21             On this point, the defense has suggested that the gun

22   wasn't being used for protection of the drugs.  That doesn't

23   line up with the evidence that you've heard in this case.

24   You've heard about what the defendant said about the people

25   that he was dealing with.  Drug dealers who were selling

G9LQROD2                        Rebuttal - Ms. Houle

1    multiple guns illegally, who were using and selling crack, one

2    of whom the defendant says has a prior conviction for

3    manslaughter.  Remember what the defendant said about what

4    those people thought about him; that he had a lot of money;

5    that he was successful.  Those all sound like reason that a

6    drug dealer should be worried for his own safety and for the

7    protection of his drugs and his drug proceeds.

8            This is a straightforward case.  That is common sense

9    that the gun was protecting the drugs.  The gun was there if

10   the defendant ever needed it to protect him and to protect his

11   drugs.  And on this the defense has focused several times in

12   its closing, on the fact that there were no bullets.  You heard

13   that multiple times.

14           First of all, you'll hear Judge Crotty's instructions

15   on the law.  There is no requirement in that statute that for

16   something to qualify as a firearm that it needs to be loaded.

17   You also know from your common sense that an unloaded gun is

18   still dangerous and it still affords protection.  It is amazing

19   to me that that argument could even be made right now in any

20   city.  You know how dangerous an unloaded gun can be and what

21   power it could prove to someone else.  When a gun is pointed in

22   someone's face, they don't know if it's loaded.  And you know

23   that when a gun is pointed at someone else, it can just as

24   easily provoke violence against the person who's pointing it or

25   against others that are around.  The unloaded gun could still,

G9LQROD2                         Rebuttal - Ms. Houle

of course, provide protection to those drugs.  So we've heard
about how the defendant got the gun from drug dealers, and
we've heard about where he kept the gun -- with the drugs.

So let's think about what the defendant said happens
next.  What happens when the defendant moves his stash?  The
drugs move; the gun moves.  The gun follows the stash.  And the
gun continues to protect that stash the same way that it did
when they were together in the defendant's apartment.  The gun
follows the stash.  On this point, I want to address an
argument that the defense just made.  Mr. Handwerker focused on
the amount of drugs that the defendant had with him when he was
moving his stash.  That is a distraction.  The defendant was a
drug dealer moving his stash; a stash which you know from the
evidence was high-end marijuana, and you know from what the
defendant said it was in high demand.  The gun followed the
stash.  That's what's important.  Don't be distracted.

And don't be fooled by any suggestion that what the
defendant was moving in that moment was the extent of the
defendant's stash.  Use your common sense there.  You know that
the defendant was dealing with a full-scale marijuana grow and
distribution operation.  You know that there was a lot more
where that stash came from.  You know that the defendant had a
lot to protect.

Finally, Mr. Handwerker focused on the defendant's
claim that he was moving his drugs and his gun together because

G9LQROD2                        Rebuttal - Ms. Houle

he was afraid that the mother of his child was going to find

them, and the defense has suggested that that somehow means

that the gun and the drugs are completely unrelated.  That's

another distraction.  Let's think first about whether that

argument makes any sense.  It doesn't.  Think about what the

defense is saying to you there.  They're saying that the

defendant moved his gun and his drugs together because he was

afraid of getting caught; because he was afraid that his

drug-trafficking enterprise was going to be exposed.  It's

still all part of the defendant's drug operation.  But more

importantly, it doesn't matter.  It doesn't matter whether the

defendant was moving his drugs because he was worried that his

girlfriend would find them or because he was worried that the

police would find them or because he just wanted a change of

scenery.  It just doesn't matter.  When the defendant kept that

gun in an apartment with his drugs, he committed the crime

charged in Count Two.  When he moved that gun and his stash

together, he committed the crime charged in Count Two.

        The defense has tried to confuse you by focusing on

certain elements of the law by cherry-picking terms.

Employment.  Brandishing.  Don't be confused.  Listen to the

Judge's instructions on the law.  Remember what Ms. Estes

presented to you about the elements.  There is no requirement

that the defendant employed or used or brandished a firearm as

part of the crime charged.  Listen to the Judge's instruction.

G9LQROD2                         Rebuttal - Ms. Houle

1    Listen that the government can prove its case based on whether
2    the defendant carried or possessed a firearm in connection with
3    his drug-trafficking crime.
4              Let's talk about the drugs.  The defense again has
5    tried to distract you focusing on other people, suggesting that
6    the defendant had no connection to this marijuana conspiracy.
7    To believe what the defense has told you, you would have to buy
8    into an incredible number of completely miraculous
9    coincidences.  Let's think it through.
10             The defendant is an admitted drug dealer who puts his
11   name on an apartment that later turns out to be gutted for a
12   marijuana grow operation.  But that's not his marijuana; not
13   the marijuana that he admitted he sold.  That's other
14   marijuana.  That's strange.
15             But it's not just an apartment that the defendant puts
16   his name on that later turns on to be a grow house, right?
17   It's one where his sister gets caught red-handed trimming a
18   marijuana plant and where his close associate just happens to
19   show up while law enforcement is there.  And, remember, he
20   spoke with those two individuals all the time.  You saw the
21   call frequency analysis from Investigator Donaldson.  He spoke
22   with one of them more than six times a day.  And the other one
23   you saw he was texting about being on the 9th.  Is that all
24   just a coincidence?  Of course not.
25             And it's not just an apartment that later turns out to

G9LQROD2                      Rebuttal - Ms. Houle

1    be a grow house where the defendant's sister and his close

2    associate are found.  It's one where the defendant himself is

3    regularly.  You saw that in his cell site analysis, and you saw

4    that from the security guard who testified.  He saw the

5    defendant there multiple times per week over the whole time he

6    worked there, four years.  What was the defendant doing there?

7    It doesn't make sense.  On this point the defense has focused

8    on the fact that Special Agent Demurjian testified that the DEA

9    did not themselves observe the defendant at the grow house.

10   That's another distraction.  The fact that Special Agent

11   Demurjian didn't see the defendant there is irrelevant.  He

12   wasn't conducting 24/7 surveillance.  He told you that.  You

13   already have proof that the defendant was there on a regular

14   basis.  You have it from his cell phone.  And you have it from

15   the security guard who saw him there.

16          Let's turn back to these coincidences, because even

17   outside of the ones that I've just described, there's the money

18   orders.  If this is all a coincidence, then the defendant had

19   the very unfortunate circumstance of buying money orders that

20   happened to be used to pay for that grow house apartment.

21   Let's take it to the logical conclusion, actually, that the

22   defendant had the even more unfortunate coincidence of being

23   within a few blocks of a post office at the exact minute that

24   the money orders were being purchased to pay for the grow

25   house.  And, by the way, this mysterious person who's buying

G9LQROD2                        Rebuttal - Ms. Houle

1    the money orders is also buying money orders to pay the

2    defendant's bills.  You heard the defense say that.  You saw

3    money orders; the defendant paid his bills.  Yes, his bills,

4    including the grow house rent.  Luck of all luck, with those

5    money orders, that happens to the defendant more than once at

6    totally different post offices in totally different parts of

7    the City.  That's remarkably bad luck.

8            But you know that that's not even where the bad luck

9    would have to end.  The defendant then opens up a storage unit

10   in his name, and then that storage unit turns out to be full of

11   marijuana grow house supplies.  Then the defendant has the

12   tragic misfortune of being in the area of that storage unit on

13   a regular basis when he lives more than 30 blocks south on the

14   opposite side of the City.  What was he doing there?  How could

15   he not know that his storage unit was filled with grow house

16   supplies?  Of course he knew.

17           You also heard what the U-Haul representative said.

18   The defense has focused on who had access to the unit.  You

19   heard that the defendant's sister could not get into that unit

20   when she tried to to clear it out after he was arrested.  She

21   didn't have access.  The defendant had access.  It was his

22   storage unit.

23           All of those coincidences would have to be some really

24   bad luck.  They would have to make the defendant the most

25   unlucky man in the history of the world.  How could one man be

G9LQROD2                    Rebuttal - Ms. Houle

in the wrong place at the wrong minute all the time?  He just

happens to be in the wrong place at the wrong minute when the

post office money orders are being purchased?  He just happens

to be near the grow house at the exact minute that his text

messages show that he's going to be there?  He just happens to

be near the grow house on a regular basis?  He just happens to

be near the storage facility on a regular basis when he doesn't

live anywhere near there?  That's impossibly bad luck, because

it's impossible.  It makes no sense.  It is ridiculous.

        Mr. Handwerker told you in his opening that, like the

government, he wanted you to focus on using your common sense.

Well, I think you should take him up on that because applying

common sense to these facts bears only one result:  The

defendant was unmistakably involved in the operation of that

grow house.  It's the only logical conclusion.  It was part of

the marijuana dealing that he admitted to.  The defendant

participated in a marijuana conspiracy, and he is guilty on

Count One.

        I'd like to spend just a second here on the burden of

proof because the defense has focused on that in his closing

statement.  He's talked about that standard and how high it is,

and that the government has to prove its charges beyond a

reasonable doubt.  That is the standard.  Of course it is the

standard.  It is the standard in every criminal case in the

history of this country.  It has been met before, and it has

G9LQROD2                    Rebuttal - Ms. Houle

been met here.  Reasonable doubt is doubt based in reason, in common sense; not conjecture, not guesswork, not just mere hesitation as the defense described it.  It's a standard guided by common sense.  Common sense tells you that there is no reasonable doubt here.  The defendant was involved in a marijuana conspiracy.  He possessed a gun in connection with his drug-trafficking crime.

Shortly after I sit down, I expect that Judge Crotty is going to instruct you on the law here, and he will tell you that what I say is not evidence and what Ms. Estes said was not evidence and what Mr. Handwerker said was not evidence.  You, the jury, are entrusted with finding the facts in this case. Look past the distractions.  Look at the evidence.  We told you at the beginning of this trial that it's a straightforward case, and it is a straightforward case, and it is an important case.  It's important to the defendant for obvious reasons, and it is important to the government because we are charged with enforcing this nation's drug and gun laws.

You know all of the ways that the defendant is connected to that marijuana conspiracy:  His statements, his grow house, his money orders, his texts, his location, his storage unit, his statements.  You know all the ways that that gun was connected to the defendant's marijuana conspiracy.  He bought it in connection with his business.  He kept it in connection with his business.  He moved it in connection with

G9LQROD2                          Rebuttal - Ms. Houle

1    his business.  The gun followed the stash.

2           I'd like to end by bringing you back to that call that

3    Ms. Estes just played.  The defense has tried to distract you

4    from what is really going on in that call.  You've heard it

5    twice.  You know what was going on in that call.  The woman on

6    the phone mentions Ivan, who you know is the defendant's

7    co-conspirator.  And the defendant becomes enraged.  He calls

8    her stupid and he says, "You don't understand" and maybe she

9    didn't, but you understand.

10          At the end of this trial, you understand.  You know

11   what the defendant was trying to cover up on that call.  It's

12   the same thing that his lawyer is trying to distract you from

13   now.  The defendant worked with others to run a successful drug

14   operation, and he possessed a firearm in connection with that

15   drug business.  The defendant is guilty as charged.

16          THE COURT:  Before I give you my instructions, we will

17   take a morning recess.  It will be about 15 minutes.

18          (Jury not present)

19          THE COURT:  Do you want to put something on the

20   record, Mr. Handwerker?

21          MR. HANDWERKER:  Judge, I'd like to object to the

22   government's revolving theories of conspiracy.  I submit to the

23   Court they had varied the indictment by charging yet another

24   conspiracy.  The conspiracy he was charged with, I believe, was

25   the marijuana conspiracy along with his sister, Ivan Puello,

G9LQROD2                          Rebuttal - Ms. Houle

1    Mr. Cartegena, etc.  During the government's closing argument,

2    they seemed to mention yet another conspiracy; that conspiracy

3    between two individuals that he was referring to when he met

4    with the government in proffer sessions.  So they have varied

5    the indictment, and to be quite frank, I was not sure what to

6    sum up on because I didn't know which fight we were fighting.

7    I move for a mistrial, Judge.

8              THE COURT:  Does the government want to be heard?

9              MS. ESTES:  Yes, your Honor.  Our position is just

10   it's the exact same marijuana conspiracy.  The defendant

11   operated a grow house.  He gave some of the marijuana to these

12   individuals to sell.  He also operated the grow house with

13   Nanette Rodriguez and Ivan Puello.  The defendant is the center

14   of this marijuana conspiracy.  It is one conspiracy.

15             THE COURT:  The objection is overruled.

16             MR. HANDWERKER:  Judge, could I put one other thing on

17   the record, please?

18             THE COURT:  Yes.

19             MR. HANDWERKER:  And I apologize if I interrupted the

20   government during certain moments, but just now when ADA Houle

21   was referencing multiple firearms, possession of empty unloaded

22   firearms in today's society, I think playing to the fears of

23   the jury in terms of what is going on in our country,

24   unfortunately, I think it was completely inappropriate,

25   comparing the danger that an empty firearm holds and relating

G9LQROD2                        Charge

1    people being killed on the streets --

2            THE COURT:  I think it's commonplace that guns do

3    terrible damage in our society.  I think it is a

4    well-recognized phenomenon.  I think it is a fair comment.

5            In any event, you've made your objection.  It's on the

6    record.

7            MR. HANDWERKER:  Thank you, Judge.

8            THE COURT:  We will take about ten minutes, and I will

9    start with my charge.

10           (Recess)

11                          (Jury present)

12           THE COURT:  I told you on Monday how important your

13   service is to our country and our system of justice.  You have

14   been most conscientious in your attendance, your punctuality

15   and the complete attention you have given during the trial.

16           I am going to read the instructions to you now on the

17   law, but I want you to know that I am going to send these

18   instructions into the jury room.  There will be 12 copies so

19   you don't have to take notes as you listen.

20           Do not single out any particular instruction as alone

21   stating the law.  You should consider instead my instructions

22   as a whole.

23           We are now approaching the most important part of 24

24   case:  Your deliberations.  You have heard all of the evidence

25   as well as the final arguments of the lawyers for the parties.

G9LQROD2                         Charge

1    Before you retire to deliberate, it is my duty to instruct you

2    as to the law that will govern your deliberations.  As I told

3    you at the start of this case, and as you agreed, it is your

4    duty to accept my instructions of law and to apply them to the

5    facts as you determine them.

6         Regardless of any opinion that you may have as to what

7    the law may be or ought to be, it is your duty to follow the

8    law as I give it to you.  Also, if any attorney or other person

9    has stated a legal principle different from any that I state to

10   you in my instructions, it is my instructions that you must

11   follow.

12        Your duty is to decide the factual issues in this case

13   and arrive at a verdict.  You, the members of the jury, are the

14   sole and exclusive judges of the facts.  You decide the weight

15   of the evidence; you determine the credibility of the

16   witnesses; you resolve such conflicts as there may be in the

17   testimony; and you draw whatever reasonable inferences you

18   decide to draw from the facts as you determine them.

19        In determining the facts, you must rely upon your own

20   recollection of the evidence.  None of what the lawyers have

21   said in their opening or closing arguments, their questions or

22   their objections is evidence.  They are not sworn as witnesses;

23   they do not testify; they make arguments about what conclusions

24   you should draw from evidence or lack of it.  But as I said,

25   that is argumentation; not evidence.  And the same applies to

me:  Anything I may have said is not evidence.  I've allowed you to take notes.  As I said earlier, your notes are not evidence.

        The evidence before you consists of just two things: The testimony given by the witnesses from the stand right here that was received in evidence, and the exhibits that were received in evidence.

        Testimony consists of the answers that were given by the witnesses to the questions that were permitted.  The questions themselves are not evidence.  It is the answers to the questions that count.  Also, as I have instructed you at the beginning of the case, and I am sure you have complied with my instruction, anything you may have seen or heard about this case outside the courtroom is not evidence and must be entirely disregarded.

        Now, it is the duty of the attorney for each party to object when the other party offers testimony or other evidence that the attorney believes is not properly admissible.  Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences out of the hearing of the jury.  Those questions of law have to be decided by me.  You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence or asked for a conference out of your hearing or asked me for a ruling on the law.

G9LQROD2                          Charge

1          I am instructing you now that the testimony and

2     documents that have been admitted into evidence are appropriate

3     for your consideration.  You may consider all the evidence that

4     has been admitted.

5          I also ask you to draw no inference from my rulings or

6     from the fact that upon occasion I asked a question of certain

7     witnesses.  My rulings were no more than the application of law

8     and my questions were only intended for clarification or to

9     expedite matters.  You are to expressly understand that I have

10    no opinion as to the verdict you should render in this case.

11    Your verdict is strictly up to you.

12         You are to perform you duty of finding the facts

13    without bias or prejudice as to any party.  You are to perform

14    your duty with an attitude of complete fairness and

15    impartiality.  This case is important to both parties.

16    Mr. Rodriguez is charged with a serious crime.  He has pleaded

17    not guilty.  It is important to the government too.

18    Enforcement of our criminal laws with regard to guns and drugs

19    are a prime concern to the government.

20         The fact that the prosecution is brought in the name

21    of the United States of America entitles the government to no

22    greater consideration than accorded to any other party.  By the

23    same token, the government is entitled to no less

24    consideration.  All parties, whether the government or

25    individuals, stand as equals before the Court.

G9LQROD2                    Charge

1              It would be improper for you to consider, in reaching

2       your decision as to whether the government has sustained its

3       burden of proof, any personal feelings you may have about

4       Mr. Rodriguez's race, religion, national origin, gender, sexual

5       orientation or age.  Similarly, it would be improper for you to

6       consider any personal feelings you may have about the race,

7       religion, national origin, gender, sexual orientation or age of

8       any other witness or anyone else involved in this case.  Every

9       defendant is entitled to the presumption of innocence and the

10      government has the burden of proof, as I will discuss in more

11      detail in a moment.  It would be equally improper for you to

12      allow any feelings you might have about the nature of the crime

13      charged to interfere with your decision-making process.

14              You are not to be swayed in any way by sympathy.

15      Rather, the crucial question that you must ask yourselves as

16      you review the evidence is:  Has the government proved the

17      guilt of Mr. Rodriguez beyond a reasonable doubt?

18              It must be clear to you by now that if you were to let

19      biases, prejudice, fear, disgust, sympathy or any other

20      irrelevant consideration interfere with your thinking, there

21      would be a risk that you would not arrive at a true and just

22      verdict.  So do not be guided by anything except clear thinking

23      and calm analysis of the evidence.  Sympathy should play no

24      role in your deliberations.

25              You should not consider any personal feelings you may

G9LQROD2                           Charge

1   have about the attorneys who represented the parties in this

2   matter.  As I indicated at the beginning of this trial, the

3   lawyers and the other participants at counsel table have been

4   instructed not to have any communication with you as jurors.

5   If due to the congestion in the courthouse you ran into counsel

6   and they ignored you, they did so because that's what they're

7   supposed to do.  That's the rule.  This should not influence

8   your decisions regarding Mr. Rodriguez's guilt or innocence in

9   any way.

10          The question of Mr. Rodriguez's potential punishment

11  is of no concern to the jury and should not in any sense enter

12  into or influence your deliberations.  The duty of imposing a

13  sentence rests exclusively with the Court.  Your function is to

14  weigh the evidence, or lack of it, in the case and to determine

15  whether or not the government has proven Mr. Rodriguez's guilt

16  beyond a reasonable doubt.

17          Now, as everybody has told you, the defendant,

18  Mr. Rodriguez, has been formally charged in an indictment.

19  Under our rules, he is entitled to know what the charges are

20  against him.  But as I instructed you when the trial started,

21  the indictment is not evidence.  It merely describes the

22  charges against Mr. Rodriguez, and may not be considered by you

23  as evidence of guilt.  You are to give no weight to the fact

24  that a grand jury returned an indictment against Mr. Rodriguez.

25          I will not read the entire indictment to you at this

G9LQROD2                    Charge

1    time, but I will summarize the offenses charged.  I will then

2    explain in detail the elements of the charged offenses.  But

3    before you begin your deliberations, you will be provided with

4    a copy of the indictment.

5            So far I promised you a copy of the charges and a copy

6    of the indictment, which you will take into the jury room.

7            Now, the law presumes that Mr. Rodriguez is innocent

8    until proven guilty beyond a reasonable doubt.  Mr. Rodriguez

9    has entered a plea of not guilty to the charge alleged in the

10   indictment.  As a result, the government has the burden to

11   prove Mr. Rodriguez's guilt beyond a reasonable doubt.  The

12   burden never shifts to Mr. Rodriguez for the simple reason that

13   the law presumes him innocent and never imposes upon any

14   defendant in a criminal case the burden or duty of calling any

15   witness or producing any evidence.

16           In other words, Mr. Rodriguez starts with a clean

17   slate.  He is presumed innocent until such time that you, the

18   jury, are unanimously satisfied that the government has proved

19   Mr. Rodriguez guilty beyond a reasonable doubt.  If the

20   government fails to sustain this burden with respect to

21   Mr. Rodriguez, you must find him not guilty.

22           I have said that the government must prove

23   Mr. Rodriguez is guilty beyond a reasonable doubt, and that

24   burden never shifts to Mr. Rodriguez.  Instead, it is always

25   the government's burden to prove beyond a reasonable doubt each

1    of the elements of the crime charged.  Mr. Rodriguez has no

2    burden to prove himself innocent.

3              The question then is:  What is a reasonable doubt?

4    Well, the words almost define themselves.  It is a doubt based

5    on reason.  It is a doubt that a reasonable person has after

6    carefully weighing all of the evidence.  Proof beyond a

7    reasonable doubt must, therefore, be proof of such a convincing

8    character that a reasonable person would not hesitate to rely

9    and act upon it in the most important of his or her own

10   affairs.

11             A reasonable doubt is not a guess.  It's not a whim.

12   It's not speculation.  It's not suspicion.  It is not an excuse

13   to avoid the performance of an unpleasant duty, and it is

14   certainly not sympathy.  The law does not require that the

15   government prove guilt beyond all possible doubt.  Proof beyond

16   a reasonable doubt is sufficient to convict.

17             If, after fair and impartial consideration of all the

18   evidence, you have a reasonable doubt as to the guilt of

19   Mr. Rodriguez, it is your duty to find him not guilty.  On the

20   other hand, if after a fair and impartial consideration of all

21   of the evidence you are satisfied that the government has met

22   its burden of proving Mr. Rodriguez's guilt beyond a reasonable

23   doubt, it is your duty to find him guilty.

24             Now, a few instructions about the evidence.  In

25   deciding whether Mr. Rodriguez is guilty or not guilty, you may

G9LQROD2                         Charge

1    consider both direct evidence and circumstantial evidence.

2              Direct evidence is evidence that proves a disputed

3    fact directly.  For example, where a witness testifies as to

4    what he or she saw, heard, or observed, that is called direct

5    evidence.

6              Circumstantial evidence is evidence that tends to

7    prove a disputed fact by proof of other facts.  Let me give you

8    a simple example.  Suppose that when you came into the

9    courthouse today, the sun was shining, and it was a nice day,

10   but now the courtroom blinds are drawn and you cannot look

11   outside.  And as you are sitting here, someone walks in the

12   back of the courtroom with a dripping wet umbrella, and soon

13   after that someone else walks in with a dripping wet raincoat.

14   Noun, on our assumed facts, you can't look outside of the

15   courtroom and see whether it's raining.  So you have no direct

16   evidence of that fact.  But on the combination of the facts

17   about the umbrella and the raincoat, it would be reasonable for

18   you to conclude that it had started to rain.  That is all there

19   is to circumstantial evidence.  Using your reason and

20   experience, you infer from established facts the existence or

21   the non-existence of some other fact.

22             An inference is the deduction or conclusion that

23   reason and common sense prompts a reasonable mind to draw from

24   the facts that have been proven by the evidence.  Not all

25   logically possible conclusions are legitimate or fair

G9LQROD2                         Charge

1    inferences.  Only those inferences to which the mind is

2    reasonably led or directed are fair inferences from direct or

3    circumstantial evidence in this case.  Whether or not to draw a

4    particular inference is, of course, a matter exclusively for

5    you to decide, as are all determinations of fact.

6           Many material facts, such as state of mind, are rarely

7    susceptible of proof by direct evidence.  Generally, such facts

8    are established by circumstantial evidence and the inferences

9    the jury draws from them.  The law makes no distinction between

10   direct and circumstantial evidence.  Circumstantial evidence is

11   of no less value than direct evidence, and you can consider

12   either or both and can give them each such weight as you

13   conclude is warranted.

14          Now, it must be clear to you by now that counsel for

15   both of the parties are asking you to draw very different

16   conclusions about the significant factual issues in this case.

17   An important part of your decision will involve making

18   judgments about the testimony of witnesses you have listened to

19   and observed.  In making these judgments, you should carefully

20   scrutinize all of the testimony of each witness, the

21   circumstances under which each witness testified, and any other

22   matter in evidence that may help you to decide the truth and

23   the importance of each witness's testimony.  For example, was

24   the testimony of a witness corroborated by the testimony of

25   other witnesses or another exhibit?

G9LQROD2                    Charge

1          Your decision whether or not to believe a witness may

2     depend upon how that witness impressed you.  Was the witness

3     candid, frank, and forthright, or was the witness evasive or

4     suspect in some way?  How did the way the witness testified on

5     direct examination compare with how the witness testified on

6     cross-examination?  Was the witness consistent or

7     contradictory?  Did the witness appear to know what he or she

8     was talking about?  Did the witness strike you as someone who

9     was trying to report his knowledge or her knowledge accurately?

10    What was the witness's demeanor like?  These are examples of

11    the kinds of common sense questions you should ask yourselves

12    in deciding whether a witness is or is not truthful.

13         In addition, you may consider whether a witness had

14    any possible bias or relationship with a party or any possible

15    interest in the outcome of the case.  Such a bias, relationship

16    or interest does not necessarily make that witness unworthy of

17    belief.  These are simply factors that you can consider.

18         If you find that a witness has testified falsely as to

19    any material fact, you may reject the witness's testimony in

20    its entirety, or you may accept those parts that you believe to

21    be truthful or that are corroborated by other evidence in this

22    case.

23         You should also consider whether the witness had an

24    opportunity to observe the facts he or she testified about, and

25    whether the witness's recollection of the facts stands up in

1    the light of the other evidence in this case.

2          In other words, what you have to try to do in deciding

3    credibility is to size up a person just as you would in any

4    important matter where you are going to decide if a person is

5    truthful, straightforward and accurate in his or her

6    recollection.

7          It is for you, the jury, and for you alone – not the

8    lawyers or witnesses or me – to decide the credibility of

9    witnesses who appeared here and the weight that their testimony

10   deserves.  After making your own judgment or assessment

11   concerning the credibility of a witness, you can then attach

12   such importance or weight to their testimony, if any, that you

13   feel that it deserves.  You will then be in a position to

14   decide whether the government has proven the charges beyond a

15   reasonable doubt.

16         Now, you have heard the testimony of seven law

17   enforcement officials.  The fact that a witness may be employed

18   by the government as a law enforcement official does not mean

19   that his or her testimony is necessarily deserving of more or

20   less consideration or greater or lesser weight than that of an

21   ordinary witness.  In this context, defense counsel was allowed

22   to try to attack the credibility of such a witness on the

23   grounds that his or her testimony may be colored by a personal

24   or professional interest in the outcome of the case.

25         But it is your decision after reviewing all of the

G9LQROD2                        Charge

1    evidence whether to accept the testimony of the law enforcement

2    witnesses and to give that testimony whatever weight, if any,

3    you find that it deserves.

4          Now, you have heard the testimony of Reginald

5    Donaldson, an expert in cell site data.  An expert is someone

6    who by education or experience has acquired learning or

7    experience in a science or a specialized area of knowledge.

8    Such a witness is permitted to give his opinions as to relevant

9    matters in which he professes to be expert and give his reasons

10   for his opinions.  Expert testimony is presented to you on the

11   theory that someone who is experienced in the field can assist

12   you in understanding the evidence or in reaching an independent

13   decision on the facts.

14         Your role in judging credibility applies to experts as

15   well as to other witnesses.  You should consider the expert

16   opinions that were received in evidence in this case or, I

17   should say, expert opinion that was received in evidence in

18   this case, and give it as much or as little weight as you think

19   it deserves.  If you should decide that the opinion of an

20   expert was not based on sufficient education or experience or

21   on sufficient data or if you should conclude that the

22   trustworthiness or credibility of an expert is questionable for

23   any reason or if the opinion of the expert was outweighed in

24   your judgment by other evidence in this case, then you may

25   disregard the opinion of the expert entirely or in part.

1          On the other hand, if you find that the opinion of the

2    expert was based on sufficient evidence, data and experience,

3    and the other evidence does not give you reason to doubt his

4    conclusions, you would be justified in placing greater reliance

5    on his testimony.

6          Now, Mr. Donaldson also used charts and summaries

7    during his testimony in order to make the other evidence more

8    meaningful and to aid you in considering this evidence.  Those

9    charts and evidence are not direct independent evidence; they

10   are summaries of other evidence.  They are admitted into

11   evidence as aids to you.

12         In understanding the evidence which you have heard, it

13   is clearly easier and more convenient to utilize summary charts

14   than to place all of the relevant documents in front of you.

15   It is for you to decide whether the charts and summaries

16   correctly present the information contained in the testimony

17   and in the exhibits on which they are based.  To the extent

18   that the charts conform to what you determine the underlying

19   evidence to be, you may consider them if you find that they are

20   of assistance to you in analyzing and understanding the

21   evidence.

22         Now, some of the people who may have been involved in

23   the events leading to this trial are not on trial here.  This

24   does not matter.  There is no requirement that all members of a

25   conspiracy be charged and prosecuted or tried together in the

G9LQROD2                         Charge

1    same proceeding.

2            You cannot draw any inference, favorable or

3    unfavorable, towards the government or the defendant from the

4    fact that certain persons other than defendant were not named

5    as defendants in the indictment, nor may you speculate as to

6    the reason why other persons are not on trial.  These matters

7    are wholly outside of your concern and have no bearing on your

8    function as jurors.

9            Whether a person should be named as a co-conspirator

10   or indicted as a defendant in this case or another separate

11   case is a matter within the sole discretion of the United

12   States and the grand jury.  Therefore, you may not consider it

13   in any way in reaching your verdict as to the defendant.

14           Now, as you know, Mr. Rodriguez did not testify in

15   this case.  Under our Constitution, a defendant has no

16   obligation whatsoever to testify or to present any evidence

17   because it is the government's burden to prove guilt beyond a

18   reasonable doubt.

19           (Continued on next page)

20

21

22

23

24

25

G9LVROD3

1          THE COURT:  That burden remains with the government

2     throughout the entire trial and never shifts to a defendant.

3     The defendant is never required to prove he or she is innocent.

4     You must not attach any significance to the fact that

5     Mr. Rodriguez did not testify.  No adverse inference against

6     Mr. Rodriguez may be drawn by you because he did not take the

7     witness stand.  You may not consider this against Mr. Rodriguez

8     in any way in your deliberations in the jury room.

9          Now, there are several people whose names you have

10    heard during the course of the trial but who did not appear

11    here to testify.  I instruct you that each party had an equal

12    opportunity or lack of opportunity to call any of those

13    witnesses.  Therefore, you should not draw any inference or

14    reach any conclusion as to what they would have testified to

15    had they been called.  Their absence should not affect your

16    judgment in any way.  You should, however, remember my

17    instructions that the law does not impose on a defendant in a

18    criminal case the burden or duty of calling any witness or

19    producing any evidence.  The burden remains with the government

20    to prove the guilt of the defendant beyond a reasonable doubt.

21         This is an instruction that I give because sometimes

22    people get notions of how the government ought to prove its

23    case based on what they see on various crime shows.

24         There's been references in the arguments of defense

25    counsel in this case to the fact that certain investigative

G9LVROD3

1    techniques were not used by the government.  The issue is not

2    whether the best or most scientifically-advanced method of

3    proof is used for a particular fact, but whether the method of

4    proof selected establishes the fact beyond a reasonable doubt.

5    There is no legal requirement that the government prove its

6    case through any particular means.

7          You should carefully consider the evidence adduced by

8    the government.  You are not to speculate as to why they used

9    the techniques they did or why they did not use other

10   techniques.  The government is not on trial.  Law enforcement

11   techniques are not your concern.  Your concern is to determine

12   whether or not on the evidence or lack of evidence the guilt of

13   the defendant has been proved beyond a reasonable doubt.

14         Now, you've heard testimony about evidence seized in

15   connection with certain searches conducted pursuant to search

16   warrants by law enforcement officers.  Evidence obtained from

17   these searches was properly admitted in this case and may be

18   properly considered by you.  Whether you approve or disapprove

19   of how the evidence was obtained should not enter into your

20   deliberations because I instruct you that the government's use

21   of the evidence is entirely lawful.  Regardless of your

22   personal opinions, you must give this evidence full

23   consideration, along with all the other evidence in this case,

24   in determining whether or not the government has proved the

25   guilt of Mr. Rodriguez beyond a reasonable doubt.

G9LVROD3

1          While Mr. Rodriguez did not testify, he made

2     statements.  There has been evidence that Mr. Rodriguez made

3     statements to law enforcement authorities.  Evidence of these

4     statements was properly admitted in this case and you can

5     properly consider it.  You are to give the evidence of those

6     statements such weight as you feel it deserves in light of all

7     the evidence.  Whether you approve or disapprove the use of

8     these statements may not enter into your deliberations.  I

9     instruct you that no one's rights were violated, and the

10     government's use of this evidence is entirely lawful.

11          You've heard testimony about cell phone location

12     information obtained from the cell phone service provider

13     pursuant to a court order.  The evidence was properly admitted

14     in this case and may be properly considered by you.  The

15     acquisition of this evidence was an entirely appropriate law

16     enforcement action.  Whether you approve or disapprove how the

17     evidence was obtained should not enter into your deliberations,

18     because I instruct you that the government's use of the

19     evidence is entirely lawful.  You must, therefore, regardless

20     of your personal opinions, give this evidence your full

21     consideration, along with all the other evidence in this case,

22     in determining whether the defendant has proved the defendant's

23     guilt beyond a reasonable doubt.

24          Some of the evidence in this case has consisted of

25     electronic communications seized from computers or electronic

G9LVROD3

accounts.  There is nothing illegal about the government's use

of such electronic communications in this case, and you may

consider them along with all the other evidence in this case.

Whether you approve or disapprove of the seizure of these

communications may not enter your deliberations.  You must,

therefore, regardless of any personal opinions, consider this

evidence, along with all the other evidence in this case, in

determining whether the government has proved beyond a

reasonable doubt the guilt of the defendant.  However, as with

other evidence, it is for you to determine what weight, if any,

to give such evidence.

Audio recordings of conversations have been admitted

into evidence.  Whether you approve or disapprove of the

recordings or interception of those conversations cannot enter

your deliberations.  I instruct you that these recordings were

made in a lawful manner and that no one's rights were violated.

The government's use of this evidence is entirely lawful.  You

must, therefore, regardless of any personal opinions, give this

evidence full consideration, along with all the other evidence

in this case, in determining whether the government has proved

beyond a reasonable doubt the guilt of the defendant that you

are considering.

You have heard evidence in the form of stipulations of

testimony.  A stipulation is in the 1200 series.  A stipulation

of testimony is an agreement among the parties that if called

G9LVROD3

as a witness, the person would give certain testimony.  You

must accept as true the fact that a witness would have given

that testimony, but it is for you to determine the effect to be

given that testimony.

You've also heard evidence in the form of a

stipulation of fact.  A stipulation of fact is an agreement

among the parties that a certain fact is true.  You must regard

such agreed facts as true.  It is for you, however, to

determine the effect to be given to any stipulated fact.

We have among the exhibits received in evidence some

documents that are redacted.  "Redacted" means that part of the

document was blacked out.  You are to concern yourself only

with the part of the item that has been admitted into evidence.

You should not consider any possible reason why the other part

of the document has been deleted.

That takes care of some of the guidance I want to give

you on evidence.

We will now turn to the substantive law and an

explanation of the indictment.

As I explained to you before, the indictment is simply

a charge or an accusation; it is not evidence.  I will

summarize the counts that are charged in the indictment and

then I will explain in detail the elements of each charged

crime.

The indictment contains two counts.  Each count is a

G9LVROD3

separate offense or crime.  Each count must, therefore, be

considered separately by you and you must return a separate

verdict on each count.

Count One charges Mr. Rodriguez conspired with

others -- that is, he agreed with others -- in or about August

2015 to distribute marijuana and to possess marijuana with

intent to distribute it.

Count Two charges that on or about August 21st of

2015, Mr. Rodriguez, during and in relation to the narcotics

trafficking conspiracy charged in Count One, knowingly used and

carried a firearm and, in furtherance of such crime, did

possess a firearm and aided and abetted the use, carrying, and

possession of a firearm.

You will note that the indictment alleges that certain

acts occurred on or about various dates.  I instruct you that

it does not matter if a specific event is alleged to have

occurred on or about a certain date or month, but the testimony

indicates that, in fact, it was a different date or month.  The

law requires only a substantial similarity between the dates

and months alleged in the indictment and the dates and months

established by the evidence.

Let's take a look at Count One.

Mr. Rodriguez is accused in Count One of having been a

member of a conspiracy to violate federal law.  I'll read Count

One.  You'll have the indictment in the jury room as well.

G9LVROD3

1          In or about August 2015, in the Southern District of

2     New York and elsewhere, Michael Earl Rodriguez, the defendant,

3     together with others known and unknown, intentionally and

4     knowingly did combine, conspire, confederate, and agree,

5     together and with each other, to violate the narcotics laws of

6     the United States.  It was a part and an object of the

7     conspiracy that Michael Earl Rodriguez, the defendant, and

8     others known and unknown, would and did distribute and possess

9     with the intent to distribute a controlled substance, in

10    violation of Title 21, United States Code, Section 841(a)(1).

11         The controlled substance that Michael Earl Rodriguez,

12    the defendant, conspired to distribute and possess with intent

13    to distribute was marijuana, in violation of Title 21, United

14    States Code, Section 841(b)(1)(D).

15         Now, what's a conspiracy?  A conspiracy is kind of a

16    criminal partnership; a combination or agreement of two or more

17    persons to join together to accomplish an unlawful purpose.

18    The crime of conspiracy to violate a federal law is an

19    independent offense; it is separate and distinct from the

20    actual violation of any specific federal laws which the law

21    refers to as substantive crimes.

22         Given that a conspiracy and a substantive crime are

23    distinct and independent offenses, you may find the defendant

24    guilty of the crime of conspiracy, even if you find that he

25    never actually committed the substantive crime that was the

G9LVROD3

object of the conspiracy.  In other words, you may find the

defendant guilty of the crime of conspiracy to distribute a

controlled substance or to possess a controlled substance with

intent to distribute, that is, agreeing to distribute or

possess with intent to distribute a controlled substance, even

if there's no actual distribution or possession with the intent

to distribute a controlled substance.

Under our law, conspiracy standing alone is a separate

crime, even if the conspiracy is not successful and no drugs

are actually distributed or possessed with intent to

distribute.

To sustain its burden of proof with respect to the

conspiracy, the government must establish two elements beyond a

reasonable doubt:

First, the existence of the conspiracy charged in

Count One of the indictment; in other words, that there was, in

fact, an agreement or understanding to violate those provisions

of the law that make it illegal to distribute narcotics or

possess narcotics with the intent to distribute them.

Second, the government must prove beyond a reasonable

doubt that the defendant knowingly became a member of the

conspiracy charged, that is, he knowingly associated himself

with the conspiracy and participated in the conspiracy to

distribute or possess with intent to distribute narcotics.

Now I will describe the two elements.

G9LVROD3

1          The first element is the existence of the conspiracy.

2     Starting with the first element, a conspiracy is a combination

3     or agreement or understanding of two or more people to

4     accomplish by a concerted or collective action a criminal or

5     unlawful purpose.

6          In this instance, the unlawful purpose alleged to have

7     been the object of the conspiracy charged in Count One is the

8     distribution of a controlled substance with the possession and

9     intent to distribute it.  The gist or the essence of the crime

10    or conspiracy is the unlawful combination or agreement to

11    violate the law.  The success of the conspiracy or actual

12    commission of the criminal act which is the object of the

13    conspiracy is not an element for the crime of conspiracy.  The

14    conspiracy alleged here, therefore, is the agreement to commit

15    the crime.  That is an entirely separate and distinct offense

16    from the underlying crime which the law calls the substantive

17    crime.  The crime of conspiracy is complete once the unlawful

18    agreement is made and the defendant enters into it.

19         Accordingly, you may find a defendant guilty of the

20    crime of conspiracy to distribute or possess with intent to

21    distribute marijuana, even though the object of the

22    conspiracy -- that is, the actual possession or distribution of

23    marijuana -- might not actually have been committed.  The

24    ultimate success of the conspiracy is not required.

25         To prove a conspiracy, the government is not required

G9LVROD3

to show that the individuals sat around a table and entered a

solemn pact orally or in writing stating that they had formed a

conspiracy to violate the law and setting forth the details of

the plans and the means by which the unlawful project is to be

carried out or the part to be played by each conspirator.

Indeed, it would be extraordinary if there were such a formal

document or specific oral agreement.

Your common sense tells you that when people, in fact,

undertake to enter into a criminal conspiracy, a great deal is

left to unexpressed understanding.  From its very nature, a

conspiracy is almost invariably secret in its origin and

execution.  Conspirators do not usually reduce their agreements

to writing or acknowledge them in front of a notary public, nor

do they publicly broadcast their plans; thus, you may infer the

existence of a conspiracy from the circumstances of the case

and the conduct of the parties involved.

To show that a conspiracy existed then, it is

sufficient if the evidence shows that two or more persons in

some way or manner, through any contrivance, explicit or

implicit, came to an understanding to violate the law and to

establish an unlawful plan.  Express language or specific words

are not required to indicate assent or attachment to a

conspiracy.

In determining whether there has been an unlawful

agreement, you may consider the acts of the conduct of the

G9LVROD3

1    alleged co-conspirators which were done to carry out the

2    apparent criminal purpose.  The adage "actions speak louder

3    than words" is applicable here.  Often, the only evidence

4    available with respect to the existence of a conspiracy is that

5    of disconnected acts on the part of the alleged individual

6    co-conspirators.  When taken together and considered as a

7    whole, however, these acts are capable of showing a conspiracy

8    or agreement as conclusively as would more direct proof.

9              Of course, proof concerning the accomplishment of the

10   objects of the conspiracy may be the most persuasive evidence

11   of the existence of the conspiracy itself.  But it is not

12   necessary that the conspiracy actually succeed in its purpose

13   in order for you to conclude that the conspiracy existed.

14             In deciding whether the alleged conspiracy, in fact,

15   existed, you can consider all the facts, conduct, declarations

16   of the alleged co-conspirators, and the reasonable inferences

17   to be drawn from such evidence.

18             It is sufficient to establish the existence of the

19   conspiracy if, after considering all the relevant evidence, you

20   find beyond a reasonable doubt that the minds of at least two

21   alleged co-conspirators met in an understanding way, and that

22   they agreed, as I have explained, to work together in

23   furtherance of the unlawful scheme alleged in the indictment.

24             In short, as far as the first element of the

25   conspiracy is concerned, the government has to prove beyond a

G9LVROD3

reasonable doubt that at least two alleged co-conspirators came to a mutual understanding -- either spoken or unspoken -- to violate the law in the manner charged in the indictment.

The object of a conspiracy is the illegal goal that the co-conspirators agree or hope to achieve.

Count One of the indictment charges that the objective of the conspiracy charged in that count was the distribution or possession with intent to distribute a controlled substance, here, marijuana.  I will define the terms "distribution" and "possession" for you in just a moment.  As I will explain in more detail in a few moments, "to distribute" means simply to transfer to another; it does not require a sale.  "Possession with intent to distribute" simply means possession of a controlled substance with the intention or purpose to distribute it to another person or persons.

Let me note that the government need prove only that the defendant conspired to distribute the controlled substance or that he conspired to possess the controlled substance with intent to distribute it.  The government does not need to prove both.

Before I go further, let me note something regarding the quantity and the purity of the drugs involved.

I instruct you that the actual quantity and purity of the controlled substance involved in the conspiracy charged in Count One is not an element of this crime, so you need not be

G9LVROD3

1    concerned with quantity or purity in determining whether the

2    defendant is guilty or not guilty of the crime charged in Count

3    One.  You need only find beyond a reasonable doubt that a

4    conspiracy existed to distribute or possess with intent to

5    distribute some amount of a controlled substance.

6            Now, I've used the terms "distribution" and

7    "possession with intent to distribute."  What do those terms

8    mean?

9            Let's start with "distribution."

10           The word "distribution" means the actual constructive

11   or attempted transfer of a controlled substance.  To distribute

12   simply means to deliver or to pass on, to hand over something

13   to another person or to cause it to be delivered, passed on, or

14   handed over to another.  Distribution does not require a sale,

15   but it includes sales.

16           What does "possession with intent to distribute" mean?

17           Let's start with "possession."

18           The legal concept of "possession" differs from the

19   everyday usage of the term, so let me explain it to you in some

20   detail.

21           Actual possession is what most of us think of as

22   possession; that is, having physical custody or control of an

23   object, as in I possess this pen I'm holding in my hand.  I

24   possess this pen.  However, a person need not have actual

25   physical possession, that is, physical custody of an object in

G9LVROD3

1   order to be in legal possession of it.  If an individual has

2   the ability to exercise substantial control over an object that

3   he does not have in his physical custody, and the intent to

4   exercise such control, then he is in possession of the article.

5   This is called constructive possession.

6         Control over an object may be demonstrated by the

7   existence of a working relationship between the person having

8   such control and the person with actual physical custody.  The

9   person having control over an object possesses it because he

10  has the effective working relationship with the person who has

11  actual physical custody of it because he can direct the

12  movement or transfer or disposition of the object.  In this

13  manner, for example, a person may legally possess things that

14  are in his house or car even though he's not in the house or

15  car at the time he is said to possess them.

16        More than one person can have control over the same

17  narcotics.  The law recognizes that possession can be sole or

18  joint.  If one person alone has actual or constructive

19  possession of a thing, then possession is sole.  If more than

20  one person has possession of it as I have defined "possession"

21  for you, then possession is joint.  That is what is meant by

22  "possession."

23        Now, if you find that a person knowingly possessed a

24  controlled substance, then you must decide whether the person

25  intended to distribute it.  "Possession with intent to

distribute" means that a person possessed the controlled

substance with the intention or purpose to distribute it to

another person or persons.  As I explained to you, "distribute"

means simply to transfer to another.

We cannot read a person's mind, so the determination

as to what the defendant's intent is is inferred from his

behavior.  However, you may not convict the defendant unless

these inferences convince you beyond a reasonable doubt that

the defendant intended to distribute narcotics.

Basically, the question with regard to the intent

aspect of the underlying offense is whether any drugs in the

defendant's possession that is subject to his control in the

manner I have indicated were for his personal use or for the

purpose of distribution or delivery to another.  It is

impossible to make this determination from the quantity of

drugs found in the defendant's possession.  Possession of a

large quantity of narcotics does not necessarily mean that the

defendant intended to distribute them.  On the other hand, an

individual may have intended to distribute a controlled

substance even if he did not possess a large quantity of it.

Other physical evidence, such as paraphernalia for the

packaging and processing of drugs, may show an intent to

distribute.  You should make your decision based on all the

evidence presented.

The government must prove that the objective of the

G9LVROD3

conspiracy was either to distribute the controlled substance or
to possess the controlled substance with the intent to
distribute it.  The government need not prove both.  But you
must be unanimous, however, as to which act was proven beyond a
reasonable doubt to have been the object of the conspiracy.

     The second element is membership.

     First is did the conspiracy exist; did it have an
unlawful purpose.

     If you conclude that the government has proven beyond
a reasonable doubt that the conspiracy charged in Count One
existed, you have to go on to the next question:  Did the
defendant participate in the conspiracy with knowledge of its
unlawful purpose and in furtherance of its unlawful objectives.
As you can see, this element concerns the defendant's state of
mind.  Direct proof of state of mind is not always available
and is not required.

     The terms "unlawfully," "intentionally," and
"knowingly" are intended to ensure that if you find that the
defendant did join the conspiracy, you also conclude beyond a
reasonable doubt that, in doing so, he knew what he was doing;
in other words, that he took the actions in question
deliberately and voluntarily.

     "Unlawfully" simply means contrary to the law.  The
defendant need not have known he was breaking any particular
law, but he must have been aware of the generally unlawful

G9LVROD3

nature of his acts.

Now, science has not yet devised a manner of looking into a person's mind and knowing what that person is thinking. However, you do have before you the evidence of certain acts and conversations alleged to have been taken place with the defendant or in his presence.  The government contends that these acts and conversations show beyond a reasonable doubt the defendant's knowledge of the unlawfulness of his actions.  By pleading not guilty, the defendant denies he committed the charged offense.  It is for you to determine whether the government has established to your satisfaction beyond a reasonable doubt that such knowledge and intent on the part of the defendant existed.

An act is done knowingly and intentionally if it is done deliberately and purposely; that is, the defendant's acts must have been the product of that defendant's conscious objective rather than the product of mistake or accident, mere negligence or some other innocent reason.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence based on a person's outward manifestations, words, conduct, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

By pleading not guilty, Mr. Rodriguez denies that he

G9LVROD3

was a member of this conspiracy.  It is for you to determine

whether the government has established to your satisfaction and

beyond a reasonable doubt that such knowledge and intent on the

part of the defendant existed.  It is not necessary that the

defendant be fully informed as to all the details of the

conspiracy to justify an inference of knowledge on his part.

        To have guilty knowledge, a defendant need not have

known the full extent of the conspiracy or all of its

objectives or all of its participants.  It is not even

necessary that the defendant know every other member of the

conspiracy.  In fact, the defendant may know only one other

member of the conspiracy and still be charged as a

co-conspirator.  Nor is it necessary that the defendant receive

any monetary benefit from participating in the conspiracy or

have a financial stake in the outcome, so long as he, in fact,

participated in the conspiracy in the manner I have explained.

        When people enter into a conspiracy to accomplish an

unlawful end, they become agents or partners of one another in

carrying out the conspiracy.  In determining the factual issues

before you, you may consider against the defendant any acts or

statements made by any of the people that you find under the

standards I have already described to have been his

co-conspirators, even though such acts or statements were not

made in his presence or were made without his knowledge.

        When I give you the verdict sheet, if and only if you

G9LVROD3

1    find that the government has proved beyond a reasonable doubt

2    that the defendant is guilty of participating in the conspiracy

3    charged in Count One of the indictment, you must then determine

4    the type of controlled substance involved in the conspiracy.

5             The government has alleged that the marijuana was the

6    controlled substance involved in the conspiracy.  The

7    government need not prove the quality or purity of marijuana;

8    however, any mixture or substance containing a detectable

9    amount of marijuana is sufficient.  If you conclude unanimously

10   that the government has failed to prove beyond a reasonable

11   doubt the conspiracy alleged in Count One of the indictment

12   involved marijuana -- let me start again.  If you conclude

13   unanimously that the government failed to prove beyond a

14   reasonable doubt that the conspiracy alleged in Count One of

15   the indictment involved marijuana, check "no" in response to

16   that question on the verdict form.  If, on the other hand, you

17   conclude unanimously that the government has proved beyond a

18   reasonable doubt that the conspiracy alleged in Count One

19   involved marijuana, check "yes" in response to that question on

20   the verdict form.

21            In making your determination about the type of any

22   controlled substance involved in the conspiracy charged in

23   Count One of the indictment, you should include whatever type

24   of controlled substance was involved in any of the acts in

25   which the defendant personally or directly participated.

G9LVROD3

1          In making your determination about the type of

2     controlled substance involved in an offense, you should also

3     include any controlled substances associated with any

4     co-conspirators of the defendant, as long as the type was

5     either known to the defendant or reasonably foreseeable to him

6     within the scope of criminal activity that he jointly

7     undertook.

8          That concludes my instructions on Count One.

9          With regard to Count Two, the firearms offense, I want

10    to turn now to the firearms offense charged in Count Two of the

11    indictment and instruct you on the elements of that offense.

12         Count Two alleges a violation of Section 924(c) of the

13    Federal Criminal Code.  That provision makes it a crime for any

14    person, during and in relation to any drug trafficking crime,

15    to use or carry a firearm or, in furtherance of any such crime,

16    to possess a firearm.

17         Count Two is a firearms count connected to the

18    narcotics conspiracy charged in Count One, and it charges

19    Mr. Rodriguez as follows:

20         On or about August 21, 2015, in the Southern District

21    of New York and elsewhere, Michael Earl Rodriguez, the

22    defendant, during and in relation to a drug trafficking crime

23    for which he may be prosecuted in a court of the United States,

24    namely, the conspiracy to distribute and possess with the

25    intent to distribute marijuana charged in Count One of this

G9LVROD3

indictment, knowingly did use and carry a firearm and, in

furtherance of such crime, did possess a firearm and did aid

and abet the use, carrying, and possession of a firearm, to

wit, a Beretta .22 caliber semiautomatic pistol.

In order to convict the defendant of Count Two, the

government must prove the following elements beyond a

reasonable doubt:

One.  On or about the date alleged in the indictment,

the defendant used or carried or possessed a firearm or any

combination of those acts.

Two.  The defendant used or carried the firearm during

and in relation to the specified drug trafficking conspiracy,

or that the defendant possessed a firearm in furtherance of the

specified drug trafficking conspiracy.

Third.  The defendant acted knowingly.

The first element the government must prove beyond a

reasonable doubt is that the defendant committed a drug

trafficking crime for which he can be prosecuted by a court in

the United States.  The defendant is charged in Count One of

the indictment with the distribution and with the possession,

with intent to distribute, a controlled substance.  I instruct

you that the crime charged in Count One of the indictment is a

drug trafficking crime for which someone can be prosecuted by a

court in the United States.  It is up to you to determine,

however, that the government has proven beyond a reasonable

G9LVROD3

doubt that the defendant committed the crime charged in Count
One.

If you find the defendant not guilty as to Count One,
you must find the defendant not guilty as to Count Two and you
should check "not guilty" in response to Count Two on the
verdict form.  On the other hand, if you find the defendant
guilty as to Count One, you have to consider Count Two
separately to determine whether the defendant is guilty or not
guilty of Count Two.

The second element the government must prove beyond a
reasonable doubt for Count Two is that the defendant either
carried a firearm during and in relation to the drug
trafficking crime charged in Count One, or that he possessed a
firearm in furtherance of that drug trafficking crime.  The
government must prove either one of these two things beyond a
reasonable doubt, that the defendant carried a firearm during
and in relation to the drug crime, or that the defendant
possessed the firearm in furtherance of that crime.  The
government does not need to prove both, although the same
conduct may constitute both carrying and possession.

A firearm under the statute means any weapon which
will or is designed to or may readily be converted to expel a
projectile by the action of an explosive.  In considering the
specific element of whether the defendant used or carried or
possessed a firearm, it does not matter whether the firearm was

G9LVROD3

1    loaded or operable at the time of the crime.  Operability is

2    not relevant to your determination of whether a weapon

3    qualifies as a firearm.  I instruct you right now that a gun is

4    a firearm.

5            As I have explained, the government must prove the

6    second element in either one of two ways:

7            First, the government may prove beyond a reasonable

8    doubt that the defendant used or carried a firearm during and

9    in relation to the drug trafficking offense.

10           In order to prove that the defendant used the firearm,

11   the government must prove beyond a reasonable doubt an active

12   employment of the firearm by the defendant during and in

13   relation to the commission of the drug trafficking crime.  The

14   defendant does not have to actually fire or attempt to fire the

15   weapon.  Brandishing, displaying, or even referring to the

16   weapon so that others present knew that the weapon -- the

17   defendant had the firearm available if needed, all constitute

18   use of the firearm.  The mere possession of a firearm at or

19   near the site of the crime without active employment as I just

20   described it is not, however, sufficient to constitute use of a

21   firearm.

22           In order to prove that the defendant carried the

23   firearm, the government must prove beyond a reasonable doubt

24   that the defendant had the weapon within his control so that it

25   was available in such a way that it furthered the commission of

G9LVROD3

1   the crime.  The defendant need not have held the firearm

2   physically, that is, have actual possession of it on his

3   person.  If you find that the defendant had dominion and

4   control over the place where the firearm was located, and had

5   the power and intention to exercise control over the firearm,

6   and that the firearm was immediately available to him in such a

7   way that it furthered the commission of the drug trafficking

8   offense, you may find that the government has proved that the

9   defendant carried the weapon.

10          A firearm is carried in relation to a drug trafficking

11   offense if the firearm had some purpose or effect with respect

12   to the drug crime.  The requirement is satisfied if the firearm

13   facilitated or had the potential to facilitate the drug

14   trafficking offense.  On the other hand, this requirement is

15   not satisfied if the carrying of the firearm was entirely

16   unrelated to the drug crime.

17          The government may also establish the second element

18   by proving that the defendant possessed the firearm in

19   furtherance of the drug trafficking crime.

20          Possession of a firearm in furtherance of a drug

21   trafficking crime requires that the defendant possess the

22   firearm and the possession advance or move forward the crime.

23   The mere presence of a firearm is not enough.  Possession in

24   furtherance requires that the possession be incident to an

25   essential part of the crime.  The firearm must have played some

G9LVROD3

part in furthering the crime in order for this element to be

satisfied.

As I explained earlier, the legal concept of

possession differs from the everyday usage of this term.

Actual possession is what most people think of as possession,

that is, having physical custody or control of an object, as in

I possess this pen.  If you find the defendant had the firearm

on his person therefore, you may find that he had possession of

it.  However, a person need not have actual physical

possession, that is, physical custody of an object, in order to

be in legal possession of it.  If an individual has the ability

to exercise substantial control over the object, even if he

does not have the object in his physical custody at a given

moment, and that person has the intent to exercise such

control, then he is in legal possession of that article and

this is called constructive possession.

More than one person can have control over the same

firearm.  The law recognizes that possession may be sole or

joint.  If one person alone has actual or constructive

possession of a thing, possession is sole.  If more than one

person has possession of it as I have defined "possession,"

then possession is joint.  Control over an object may be

demonstrated by the existence of a working relationship between

one person having the power or ability to control the item and

another person who has actual physical custody.  The person

G9LVROD3

having control possesses the firearm because he has the

effective working relationship with the people who have actual

physical custody of the firearm and because he can direct the

movement or transfer or disposition of the firearm.

In addition, an individual may have possession of an

item that is not found on his person because that individual

has a relationship to the location where the item is

maintained.  In this matter, for example, a businessperson may

legally possess things that are scattered throughout a number

of stores or offices or installations around the country.  If

an individual has the ability to exercise substantial control

over an object, he does not have it in his physical custody and

the intent to exercise such control, then he is in possession

of the article.  Proof of ownership is not required to

establish possession.

"To possess a firearm in furtherance of a narcotics

crime" means that the firearm helped promote, accomplish,

advance, or achieve the goal or objective of the underlying

offense.  The mere presence of the firearm at the scene of the

drug trafficking is not enough.  The firearm must have had some

nexus, that is, some purpose or effect with respect to

underlying drug offenses such as when the firearm is readily

accessible to protect drugs, drug proceeds, or the drug dealer

himself.

In deciding whether there is such a nexus, you may

G9LVROD3

consider the accessibility of the firearm, whether the firearm

was loaded, the type of weapon, whether or not the defendant

legally possessed it, the type of drug activity conducted,

whether the firearm was stolen, the time and circumstances

under which the firearm was found, and the proximity of the

firearm to the drugs or drug profits.  This list of factors is

not exclusive, but it helps to distinguish between possession

in furtherance of crime from innocent possession such as a drug

dealer who possesses a wall-mounted antique or an unloaded

rifle that is locked in the cupboard and used for target

shooting or in hunting game.

          The final element the government has to prove in the

gun charges beyond a reasonable doubt alleged in Count Two is

that the defendant knew that he was using, carrying, or

possessing a firearm, and that he acted knowingly in doing so.

          So satisfy this element, you must find the defendant

had knowledge that he was carrying or using the firearm as that

term is generally used.  An act is done knowingly if it's done

purposefully and voluntarily as opposed to mistakenly or

accidentally.  You will recall that I instructed you earlier

that to determine someone acted knowingly requires you to make

a finding as to that person's state of mind.

          In order for the government to satisfy this element,

it must prove that the defendant knew what he was doing.  For

example, that he knew that he was possessing or carrying a

G9LVROD3

firearm in the commission of a drug trafficking crime.  It is
not necessary, however, for the government to prove that the
defendant knew that he is violating any particular law.

In addition to all the elements for Counts One and
Two, as I've just described to you, you must decide separately
and with respect to each of the counts whether any act in
furtherance of the crime occurred within the Southern District
of New York.  The Southern District of New York includes, among
other places, Manhattan, the Bronx.

In this regard, the government need not prove that the
crime was committed in this district, but that the defendant
himself was present here.  It is sufficient to satisfy this
element if any act in furtherance of the crime occurred in the
Southern District.

I should note that on this issue, and this issue
alone, the government need not prove venue beyond a reasonable
doubt, but only by a mere preponderance of the evidence.  The
preponderance of the evidence means that the government must
prove that it is more likely than not that any act in
furtherance of the charge you are considering occurred in the
Southern District.  Thus, with respect to Counts One and Two,
the government has satisfied its venue obligations if you
conclude that it is more likely than not that any act in
furtherance of the crime charged occurred within this district.
If you find that the government has failed to prove this venue

G9LVROD3

1    requirement, then you must acquit the defendant of this charge.

2              Now the concluding instructions.

3              You are about to go into the jury room and begin your

4    deliberations.  Your function now is to weigh the evidence in

5    this case and determine whether the government has proven

6    beyond a reasonable doubt that Mr. Rodriguez is guilty of the

7    offenses charged in Counts One and Two of the indictment.

8    Remember, you must answer each count separately.  You must base

9    your verdict solely on the evidence and these instructions as

10   to the law.  You are obliged under your oath as jurors to

11   follow the law as I have instructed you, whether you agree or

12   disagree with the particular law in question.

13             The verdict must represent the considered judgment of

14   each juror.  In order to return a verdict, it is necessary that

15   each juror agree to it.  Your verdict has to be unanimous.  If

16   you are divided, do not report how the vote stands.  If you

17   have reached a verdict, do not report what it is until you are

18   asked for your decision in open court.

19             When you retire to the jury room, you must have a

20   foreperson.  That person will preside over deliberations and

21   speak for you here in the court.  Other than those functions,

22   the foreperson has no greater or lesser authority than any

23   other juror.

24             It is my custom to select Juror No. 1 in every case to

25   be foreperson of the jury.  Accordingly, I am now selecting

G9LVROD3

1   Juror No. 1, Ms. Jackson, as your foreperson.

2           It is your duty as jurors to consult with one another
3   and deliberate with a view towards reaching an agreement.  Each
4   of you must decide the case for himself or herself, but you do
5   so only after impartial discussion and consideration of all the
6   evidence in this case with your fellow jurors.  In the course
7   of your deliberations, do not hesitate to reexamine your own
8   views and change an opinion if you become convinced your
9   opinion is erroneous.  But do not surrender your honest
10  convictions as to the weight or effect of evidence solely
11  because of the opinions of your fellow jurors.

12          Because it is essential that every juror consider all
13  the facts and arguments before reaching a decision, all of you
14  must be present in order to deliberate.  If any juror takes a
15  break during the course of your deliberations, all of you must
16  stop discussing the case until the jurors who are taking a
17  break return.

18          Similarly, if any juror arrives late in the morning,
19  you may not commence your deliberations until all 12 of you are
20  present.  For your deliberations, you will be provided with
21  copies of this instruction I am currently giving you, copies of
22  the indictment.  There will be one verdict sheet.  I'm going to
23  send in the documentary evidence that was received in
24  evidence -- the documentary exhibits that were received in
25  evidence.

G9LVROD3

1          If you want any of the testimony read, you can also

2     request that.  Please remember that it is not always easy to

3     locate what you might want, so try to be as specific as you

4     possibly can in requesting testimony and portions of testimony.

5          If you want further explanation of the law as I have

6     explained it to you, you may also request that from the Court.

7     If there is any doubt or question about the meaning of any part

8     of this charge, you may ask for a clarification or further

9     explanation.

10          Your requests or any communication you wish to make

11    with the Court should be made in writing, signed by your

12    foreperson, and given to one of the court security officers.

13    Bear in mind that you are never to reveal to any person -- not

14    even to me -- how you, the jury, stand numerically or otherwise

15    on the question before you until after you have reached a

16    unanimous verdict.

17          As I say, again, your decisions must be unanimous; but

18    you are not bound to surrender your honest beliefs concerning

19    the effect or weight of the evidence for the mere purpose of

20    returning a verdict or solely because the opinion of other

21    jurors.  Discuss and weigh your respective opinions

22    dispassionately, without regard to sympathy, prejudice, or

23    favor for either party, and adopt a conclusion that in your

24    good conscience appears to be in accordance with the truth.

25          Some of you have taken notes during the trial.  As I

G9LVROD3

told you at the beginning of the trial, I permit this because
some people find that taking notes helps them focus on the
testimony being given.  But your notes are for your private use
only as a way to help you recall the testimony as you begin
your deliberations.  A juror's notes are not entitled to any
greater weight than the recollection of the juror who did not
take notes.

          Again, each of you must make your own decision about
the proper outcome of this case based on your consideration of
the evidence and your discussion with your fellow jurors.  No
juror should surrender his or her conscientious beliefs solely
for the purpose of reaching a unanimous verdict.

          Your verdict has to be based solely upon the evidence
introduced at trial or the lack of evidence.  It is improper
for you to consider any personal feelings you may have about
the defendant's race, religion, national origin, gender, sexual
orientation, or age.  The parties in this case are entitled to
a trial free from prejudice, and our judicial system cannot
work unless you reach your verdict in fair and impartial
consideration with the evidence before you.

          Your function now is to weigh the evidence in this
case and to determine whether the government has or has not
established Mr. Rodriguez's guilt beyond a reasonable doubt
with respect to each count of the indictment.  You must base
your verdict solely on the evidence and these instructions as

G9LVROD3

1   to the law.  You are obliged by your oath as jurors to follow

2   the law as I instruct you, regardless of whether you agree or

3   disagree with the particular law in question.  Remember at all

4   times you are not partisans, you are judges, judges of the

5   facts.  Your sole interest is to seek the truth from the

6   evidence in this case.

7           I will now consult with the lawyers at the side to see

8   if there's any supplemental instructions they want me to

9   consider.

10          (At the side bar)

11          THE COURT:  Before we start, I want to put on the

12  record that we had a charging conference yesterday.  The basis

13  for the charging conference was the proposed charges the

14  parties had submitted that I circulated to the parties last

15  evening, represents a substantial rendition which is faithful

16  to what the proposed charges were submitted on consent of both

17  parties.

18          Do you have any objections?

19          MS. HOULE:  No, your Honor.

20          MR. HANDWERKER:  No, your Honor.

21          THE COURT:  Thank you very much.

22          (In open court)

23          THE COURT:  Only 12 can deliberate, so at this time

24  I'm going to excuse the alternate jurors, Ms. Eschen and

25  Mr. Jacobs.  So you're excused now with the thanks of the

G9LVROD3

1    Court.  I appreciate your time with us.

2              If you took notes, please leave your notes in the jury

3    room and don't discuss the case.  We have your contact

4    information; we'll let you know what the jury verdict is when

5    they return the verdict.

6              Thank you very much.

7              (Alternates excused)

8              THE COURT:  Marlon, would you swear in the court

9    officer.

10             (Marshal sworn)

11             THE COURT:  We're going to have lunch at what time,

12   Marlon?

13             THE DEPUTY CLERK:  In about ten minutes, Judge.

14             THE COURT:  We'll be serving lunch in ten minutes.

15   You can certainly have lunch.

16             Your schedule for deliberations will be strictly up to

17   you.  All we ask is when you break for the day, that you send

18   us a note indicating what time you want to break.

19             Is there anything else, Marlon?

20             THE DEPUTY CLERK:  No, sir.

21             THE COURT:  Okay.

22             So have your lunch, begin your deliberations.

23             We'll send in the indictment, a couple copies of the

24   indictment, the jury charges, the jury verdict sheet.  We'll

25   assemble the documentary evidence that you can bring in the

G9LVROD3

1      jury room.

2             If there's anything else you need, just send us a

3      note.  Let us know towards the end of the day what your

4      schedule is for deliberations.

5             Tomorrow morning, if you don't reach a verdict today,

6      tomorrow morning we'll have the same -- follow the same plan:

7      Coffee and doughnuts will be available at 9 o'clock in the

8      morning.  You can begin your deliberations when all 12 of you

9      arrive.  Okay?

10             Thank you very much.

11             (At 12:39 p.m., the jury retired to deliberate)

12             THE COURT:  The parties should work together to

13      assemble the documentary evidence, the exhibits that were

14      received in evidence.

15             MS. ESTES:  Yes, your Honor.

16             THE COURT:  One notebook.

17             MS. ESTES:  Yes, your Honor.  We have a notebook.

18             THE COURT:  Make sure Mr. Handwerker agrees there's

19      nothing in those books that is not received in evidence that's

20      going into the jury room.

21             MS. ESTES:  Yes, your Honor.  We will confer with

22      Mr. Handwerker.

23             Your Honor, would you like the physical exhibits to go

24      back as well or just the notebook?

25             THE COURT:  No, not the physical exhibits.

G9LVROD3

1          MS. ESTES:  Thank you, your Honor.

2          THE COURT:  If they want the physical exhibits, they

3    can ask for them.

4          THE DEPUTY CLERK:  We are sending into the jury room

5    one copy of the verdict form, 12 copies of the indictment, and

6    12 copies of the jury charge.

7          MS. ESTES:  Thank you.

8          THE DEPUTY CLERK:  You're welcome.

9          MS. HOULE:  Your Honor, would you like us to put on

10   the record that the parties have agreed on the document exhibit

11   binder?

12         THE COURT:  Yes.

13         MS. HOULE:  We've agreed.

14         MR. HANDWERKER:  We have.

15         THE COURT:  Congratulations.

16         MS. HOULE:  Thank you.

17         THE COURT:  We're going to give the agreed-upon

18   exhibits to the court officer and the court officer will bring

19   it to the jury room.

20         MS. HOULE:  Thank you.

21         (Recess pending verdict)

22         (At 1:31 p.m., a note was received from the jury)

23         THE COURT:  We have a note from the jury.

24         Message:  Testimony of Antoinette Guzman.  It's signed

25   by -- print name and juror number, Judith Woods, No. 5.  This

G9LVROD3

note came in at 1:31.

          I'm going to -- Marlon, give that to the parties.

          You've seen it already?

          MS. ESTES:  Yes, your Honor.

          MR. HANDWERKER:  Yes.

          THE COURT:  Mr. Handwerker, you want to see it again?

          MR. HANDWERKER:  No, thank you.

          THE COURT:  Now, Ms. Guzman's testimony starts at --
Ms. Houle examines him starting at page 199, and it goes to
page 207.  Mr. Handwerker starts at 207 and goes to 210.

          What I would propose to do, rather than reading it to
them, is just give them pages 199 to 210.

          MS. ESTES:  That's fine with the government, your
Honor.

          MR. HANDWERKER:  Judge, if it's not an inconvenience,
we would prefer that the jury come out.

          THE COURT:  Okay.  Marlon.

          Do you want the court reporter to read it back?  The
court reporter will read back the testimony.

          MR. HANDWERKER:  That's fine.

          MS. ESTES:  Your Honor, may we confirm that if there
were objections that were sustained, those questions won't be
read?

          THE COURT:  Where are the objections?

          MS. ESTES:  One moment.

G9LVROD3

1          They are on page 210, line 21 -- or line 18.

2          (Jury present)

3          THE COURT:  We have your note asking for Ms. Guzman's

4  testimony.  Ms. Guzman's testimony starts at page 199, at line

5  5, that's the examination by Ms. Houle.  Mr. Handwerker's

6  examination starts at page 207 and goes till page 210 at line

7  17.

8          I'll ask the court reporter, Martha Martin, to take

9  the witness stand and read it back.

10          (Record read)

11          THE COURT:  Exhibit 800, which is in the jury room,

12  was also introduced into evidence during Ms. Guzman's

13  testimony.  That's the agreement between Mr. Rodriguez,

14  Mr. Handwerker, and the U.S. Attorney's Office over the context

15  of the discussion we were having.  Okay?

16          You can resume your deliberations.

17          Thank you very much.

18          (Jury resumed deliberations; time noted:  2:06 p.m.)

19          THE COURT:  Everybody stay close to your phones.

20          MS. ESTES:  We will, your Honor.

21          (Recess pending verdict)

22          (Jury present)

23          THE COURT:  Have you reached a verdict?

24          THE FOREPERSON:  Yes.

25          THE DEPUTY CLERK:  In the matter of *United States of*

G9LVROD3

1    *America v. Michael Earl Rodriguez*, docket number 15 CR 756.

2              You can open it up.

3              Count One.

4              No. 1.  As to Count One, how do you find the

5    defendant, guilty or not guilty?

6              THE FOREPERSON:  Guilty.

7              THE DEPUTY CLERK:  1A.  Was the controlled substance

8    involved in the conspiracy in Count One marijuana?

9              THE FOREPERSON:  Yes.

10             THE DEPUTY CLERK:  Count Two.

11             As to Count Two, how do you find the defendant, guilty

12   or not guilty?

13             THE FOREPERSON:  Not guilty.

14             THE COURT:  Do you want the jury polled?

15             MS. ESTES:  No, your Honor.

16             MR. HANDWERKER:  No, Judge.

17             THE COURT:  All right.

18             Well, thank you very much.  I never comment on the

19   jury's verdict.  As I told you in my instructions, the jury

20   verdict, that's your business.  But I appreciate your

21   promptness, your attention to the facts here.  You were paying

22   close attention to the instructions and you're discharged now

23   from jury service.  Each of you will get a letter.  I think

24   you're exempt now from jury service for how long, Marlon?

25             THE DEPUTY CLERK:  Four years.

G9LVROD3

1          THE COURT:  Four years.

2          So thank you again.

3          The lawyers may want to talk to you.  It's up to you.

4   If you wish to talk to the lawyers, you can stay in the jury

5   room.  If you don't want to talk to them, you don't have to;

6   but if you want to, you're certainly welcome to.

7          So thank you again.  I appreciate your service.  It's

8   been very valuable.

9          (Jury discharged)

10          THE COURT:  Do you want to make motions,

11   Mr. Handwerker?

12          MR. HANDWERKER:  I'll waive motions, Judge.  I'll

13   reserve.

14          THE COURT:  What are the guidelines on Count One?

15          MS. ESTES:  Your Honor, we don't have a current

16   calculation at this time.

17          THE COURT:  Give me an approximation.

18          MS. ESTES:  I believe the high end would be over 16

19   months.

20          THE COURT:  Over?

21          MS. ESTES:  Over 16 months.

22          THE COURT:  16, one six?

23          MS. ESTES:  16, one six.

24          THE COURT:  Six zero?

25          MS. ESTES:  One six.

G9LVROD3

```
 1              MR. HANDWERKER:  No, one six.
 2              THE COURT:  How long has Mr. Rodriguez been detained?
 3              MS. ESTES:  Thirteen months.
 4              MR. HANDWERKER:  Thirteen months.
 5              THE COURT:  And the high end is 16?
 6              MS. ESTES:  It would be over 16.
 7              I believe the plea offer, which contained acceptance
 8     points and which is before we believe we proved greater weight,
 9     the high end of the guidelines with that offer was 16 months.
10              MR. HANDWERKER:  Judge, if I may, the range there was
11     10 to 16 months, and he's got 13 months in.
12              THE COURT:  We ought to set a date for sentencing as
13     quickly as possible.
14              MS. ESTES:  That's fine, your Honor.
15              THE COURT:  Marlon, how quickly can we do this?
16              THE DEPUTY CLERK:  If we're asking for a PSR to be
17     done, in about six weeks.
18              THE COURT:  Mr. Handwerker?
19              MR. HANDWERKER:  Judge, I would ask that the defendant
20     be released on bond at this time.
21              THE COURT:  No, not after a conviction.  I'm willing
22     to expedite the PSR as much as I possibly can.
23              MR. HANDWERKER:  Can I have a late October date or
24     early November?
25              THE DEPUTY CLERK:  Monday, October 31st.
```

G9LVROD3

1          MR. HANDWERKER:  October 31st?

2          THE COURT:  Yes.

3          MR. HANDWERKER:  That's fine.

4          THE DEPUTY CLERK:  4:30 p.m. on the 31st.

5          THE COURT:  Now, probation is going to expedite this

6    report so it's ready by October 31st.  Everybody has to

7    cooperate.  I know it's in your interest to cooperate,

8    Mr. Handwerker.  It would be in the government's interest to

9    cooperate as well.  So everybody can, if they do what they are

10   supposed to, respond properly to probation.  We'll get the

11   report and we'll do the sentencing on October 31st at what

12   time?

13         THE DEPUTY CLERK:  4:30 p.m., your Honor.

14         THE COURT:  You're waiving any motions,

15   Mr. Handwerker?

16         MR. HANDWERKER:  Yes, I am, Judge.

17         THE COURT:  Anything else to do?

18         MS. ESTES:  No.  Thank you, your Honor.

19         THE COURT:  Thank you very much.

20         MR. HANDWERKER:  Sincere thanks, Judge, you and your

21   staff.

22         THE COURT:  Okay.  Well, my staff is very good.  They

23   try to please.

24         MR. HANDWERKER:  They are.

25         THE COURT:  Thank you.    (Trial concluded)